UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ZACK WARD,<br><br>                          Plaintiff,<br><br>   – against –<br><br>NATIONAL ENTERTAINMENT COLLECTIBLES<br>ASSOCIATION, INC. AND JOEL WEINSHANKER,<br><br>                        Defendants. | ECF Case<br><br>Jury Trial Demanded<br><br><u>AMENDED COMPLAINT</u><br><br>Case #: 10-cv-3403 (FSH)(PS) |

The Plaintiff, by and through his undersigned attorneys, alleges upon knowledge as to himself and his own acts, and as to all other matters upon information and belief, and brings this Amended Complaint against the above-named Defendants, and in support thereof alleges the following:

## PRELIMINARY STATEMENT

1.      This action is brought by the Plaintiff, Zack Ward (the "Plaintiff"), the actor who portrayed the character "Scut Farkus" in A CHRISTMAS STORY (Metro-Goldwyn-Mayer ("MGM") 1983) (the "Movie").  The Plaintiff seeks monetary damages and injunctive relief against the Defendants for Fraud (Cal. Civ. Code §§ 1709-1710); Common Law Fraud, violation of the Lanham Act (15 U.S.C. § 1125(a)), Misappropriation of Likeness (Cal. Civ. Code § 3344), Common Law Right to Privacy and Breach of Contract related to the Defendants' manufacture and sale of consumer products using the Plaintiff's likeness and image.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1332 and 1338(a) and (b), and Section 43(a) of the Lanham Act.

3.      This Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Defendant is a New Jersey corporation and its principal place of business is located within this District.

## PARTIES

5.      The Plaintiff, Zack Ward, is an individual residing at 12312 Collins Street, Valley Village, California 91607.

6.      The Defendant, National Entertainment Collectibles Association, Inc. ("NECA"), is a New Jersey corporation with a principal place of business located at 603 Sweetland Ave, Hillside, New Jersey 07205.

7.      The Defendant, Joel Weinshanker ("Weinshanker"), is an individual who resides at 4 Bushkill Dr., Livingston, New Jersey 07039.  ("NECA" and "Weinshanker" are collectively referred to as the "Defendants").

8.      Weinshanker is NECA's sole shareholder.

## FACTUAL ALLEGATIONS

9.      In 1983, when the Plaintiff was thirteen (13) years old, he entered into an agreement with Christmas Tree Films, Inc. ("Christmas Tree Films") to play the character Scut Farkus in the Movie.

10.     The Plaintiff, a resident of Canada at the time, was a member of the Alliance of Canadian Cinema, Television and Radio Artists ("ACTRA").

11.     ACTRA is a Canadian labor union representing performers in English-language media.

2

12.     The contract with Christmas Tree Films used ACTRA's standard "Performer Contract for Independent Production – Documentary, Industrial, Non-Documentary Productions" contract and was signed by the Plaintiff's mother, Pam Hyatt.

13.     The Plaintiff's mother also signed a Parental Agreement with Christmas Tree Films because of the Plaintiff's status as a minor.

14.     The ACTRA contract did not give Christmas Tree Films merchandising rights, namely, the right to use the Plaintiff's likeness or image for the purpose of producing consumer products related to the Movie ("Merchandising Rights").

15.     The Plaintiff was the only major character from the Movie who was a resident of Canada and a member of ACTRA.

16.     The Plaintiff was paid approximately $5,000 to play the Scut Farkus character.

17.     The American version of ACTRA is known as the Screen Actors Guild ("SAG").

18.     Based upon information and belief, the SAG contracts signed by the other major cast members granted Christmas Tree Films Merchandising Rights.

19.     As a result of the difference between the SAG and ACTRA contracts, the Plaintiff is the only major character from the Movie who retained Merchandising Rights.

### *"A Christmas Story" – the Background*.

20.     The Movie was initially released by MGM in movie theatres a week before Thanksgiving in 1983.

21.     The Movie had gross earnings of just over $19.2 million during its theatrical run.

22.     In 1986, Ted Turner's Turner Entertainment Company, Inc. ("Turner Entertainment") bought MGM's film and television library, including the rights to the Movie.

23.     In the late 1980s and early 1990s, the Movie began airing on Turner's SuperStation WTBS and Superstation WGN

24.     In 1996, Time Warner, Inc. ("Time Warner") purchased Turner Entertainment and currently owns the rights to the Movie.

25.     Due to the increasing popularity of the Movie, in 1997 Turner's TNT network began airing a 24-hour marathon of the Movie twelve consecutive times beginning at 7 or 8 p.m. on Christmas Eve and ending Christmas Day.

26.     By 2005, TBS reported that 45.4 million viewers had tuned into the Movie's 24-hour marathon.

27.     In 2007, new all-time ratings records were set, with the highest single showing (8 p.m. Christmas Eve) drawing 4.4 million viewers.

28.     Viewership increased again in 2008, with 8 p.m. Christmas Eve drawing 4.5 million viewers, and 10 p.m. drawing 4.3 million, and 54.4 million total.

29.     In 2009, the Movie aired on TBS during a 24 hour marathon on Christmas Eve. The first viewing at 8 p.m. EST on Christmas Eve beat the major broadcast networks (NBC, ABC, CBS, and FOX).

### *NECA and WBCP Enter into Agreement to Make Consumer Products*.

30.     On April 25, 2003, Warner Bros. Consumer Products ("WBCP"), a division of Time Warner and NECA entered into a product license agreement (the "2003 Agreement") whereby NECA was permitted to manufacture and sell six (6) products related to the Movie: 1) Bobbling Head Dolls; 2) Collectible Action Figures; 3) Lunchboxes; 4) Leg Lamps; 5) Ball Ornaments (Boxed set of four); and 6) Decorative Lights.

31.     The 2003 Agreement allowed NECA to manufacture and sell the six (6) products related to the Movie from February 1, 2003 through December 31, 2005.

32.     The 2003 Agreement required NECA to "strictly comply and maintain compliance with … the rights of approval" prior to any goods being "**manufactured, sold, distributed or promoted by [NECA] without prior written approval**." (emphasis added).

33.     The 2003 Agreement stated that any Licensed Products not "approved in writing shall be deemed unlicensed and shall ***not be manufactured or sold***." (emphasis added).

34.     By letter dated November 24, 2003, the 2003 Agreement was amended to allow NECA to produce twelve (12) additional products (for a total of eighteen (18)) related to the Movie: 7) Figural Ornaments (non-human only); 8) Mini Christmas Trees with Ornaments (non-human only); 9) Snow Globes; 10) Statues; 11) Night Lights; 12) Playing Cards; 13) Votives; 14) Mugs; 15) Steins; 16) Clocks; 17) Watches; and 18) Posters.

35.     The November 24, 2003 letter also extended the term of the 2003 Agreement until December 31, 2006.

36.     By letter dated March 8, 2005, the 2003 Agreement was amended to allow NECA to produce two (2) additional products (for a total of twenty (20)) related to the Movie; 19) Board Games; and 20) Outdoor Airblown Inflatables.

37.     The nineteenth (19th) product, the Board Games, is the gravamen of the Plaintiff's complaint against the Defendants.

*__The Defendants Manufactured and Sold Unauthorized Board Games__*.

38.   On September 8, 2005, the Defendants submitted a prototype of the Board Game to WBCP.

39.   On October 6, 2005, WBCP responded to the Defendants with the following comments:

> Concept is not approved.   …Per Legal Affairs: Please identify these actors preferably both by name of the actor and the name of the character they portrayed so that WBCP can confirm whether or not we have merchandising rights.

40.   On February 17, 2006, Carmella Jones, a Director of Studio Licensing for WBCP ("Ms. Jones") sent the following email to Weinshanker:

> When we were in your showroom I saw the board game.  In Cyber we've only seen the packaging, can you please send a prototype so we can review gameplay and board?

41.   Weinshanker replied to Ms. Jones the same day stating, "I will make sure we get you a game prototype next week."

42.   On March 8, 2006, Ms. Jones emailed Weinshanker asking "where is the board game?"

43.   On March 9, 2006, Weinshanker replied to Ms. Jones and said he would send her the prototype of the board game that day.

44.   On March 24, 2006, Ms. Jones sent the following email to Weinshanker:

> Hi Joel,
>
> Please be advised that unless we see and approve the Christmas Story board game that we requested two months ago – you are not authorized to ship product to retail.  We initially only received a concept and never received the actual play pattern concept.  Once received, we may have creative comments/revisions that you understand you will need to incorporate into the product before production.
>
> Thank you for your immediate attention to send this to me to arrive by 3/29.

45.     Despite Ms. Jones explicit instructions not to manufacture the Board Game because it was not approved by WBCP, the Defendants had Enseng (Hong Kong) Limited ("Enseng") manufacture the Board Game in China.

46.     On August 12, 2006 and August 13, 2006, Enseng shipped a total of 4,984 Board Games directly to NECA

47.     On August 22, 2006, Enseng shipped 5,016 Board Games to the retailer Borders Group, Inc. ("Borders") FOB Hong Kong.

48.     NECA invoiced Borders for the 5,016 Board Games on August 24, 2006.

49.     Beginning on August 30, 2006, the Defendants began to sell and ship the 4,984 Board Games that Enseng shipped directly to NECA to their customers.

50.     On September 13, 2006, Lee Speidel, a Senior Account Executive with WBCP ("Ms. Speidel"), sent Weinshanker the following email:

> Joel,
>
> I am concerned that I still haven't heard back from you on the approvals for the game.  You can not ship this product without approval from the actor who plays Scott Farcus [sic].  Please send me a formal letter that indicates you have secured approval.  I will be out of the office stating [sic] tomorrow through 10/2. However, it's imperative that you send this letter. In my absence, please send to Kathleen Wallis - so she can give to our legal dept.

### *The ACTRA v. SAG Contract Causes the Defendants a Big Problem.*

51.     Based upon information and belief, at the time the first 10,000 unauthorized of "grey market" Board Games were manufactured and shipped to NECA and Borders, Weinshanker was not aware of the nuances between the ACTRA and SAG contracts and did not know that WBCP did not have merchandising rights for the Scut Farkus character.

52.     As a result, the Defendants were caught in a dilemma because the Defendants had already manufactured and shipped 10,000 "grey market" Board Games and had not even spoken

7

to the Plaintiff about his approval.

53.     The Defendants decided to provide WBCP with one of the "grey market" Board Games as its final prototype on October 25, 2006.

54.     On October 27, 2006, WBCP responded to the Defendants as follows:

Sample needs revisions. 1.  Please omit the Scut Farcus [sic] pieces (or provide proof that you have secured the rights to use his likeness).  We are not allowed to licensee [sic] his likeness (Zack Ward).

55.     WBCP also requested the following revision to the Board Game's box:

Please update the WB SHIELD's legal notice.  It should read: WB SHIELD: TM & © Warner Bros. Entertainment Inc. (s06).

56.     Because WBCP required a revision to the WB logo on the back of the box, the 10,000 "grey market" Board Games manufactured and sold by the Defendants can be identified by the (s05) v. (s06) legal notice and by the placement of the legal notice on the back of the box.

57.     In fact, the Plaintiff is in possession of one of the "grey market" Board Games.

***The Defendants' Contact the Plaintiff to Fraudulently Obtain His Approval for the Board Game***.

58.     After receiving WBCP's comments to the Defendants' final prototype of the Board Game, the Defendants were in a quandary -- 5,016 Board Games had been manufactured and shipped to Borders in August, and the other 4,984 Board Games were manufactured and shipped to NECA to be sold by the Defendants to their customers.

59.     Coincidentally, Scott Schwartz ("Mr. Schwartz"), the actor who played the character "Flick" in the Movie, was at the Defendants' offices on October 27, 2006, the day that WBCP provided Weinshanker with its final comments to the Board Game.

60.     During that visit, Weinshanker asked Mr. Schwartz if he knew how he could get in touch with the Plaintiff.

8

61.     Because Mr. Schwartz and the Plaintiff had remained in touch since they worked together on the Movie, Mr. Schwartz provided Weinshanker with the Plaintiff's phone number and Weinshanker called the Plaintiff from the Defendants' offices on October 27, 2006.

62.     This was the first time that Weinshanker and the Plaintiff discussed licensing the Plaintiff's likeness for any consumer products.

63.     During their conversation, Weinshanker told the Plaintiff that NECA wanted to manufacture and sell a 7" Scut Farkus action figure (the "Scut Farkus Action Figure").

64.     During their conversation, Weinshanker made no mention of the Board Game.

65.     The Plaintiff agreed that he would enter into a written licensing agreement to allow NECA to use his likeness to manufacture and sell the Scut Farkus Action Figure.

66.     Weinshanker advised the Plaintiff that he would send him a written licensing agreement for his review and signature.

67.     A few weeks later, on November 14, 2006, NECA and WBCP entered into a Product License agreement that superseded and replaced the 2003 Agreement (the "2006 Agreement").

68.     The term of the 2006 Agreement allowed NECA to manufacture and sell consumer products related to the Movie from January 1, 2007 through December 31, 2008.

69.     On November 18, 2006, Enseng shipped 5,000 Board Games to the Defendants.

70.     On December 11, 2006, Enseng shipped 5,000 Board Games to the Defendants.

71.     On December 20, 2006, almost two months after their initial and only discussion, the Plaintiff received a written license agreement from Weinshanker (the "NECA Ward Agreement").

72.     The Plaintiff signed and faxed the NECA Ward Agreement to the Defendants on

9

December 20, 2006 at 1:14 p.m. EST not knowing that 20,000 Board Games had been manufactured and shipped from China.

73.     Twelve minutes later, at 1:26 p.m., Weinshanker sent an email to Ms. Speidel saying only "Here is a copy…" and attached a copy of the NECA Ward Agreement.

74.     On December 21, 2006 at 10:38 a.m., Ms. Speidel sent an email to several of WBCP's employees stating:

> Attached please find for your files a copy of the agreement between NECA and Zack Ward (Scut Farcus [sic], A Christmas Story) for Zack's participation (likeness approval) in the Christmas Story board game.
>
> NECA has also secured the rights to develop additional product, including but not limited to figures and bobblehead, using the character played by Zack for an agreed upon fee.   NECA will be the only licensee utilizing this character on product.

75.     Despite what the Defendants led Ms. Speidel to believe, the Plaintiff did not provide his likeness approval for the Board Game because he was unaware of the Board Game's existence.

***The Terms of the NECA Ward Agreement***.

76.     Paragraph 4 of the NECA Ward Agreement states that:

> Royalties (and related itemized statements) shall be due and payable within thirty (30) days following the end of the preceding quarter during the term of the Agreement.    NECA will send Licensor itemized statements every quarter, regardless of whether royalties have accrued during that period.  Payments shall be made in the form of a business check, made payable to: Zack Ward.

77.     Paragraph 12 of the NECA Ward Agreement states that:

> Licensor will have the right of approval, in advance, of all items to be produced by NECA hereunder.  We will supply you with color comps, and a pre-production sample of each Authorized Product prior to manufacture for your approval.  You will reply within 8 business days with your approval, disapproval, or changes.  If a reply is not given within 8 business days, we will send a reminder and if you have not responded within 2 business days following the receipt of such notice,

the sample will be deemed approved, and we will move on to the next level of sample (if pre-production sample is approved, then we will move to production).

78.     Paragraph 1 of the NECA Ward Agreement provided that the term of the agreement was "to December 31, 2008".

79.     Paragraph 15 of the NECA Ward Agreement provides that the agreement "is entered into in California and California law is controlling."

### *The Defendants' Performance (or Lack Thereof) After Execution of the NECA Ward Agreement.*

80.     The Defendants did not provide one quarterly royalty report to the Plaintiff as required by the NECA Ward Agreement.

81.     The Defendants did not send one quarterly royalty check to the Plaintiff as required by the NECA Ward Agreement.

82.     The Defendants did not send the Board Game to the Plaintiff for his approval prior to its manufacture and sale as required by the NECA Ward Agreement.

83.     In fact, Weinshanker acted as if the NECA Ward Agreement did not exist.

84.     On or about March 8, 2010, the Plaintiff, through counsel, contacted Weinshanker and NECA via United States Certified Mail and via facsimile and requested a full accounting of all Scut Products sold.

85.     NECA failed to respond to the March 8, 2010 letter.

86.     Thereafter, on July 3, 2010, the Plaintiff commenced the instant action seeking damages related to sales of the Scut Farkus Action Figures.

87.     However, at the time the Plaintiff commenced this action, he had no idea that sales of the Scut Farkus Action Figures only accounted for 9.6% of the total sales the Defendants generated using the Plaintiff's image and likeness.

***The Defendants' Fraudulent Conduct After the Initiation of Litigation.***

88.    On August 3, 2010, the Defendants filed an Answer to the Plaintiff's Complaint.

89.    Attached to their Answer is Exhibit "A" which purports to be a "Product Profit Report" for three products: 1) the Board Game; 2) the Scut Farkus Action Figure; and 3) the Box Set of Action Figures (containing the characters Flick, Randy, Ralphie and Scut Farkus).

90.    The Product Profit Report was the first time the Defendants provided any information to the Plaintiff about the use of his likeness or image on the Board Game.  In fact, prior to receiving the Defendants' Answer, the Plaintiff had no idea that the Defendants had even manufactured and sold a Board Game based on the Movie.

91.    According to the Defendants' Product Profit Report, the gross sales related to the Board Game amounted to $755,553.67 and the Product Profit Report shows a loss related to the Board Game in the amount of $62,336.33.

92.    However, according to the invoices from Enseng to NECA, the Defendants' cost of the Board Game was $2.85 per game, therefore, based upon information and belief, the Defendants actually made approximately $470,000 in profits from the sale of the Board Games.

93.    Based upon information and belief, the Defendants prepared and submitted an inaccurate Product Profit Report as Exhibit "A" to their Answer in order to attempt to cover up their wrongdoing related to the manufacture and sale of the Board Games.

***The Fraudulent Quarterly Royalty Reports.***

94.    On September 27, 2010, the Defendants provided the Plaintiff's counsel with quarterly royalty statements from October 1, 2006 to December 31, 2008 (the "Ward Royalty Reports").

12

95.     On October 20, 2010, the Parties appeared at a conference in the instant matter during which Weinshanker made several misleading statements regarding the manufacture and sale of the Board Games, including that fact that only a "few" of the Board Games were sold after 2008.

96.     In reality, NECA shipped almost 16,000 Board Games to Rite Aid in August, 2009 pursuant to purchase orders Rite Aid issued to the Defendants in April, 2009.

97.     On or about November 24, 2010, the Defendants produced copies of the royalty reports that they provided to WBCP (the "WBCP Royalty Reports").

98.     The table below compares the Ward Royalty Reports to the WBCP Royalty Reports.

| Period | Sales Reported to WB | Sales Reported to Ward | Difference |
|---|---|---|---|
| 7/1/06 TO 9/30/06 | $75,656.32 | $0.00 | $75,656.32 |
| 10/1/06 TO 12/31/06 | $86,272.80 | $161,929.32 | ($75,656.52) |
| 1/1/07 TO 3/31/07 | $6,362.70 | $6,362.70 | $0.00 |
| 4/1/07 TO 6/30/07 | $12,224.10 | $12,224.10 | $0.00 |
| 7/1/07 TO 9/30/07 | $80,677.30 | $80,677.30 | $0.00 |
| 10/1/07 TO 12/31/07 | $76,566.00 | $76,566.00 | $0.00 |
| 1/1/08 TO 3/31/08 | $66.00 | $66.00 | $0.00 |
| 4/1/08 TO 6/30/08 | $151.60 | $151.60 | $0.00 |
| 7/1/08 TO 9/30/08 | $234,274.44 | $234,274.44 | $0.00 |
| 10/1/08 TO 12/31/08 | $1,989.00 | $183,302.21 | ($181,313.21) |
| 1/1/09 TO 3/31/09 | $2,156.76 | $0.00 | $2,156.76 |
| 4/1/09 TO 6/30/09 | $202.90 | $0.00 | $202.90 |
| 7/1/09 TO 9/30/09 | $152,190.60 | $0.00 | $152,190.60 |
| 10/1/09 TO 12/31/09 | $2,575.16 | $0.00 | $2,575.16 |

99.     As the table above shows, the Defendants prepared the Ward Royalty Reports to mislead the Plaintiff into believing that all sales of Scut Farkus products occurred during the term of the NECA Ward Agreement which ran from December 20, 2006 until December 31, 2008.

100.    The Defendants further attempted to cover up their wrongdoing related to the manufacture and sale of the Board Games by only producing one page of each quarterly WB Royalty Report to the Plaintiff.

101.    In response to a third-party subpoena to WBCP in this matter, on or about March 24, 2011 WBCP produced a copy of the quarterly royalty reports the Defendants provided to WBCP.

102.    Attached as page 3 to the quarterly royalty reports the Defendants provided to WBCP is a character likeness schedule showing which characters from the Movie appeared on consumer products sold during that quarter.

103.    The following characters are listed on the character likeness schedule from July 1, 2006 to September 30, 2008:  Ralphie, Mom, Old Man, Flick, Randy.

104.    The character Scut Farkus appears for the first time on the October 1, 2008 to December 31, 2008 character likeness schedule.

105.    On September 2, 2008, Kam Yuen Toys Manufactory Ltd. shipped the Defendants 1,800 Scut Farkus Action Figures and 2,400 Boxed Sets and on September 9, 2009, Kam Yuen shipped the Defendants 3,000 Scut Farkus Action Figures and 2,400 Boxed Sets.

106.    Based upon information and belief, the Defendants purposefully omitted the Licensee Character Likeness Summary from the documents produced to the Plaintiff during discovery in an attempt to conceal their wrongdoing related to the manufacture and sale of the

Board Games.

### *The Defendants' Use of the Plaintiff's Image on the Board Game.*

107.    It was not until early December, 2010 that the Plaintiff actually obtained one of the Board Games.

108.    The Plaintiff's image from the Movie appears on 21 of the 36 card "Question Deck"

109.    The Plaintiff's image from the Movie appears on 12 of the 75 card "Game Deck".

110.    The Plaintiff's image from the Movie appears on the back of the Board Game's box.

### *The Board Game was so Bad the Defendants Ceased Production.*

111.    Based upon information and belief, WBCP received so many complaints regarding the quality of the Board Game that the Defendants were told by WBCP to stop manufacturing and selling the Board Game.

112.    For example, of the 36 reviews of the Board Game on Amazon.com's website, 25 people rated the Board Game 1 out of 5 stars and 8 more rated the Board Game 2 out of 5 stars.

113.    The reviews of the Board Game contain the following comments:

a.      "Like others have said, this has got to be the worst board game ever produced, and if I could give it 0 stars, I would."

b.      "I don't recommend anyone buy this game. Very disappointing."

c.      "I just wanted to add my voice to the chorus of bad reviews to hopefully help hammer home the point to other consumers that they SHOULD NOT buy this game. The instructions are absolutely impossible to decipher, the layout of the board is bizarre ... it's just a train wreck. The designer must have been a mental patient. All of the other reviewers who said the manufacturers must never have play-tested the game are definitely right. Whomever controls the rights to "A Christmas Story" should be genuinely peeved at this blight on their brand name, and should never have allowed this unplayable mess to hit the stores. Five

minutes with this game and there's no question that it's nothing more than garbage churned out without even the merest effort at quality, mass-produced and relying wholly on the "Christmas Story" name to sell it."

d.      "THIS is the biggest POS game in history."

e.      "The worst game ever, I can't even give this game one stinking star."

f.      "World's worst rip-off.  This is the worst rip-off of a game made off a such a wonderful movie. If you could get through being able to understands the horrific instructions, you would then identify how terrible the game is. It was just slapped together sponging off the movie. This game is going in the trash as it's not worth the space in my house. Many other reviews go into more detail how bad this game really is."

g.      "Wow this game was bad. I mean REALLY bad…"A Christmas Story" game is the Hindenburg of board games. "Oh the humanity" … Like others who have commented about this lousy excuse for home entertainment, we thought the misunderstanding was on our end. It was not.  After slogging through the first two pages of incomprehensible directions, I actually thought the game was a joke, like an April Fools Day prank. It was not. Luckily, we purchased the game for $1 at a garage sale. We overpaid. Next time, I hope "A Christmas Story" board game manufacturers think twice before nearly ruining our favorite holiday movie."

h.      "As true fans of the movie...we were all very disappointed in the game. I would not recommend anyone buy it. The manufacturers should rethink it."


### CAUSES OF ACTION

### COUNT I
### FRAUD
### (California Civil Code §§ 1709-1710)

114.    The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

115.    Cal. Civ. Code § 1709 states, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

116.    A willful deception includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."  Cal Civ. Code § 1710(3).

117.    A willful deception also includes "[a] promise, made without any intention of performing it."  Cal Civ. Code § 1710(4).

118.    During the October 27, 2006 telephone conversation with the Plaintiff, Weinshanker willfully deceived the Plaintiff into agreeing in principle to license his likeness for use in producing a Scut Farkus Action Figure when, in reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without WBCP and Plaintiff's knowledge or approval.

119.    During the October 27, 2006 telephone conversation, Weinshanker suppressed the facts about the manufacture and sale of the Board Games in order to mislead the Plaintiff into executing the NECA Ward Agreement.

120.    Weinshanker also made a promise to pay the Plaintiff royalties pursuant to the NECA Ward Agreement when, in reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without WBCP and Plaintiff's knowledge or approval.

121.    At the time Weinshanker executed the NECA Ward Agreement and promised to pay royalties to the Plaintiff, Weinshanker had no intention of *actually* paying the royalties to the Plaintiff as Weinshanker had to conceal from the Plaintiff the fact that the Defendants unlawfully used Plaintiff's image on the Board Game.

122.     Weinshanker intended to deceive the Plaintiff to act in reliance on the promise to pay royalties in order to induce the Plaintiff to execute the Agreement on December 20, 2006.

123.     In reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without the WBCP and Plaintiff's knowledge or approval.

124.     As a result of Weinshanker's deception, the Plaintiff is entitled to actual damages, punitive damage and costs in an amount to be determined at trial; is entitled to void the NECA Ward Agreement and is entitled to an order enjoining the Defendants from manufacturing and/or selling any products using the Plaintiff's image or likeness without the Plaintiff's consent.  The Plaintiff also seeks to have the Defendants destroy all Scut Farkus products in its possession.

**COUNT II**
**COMMON LAW FRAUD**

125.     The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

126.     During the October 27, 2006 telephone conversation with the Plaintiff, Weinshanker willfully deceived the Plaintiff into agreeing in principle to license his likeness for use in producing a Scut Farkus Action Figure when, in reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without WBCP and Plaintiff's knowledge or approval.

127.     During the October 27, 2006 telephone conversation, Weinshanker suppressed the facts about the manufacture and sale of the Board Game in order to mislead the Plaintiff into executing the NECA Ward Agreement.

128.    Weinshanker also made a promise to pay the Plaintiff royalties pursuant to the NECA Ward Agreement when, in reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without WBCP and the Plaintiff's knowledge or approval.

129.    At the time Weinshanker executed the NECA Ward Agreement and promised to pay royalties to the Plaintiff, Weinshanker had no intention of *actually* paying the royalties to the Plaintiff as Weinshanker had to conceal from the Plaintiff the fact that the Defendants unlawfully used Plaintiff's image on the Board Game.

130.    Weinshanker intended to deceive the Plaintiff to act in reliance on the promise to pay royalties in order to induce the Plaintiff to execute the Agreement on December 20, 2006.

131.    In reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without WBCP and the Plaintiff's knowledge or approval.

132.    As a result of Weinshanker's deception, the Plaintiff is entitled to actual damages, punitive damage and costs in an amount to be determined at trial; is entitled to void the NECA Ward Agreement and is entitled to an order enjoining the Defendants from manufacturing and/or selling any products using the Plaintiff's image or likeness without the Plaintiff's consent.  The Plaintiff also seeks to have the Defendants destroy all Scut Farkus products in its possession.

## COUNT III
## FALSE DESIGNATION OF ORIGIN
### (The Lanham Act, 15 U.S.C. § 1125(a))

133. The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

134. 15 U.S.C. § 1125(a) provides, in pertinent part, "[a]ny person who, on or in connection with any goods or services...uses in commerce any word, term, name, symbol, or device, or any combination thereof...which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person…or approval of his or her goods, services, or commercial activities by another person…shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

135. Because the NECA Ward Agreement was induced by fraud, the NECA Ward Agreement is void and the Defendants used, and continue to use, the Plaintiff's image and likeness in a false or misleading way that is likely to cause confusion, mistake and/or deceive as to the Plaintiff's affiliation with the Scut Farkus Products.

136. Weinshanker and NECA knowingly used the Plaintiff's likeness and image without the Plaintiff's consent, even after being advised by WBCP that such use was unlawful.

137. The Defendants' actions constitute a false designation of origin in violation of 15 U.S.C. § 1125(a).

138. As a result of the Defendants' conduct, the Plaintiff is entitled to actual damages, punitive damage, attorney's fees and costs in an amount to be determined at trial; is entitled to void the NECA Ward Agreement and is entitled to an order enjoining the Defendants from manufacturing and/or selling any products using the Plaintiff's image or likeness without the

Plaintiff's consent.  The Plaintiff also seeks to have the Defendants destroy all Scut Farkus products in its possession.

## COUNT IV
## MISAPPROPRIATION OF LIKENESS
### (Cal. Civ. Code § 3344)

139.    The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

140.    Cal. Civ. Code § 3344 states in pertinent part: "[a]ny person who knowingly uses another's…likeness, in any manner on or in products, merchandise, or goods… without such person's prior consent…shall be liable for any damages sustained by the person or persons injured as a result thereof…"

141.    Cal. Civ. Code § 3344 also states that

…in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages.

142.    § 3344 states that:

[i]n establishing such profits, the injured party or parties are required to present proof only of the gross revenue attributable to such use, and the person who violated this section is required to prove his or her deductible expenses. Punitive damages may also be awarded to the injured party or parties. The prevailing party in any action under this section shall also be entitled to attorney's fees and costs.

143.    The Defendants fraudulently induced the Plaintiff to enter into the NECA Ward Agreement rendering the NECA Ward Agreement void.

21

144.    The Defendants used the Plaintiff's image for the purpose of selling the Board Game without the Plaintiff knowledge or consent.

145.    The Defendants used the Plaintiff's likeness for the purpose of selling the Scut Farkus Action Figure without the Plaintiff's consent because the NECA Ward Agreement is void.

146.    Even if the NECA Ward Agreement is not void, the Defendants used the Plaintiff's image for the purpose of selling the Board Games prior to the term of the NECA Ward Agreement and after the expiration of the term of the NECA Ward Agreement.

147.    Even if the NECA Ward Agreement is not void, the Defendants used the Plaintiff's likeness for the purpose of selling the Scut Farkus Action Figures after the expiration of the term of the NECA Ward Agreement.

148.    As a result of the Defendants' conduct, the Plaintiff is entitled to monetary damages equal to the Defendants' profits from the sale of the Board Games and Scut Farkus Action Figures as well as punitive damages, attorney's fees and costs.

## COUNT V
## COMMON LAW RIGHT TO PUBLICITY

149.    The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

150.    The Defendants used, and continue to use, the Plaintiff's image and likeness for their commercial advantage.

151.    The Defendants used, and continue to use, the Plaintiff's image and likeness without the Plaintiff's consent.

152.    As a result of the Defendants' conduct, the Plaintiff is entitled to monetary

damages in an amount to be determined at trial as well as an order enjoining the Defendants from manufacturing and/or selling any products using the Plaintiff's image and likeness without the Plaintiff's consent.

## COUNT VI
## BREACH OF CONTRACT

153.    The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

154.    The Defendants were obligated to comply with the terms of the NECA Ward Agreement by paying royalties to the Plaintiff and accounting to the Plaintiff for sales of Scut Farkus Products.

155.    The Defendants were obligated to comply with the terms of the NECA Ward Agreement by submitting all proposed products to the Plaintiff for approval prior to manufacturing said product.

156.    NECA failed to pay royalties or provide an accounting of its sales of Scut Farkus Products to the Plaintiff.

157.    NECA failed to submit the Board Game to the Plaintiff for his approval prior to manufacturing and selling the Board Game.

158.    The Defendants' conduct is a breach of the NECA Ward Agreement and the Plaintiff is entitled to monetary damages in an amount to be determined at trial as well as an order enjoining the Defendants from manufacturing and/or selling any products using the Plaintiff's image or likeness without the Plaintiff's consent.

23

**WHEREFORE**, the Plaintiff respectfully requests that this Court enter judgment against the Defendants as follows:

    a.   Declare that the NECA Ward Agreement is void;

    b.   Award the Plaintiff the Defendants' profits which are attributable to the sale of Scut Farkus Products;

    c.   Award the Plaintiff actual damages in an amount to be determined at trial;

    d.   Award the Plaintiff punitive damages pursuant to Cal. Civ. Code §§ 1709, 1710, and 3344 by reason of Defendants' deceptive acts and unauthorized use of the Plaintiff's image and likeness;

    e.   Order the Defendants to destroy all Scut Farkus Products in the Defendants' possession and/or control;

    f.   Enjoin, restrain and prohibit the Defendants, their agents, servants, employees, officers, directors, successor and assigns, and all persons, firms and corporations acting in concert or participation with the Defendants or on the Defendants' behalf, from using the Plaintiff's image and/or likeness to produce, manufacture, license, sell, promote and/or ship any Scut Farkus Products;

    g.   Award the Plaintiff costs and reasonable attorney's fees; and

    h.   Award the Plaintiff such other and further relief as the Court may deem just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a trial by jury.

Dated: New York, New York
May 5, 2011

Respectfully submitted,

RANDALL S. NEWMAN, P.C.

By:

Randall S. Newman, Esq. (RN7862)
37 Wall Street, PH D
New York, New York 10005
Tel: (212) 797-3737

*Attorney for Plaintiff,*
*Zack Ward*

25