1    SHEPPARD MULLIN RICHTER & HAMPTON LLP
    KENT R. RAYGOR, Cal. Bar No. 117224
2    BENJAMIN O. AIGBOBOH, Cal. Bar No. 268531
    1901 Avenue of the Stars, Suite 1600
3    Los Angeles, California 90067-6017
    Telephone:  (310) 228-3700
4    Facsimile:  (310) 228-3701
    E-Mail:    kraygor@sheppardmullin.com
5            baigboboh@sheppardmullin.com

6    Attorneys for Defendants
    NATIONAL ENTERTAINMENT
7    COLLECTIBLES ASSOCIATION, INC. and
    JOEL WEINSHANKER

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                WESTERN DIVISION

| | |
|---|---|
| ZACK WARD, | Case No. 2:11-CV-6358 MMM (CWx) |
|        Plaintiff, | **DEFENDANTS' MOTION *IN LIMINE* NO. 1:** |
|        v. | |
| NATIONAL ENTERTAINMENT COLLECTABLES ASSOCIATION, INC., and JOEL WEINSHANKER, | **(1) NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF ROBERT F. VALERIO; AND** |
|        Defendants. | **(2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF.** |
| | [Declarations of Kent R. Raygor and Alexis Mueller and [Proposed] Order lodged concurrently herewith] |
| | Hearing And Pre-Trial Conference<br>Date:   Monday, December 10, 2012<br>Time:   9:00 a.m.<br>Place:   Courtroom of the Hon.<br>          Margaret M. Morrow |
| | FAC Filed:                May 5, 2011<br>Fact Discovery Cut-Off:   Aug. 3, 012<br>Expert Discovery Cut-Off: Sept. 14, 2012<br>Trial:                   Jan. 18, 2013 |

1  TO PLAINTIFF ZACK WARD AND HIS COUNSEL OF RECORD:

2       PLEASE TAKE NOTICE that on December 10, 2012, at 9:00 a.m. or as soon

3  thereafter as this matter may be heard, Defendants National Entertainment

4  Collectibles Association, Inc. and Joel Weinshanker (collectively **"Defendants"**) will

5  and hereby do move the Court pursuant to the United States Supreme Court's decision

6  in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed.

7  2d 469 (1993) and Rule 702 of the Federal Rules of Evidence for an order excluding

8  the expert report and testimony of Plaintiff Zack Ward's (**"Plaintiff"**) proffered expert

9  witness, **Robert F. Valerio**.

10       This Motion is made on the grounds that:  (1) Mr. Valerio is not qualified to

11  testify on the subjects on which he opines; and (2) the opinions rendered by

12  Mr. Valerio are based on speculation, unjustified assumptions, or are otherwise

13  inadmissible.

14       This Motion is based upon this Notice, the Memorandum of Points and

15  Authorities attached hereto, the Declarations of Kent R. Raygor and Alexis Mueller,

16  the *Expert Witness Report of Robert F. Valerio*, the documents produced by Mr.

17  Valerio, the deposition of Mr. Valerio, all pleadings, papers and records on file in this

18  action, and such further written and oral argument as the Court may consider in

19  connection with the hearing on this Motion.

20       This Motion is made following a conference of counsel pursuant to C.D. Cal.

21  Local Rule 7-3, which took place on October 24, 2012.

22  November 9. 2012        SHEPPARD. MULLIN. RICHTER & HAMPTON LLP

23

24                  By    _____

25                           *s/ Kent R. Raygor*

                           KENT R. RAYGOR

26

27                Attorneys for Defendants
             NATIONAL ENTERTAINMENT
      COLLECTIBLES ASSOCIATION, INC. and

28                 JOEL WEINSHANKER

        **MOTION IN LIMINE NO. 1**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................... 1

II.     FACTUAL BACKGROUND ...................................................................... 1

        A.      Plaintiff's Claims. ......................................................................... 1

        B.      Mr. Valerio's Purported Expert Opinions. ................................... 3

III.    THE STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY ........ 4

        A.      The Legal Standard Under *Daubert*. ............................................ 4

                1.      An Expert's Experience And Knowledge Must Fit With The Specific Opinions Offered. ............................................. 6

                2.      An Expert's Opinion Must Be Reliable And Not Speculative. ............................................................. 8

IV.     MR. VALERIO'S *REPORT* AND TESTIMONY MUST BE EXCLUDED ................................................................................. 8

        A.      Mr. Valerio's Testimony Must Be Excluded Because He Is Not A Qualified Economic Damages Expert Under *Daubert*. ............................. 9

        B.      Mr. Valerio's Testimony Must Be Excluded Because He Is Not A Qualified Reasonable Royalty Expert Under *Daubert*. .......................... 10

        C.      Mr. Valerio's Testimony Must Be Excluded Because It Is Unreliable And Completely Speculative. ................................... 16

                1.      Mr. Valerio Has No Foundation For His Opinion Regarding A "Hypothetical" Penalty Royalty Rate For The Board Game. ............................................................. 16

                2.      Mr. Valerio Has No Foundation For His Opinion Regarding A "Hypothetical" Royalty For The Action Figure And Box Set. ............................................................. 24

        D.      Mr. Valerio's Opinion Regarding A "Hypothetical" Royalty Rate For The Action Figure And Boxed Set Should Be Excluded Because It Is Unhelpful To The Trier Of Fact. ............................. 25

MOTION IN LIMINE NO. 1

1

V.   CONCLUSION.................................................................................... 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION IN LIMINE NO. 1

1

TABLE OF AUTHORITIES

2

Page(s)

3

Federal Cases

4

*3000 E. Imperial, LLC v. Robertshaw Controls Co.*
   2010 U.S. Dist. LEXIS 138661 (C.D. Cal. Dec. 29, 2010) ................................. 6

5

6

*A.H.D.C. v. City of Fresno*
   2000 U.S. Dist. LEXIS 23027 (E.D. Cal. Aug. 31, 2000) ............................ 7, 23

7

8

*Berry v. City of Detroit*
   25 F.3d 1342 (6th Cir. 1994) ........................................................... 5, 7, 16

9

10

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) ................................................ 16

11

12

*Broadcort Capital Corp. v. Summa Medical Corp.*
   972 F.2d 1183 (10th Cir. 1992) ........................................................ 6, 14, 15

13

14

*Daubert v. Merrell Dow Pharm.*
   43 F.3d 1311 (9th Cir. 1995) ........................................................... 7, 8, 19

15

16

*Daubert v. Merrell Dow Pharms., Inc.*
   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993) ......................... 4, 5, 6

17

18

*Elrick Rim Co. v. Cheek, et al.*
   195 F. Supp. 496 (S.D. Cal. 1961) ...................................................... 18

19

20

*Faulkner v. Gibbs*
   199 F.2d 635 (9th Cir. 1952) ............................................................. 18

21

*Frazier v. South Florida Cruises, Inc.*
   1991 U.S. Dist. LEXIS 2121 (E.D. Pa. Feb. 21, 1991) ......................... 18

22

23

*Gen. Elec. Co. v. Joiner*
   522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)........................ 8

24

25

*Hathaway v. Bazany*
   507 F.3d 312 (5th Cir. 2007) ............................................................. 7

26

27

*Hynix Semiconductor, Inc. v. Rambus, Inc.*
   2008 WL 73681 (N.D. Cal. Jan. 5, 2008)........................................... 6

28

*Hynix Semiconductor Inc. v. Rambus Inc.*
   2008 U.S. Dist. LEXIS 123822 (N.D. Cal. Jan. 5, 2008)................................ 25

*JMJ Enter., Inc. v. Via Veneto Italian Ice, Inc.*
   1998 WL 175888 (E.D. Pa. Apr. 15, 1998)...........................................................7

*Karnauskas v. Columbia Sussex Corp.*
   2012 U.S. Dist. LEXIS 8988 (S.D.N.Y. Jan. 24, 2012) ................................... 24

*Keegan v. Am. Honda Motor Co.*
   2012 U.S. Dist. LEXIS 91394 (C.D. Cal. June 12, 2012) ...................................4

*Kumho Tire Co. v. Carmichael*
   526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed 2d 238 (1999)............................. 5, 6

*In re Live Concert Antitrust Litig.*
   2012 U.S. Dist. LEXIS 47768 (C.D. Cal. Mar. 23, 2012)...................................4

*Lust v. Merrill Dow Pharms., Inc.*
   89 F.3d 594 (9th Cir. 1996) ........................................................................... 4, 8

*Mesfun v. Hagos*
   2005 WL 5956612 (C.D. Cal. Feb. 16, 2005) ............................................. 8, 16

*Montgomery v. Noga*
   168 F.3d 1282 (11th Cir. 1999) ........................................................................7

*Morin v. McCulloch Corp.*
   2002 WL 34357202 (C.D. Cal. July 3, 2002).....................................................7

*Nationwide Transp. Fin. v. Cass Info. Sys.*
   523 F.3d 1051 (9th Cir. 2008) ....................................................................... 19

*Pecover v. Elec. Arts Inc.*
   2010 U.S. Dist. LEXIS 140632 (N.D. Cal. Dec. 21, 2010)................................7

*Prest v. Jermstad*
   2009 U.S. Dist. LEXIS 101550 (S.D. Cal. Oct. 30, 2009) ................................5

*Sheats v. Bowen*
   318 F. Supp. 640 (D. Del. 1970)................................................................. 8, 22

*Smith Eng'g Co. v. Eisenmann Corp.*
   2000 U.S. Dist. LEXIS 21803 (C.D. Cal. Oct. 25, 2000)............................... 19

MOTION IN LIMINE NO. 1

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*
  427 F. Supp. 2d 1022 (D. Kan. 2006)....................................................................8

*Technology Licensing Corp. v. Gennum Corp.*
  2004 WL 1274391 (N.D. Cal. March 26, 2004).....................................................5

*U.S. Philips Corp. v. KXD Tech., Inc.*
  2007 U.S. Dist. LEXIS 98908 (C.D. Cal. Sept. 17, 2007) ...............................19

*U.S. v. Chang*
  207 F.3d 1169 (9th Cir. 2000) ...............................................................................7

*U.S. v. Cook*
  261 Fed. Appx. 52 (9th Cir. 2007)..........................................................................7

*U.S. v. Fredette*
  315 F.3d 1235 (10th Cir. 2003) ..............................................................................6

*U.S. v. McKenzie*
  2011 U.S. Dist. LEXIS 44078 (C.D. Cal. Apr. 19, 2011) ...................... 4, 5, 6, 10

*U.S. v. Orr*
  692 F.3d 1079 (10th Cir. 2012) ............................................................................16

*Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*
  593 F. Supp. 2d 1153 (S.D. Cal. 2008)...................................................................6

*Venture Corp. v. Wherify Wireless, Inc.*
  2005 U.S. Dist. LEXIS 45968 (C.D. Cal. Sept. 23, 2005) ....................................6

*Waits v. Frito-Lay, Inc.*
  978 F.2d 1093 (9th Cir. 1992) .............................................................................18

*Wang Lab., Inc. v. Mitsubishi Elec. Am., Inc.*
  860 F. Supp. 1448 (C.D. Cal. 1993) ....................................................................18

*Williams v. Lockheed Martin Corp.*
  2011 U.S. Dist. LEXIS 58716 (S.D. Cal. June 1, 2011).......................................19

State Cases

*Cabaniss v. Hipsley*
  114 Ga. App. 367 (Ga. Ct. App. 1966)..................................................................18

Federal: Statutes, Rules, Regulations, Constitutional Provisions

Federal Rule of Evidence 408 ..................................................................... 10

Federal Rule of Evidence 702 .............................................. 5, 6, 7, 8, 10

State: Statutes, Rules, Regulations, Constitutional Provisions

CAL. CIV. CODE § 3344 ............................................................................ 14

Other Authorities

29 C. Wright & V. Gold, FED. PRACTICE AND PROC.: EVID. § 6265 (1997) .............5

MOTION IN LIMINE NO. 1

# I.

## INTRODUCTION

Plaintiff Zack Ward's ("**Plaintiff**") designated expert Robert F. Valerio claims to be an expert in "product licensing", but both his experience and testimony directly contradict his claims of expertise. Mr. Valerio **has no** experience in licensing names or likenesses for use on film-based merchandise—the entire issue in this case. Mr. Valerio's opinion makes this clear, as he engages in rampant speculation—using a completed invented methodology—to arrive at the conclusion that Defendants National Entertainment Collectibles Association, Inc. ("**NECA**") and Joel Weinshanker ("**Weinshanker**") (collectively, "**Defendants**") owe Plaintiff a "reasonable" royalty rate of more than *91%* for the use of a tiny, partial photograph of a character he played as a young boy in a 1983 film on the back of a board game.

# II.

## FACTUAL BACKGROUND

**A.    Plaintiff's Claims.**

In 1983, at the age of 12 or 13, Plaintiff was cast to play the peripheral, subsidiary character "Scut Farkus" in the film *A Christmas Story* (the "**Film**"). [ECF Docket No. 37 (*Am. Complaint*), ¶ 9.] Twenty years later, NECA entered into contracts with Warner Bros. Consumer Products ("**WB**"), whereby NECA was authorized was to produce and sell merchandise based on the Film, including board games. [*Id.* at ¶¶ 30, 34, 36.] According to Plaintiff, those board games serve as "the gravamen of [his] complaint". [*Id.* at ¶ 37.]

Although NECA had the right to sell board games based on the Film, Plaintiff alleges that NECA could not use photographs of the "Scut Farkus" character on any Film-based product without his approval. [*Id.* at ¶¶ 14, 51.] He further alleges that upon being made aware that NECA could not use his image without his approval, Defendant Weinshanker, an officer of NECA, contacted Plaintiff by telephone in October 2006 to obtain his approval for a "Scut Farkus" action figure to be sold by

**MOTION IN LIMINE NO. 1**

1  NECA. [*Id.* at ¶¶ 58-61.]  Weinshanker, on the other hand, testified that his

2  conversation with Plaintiff actually took place much earlier—in late 2005 or early

3  2006—and that NECA obtained the right to produce and sell merchandise using

4  Plaintiff's character's image during that conversation.  [*Declaration of Kent R. Raygor*

5  ("***Raygor Decl.***") ¶ 2, **Ex. A** (Weinshanker Depo.) at 64:14-65:15, 87:24-88:19.]

6  Regardless, Plaintiff claims that Weinshanker never mentioned any other piece of

7  Film-related merchandise other than the "Scut Farkus" action figure.  [ECF Docket

8  No. 37 (*Am. Complaint*) at ¶ 64.]  NECA disagrees and asserts that there were no

9  limits on such use.  [ECF Docket No. 103 (NECA's *Answer*) at ¶¶ 169, 172.]

10      Plaintiff acknowledges that he signed a license agreement with NECA (the

11  "***License Agreement***").  [ECF Docket No. 37 (*Am. Complaint*) at ¶ 72.]  The *License*

12  *Agreement* formalized the agreement Plaintiff and NECA had reached in their late

13  2005 or early 2006 conversation.  [*Raygor Decl.* ¶ 2, **Ex. A** (Weinshanker Depo.) at

14  78:10-79:25.]  Pursuant to the *License Agreement* signed by Plaintiff, NECA was

15  entitled to sell "***All Consumer Products***" (emphasis added) bearing Plaintiff's "names,

16  ***photographs***, ***likenesses***, symbols, emblems and designs" (emphasis added), in

17  exchange for a royalty of 2% of NECA's net profits.  [ECF Docket No. 125-15

18  (*Declaration of Joel Weinshanker Filed in Support of Defendants' Motion for Partial*

19  *Summary Judgment*), **Ex. C** (*License Agreement*) at ¶¶ 1, 3(a), 4.]

20      In his *Amended Complaint*, Plaintiff asserts six causes of action against

21  Defendant NECA:  (1) fraud; (2) common law fraud; (3) false designation of origin

22  [LANHAM ACT, 15 U.S.C. § 1125(a)]; (4) misappropriation of likeness [CAL. CIV.

23  CODE § 3344]; (5) common law right to publicity; and (6) breach of contract.  Only

24  the first two claims are asserted against Defendant Weinshanker.  [ECF Docket No.

25  125-3 (*Declaration of Kent R. Raygor in Support of Defendant's Motion for Partial*

26  *Summary Judgment*), ¶10, **Ex. K** (*Plaintiff's Third Supplemental Response to*

27  *Defendant Weinshanker's Second Set of Interrogatories*, dated July 18, 2012, at

28  Exhibit "A" thereto).]

-2-                    **MOTION IN LIMINE NO. 1**

### B.    Mr. Valerio's Purported Expert Opinions.

Mr. Valerio generally purports to provide testimony "that quantifies the Plaintiff's economic damages in the lawsuit . . . ." [*Raygor Decl.* ¶ 3, **Ex. B** (*Expert Report of Robert F. Valerio*) (the "***Valerio Report***") at p. 1.] In his deposition, however, Mr. Valerio summarized his assignment in the following manner:

"A.  I was asked to write a report based on my knowledge and experience of what would be a reasonable royalty given the facts of this case.  And my determination was that it didn't matter so much about Zack Ward's celebrity or noncelebrity [*sic*] as much as the value of the reasonable royalty ***based on the fact that there was fraud involved***, and what is the reasonable amount that NECA would have paid ***to have fessed up to this and solved it***."

[*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 186:24-187:7 (emphasis added).]  So Mr. Valerio builds his entire opinion on his belief that there must have been fraud, and then, in order to quantify Plaintiff's "economic damages", proceeds to utilize what he later calls a "hypothetical negotiation methodology" [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 17] in order to come up with some number that Defendants would have been paid in this hypothetical negotiation "to have fessed up to this [fraud] and solved it."  That process then leads him to two opinions.

First, as to the board game only, Mr. Valerio opines that "a hypothetical negotiation between the Plaintiff and the Defendants regarding the unauthorized use of the Plaintiff's image on the Board Game would have resulted in the Defendants paying the Plaintiff a royalty in the amount of $345,970.49 . . . ." [*Id.* at pp. 18-19.]  Mr. Valerio's opinion, however, is based on nothing more than his own invention of a hypothetical "penalty royalty rate" methodology [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 83:6-9; 86:20-21; 88:21-22; 181:5-9; 227:20-25; 228:11-13; 230:1-3; 235:15-20; 236:10-17; 238:9-13; 241:18-22; 245:12-18; 280:7-12; 281:15-16; 282:11-13 and 20-23, 284:4-10 and 15-18; 285:4-5 (discussed further below)], which he attempts to explain in Section V(A) of his *Report* but that lacks any foundation.

1       Second, as to the action figures only, Mr. Valerio then acknowledges and

2   adopts the 2% royalty rate contained in his *License Agreement* with NECA as an

3   entirely appropriate royalty rate for the NECA-licensed uses of Plaintiff's photograph

4   and likeness for *A Christmas Story* merchandise, stating that a "2% royalty rate is a

5   reasonable rate for the use of the Plaintiff's likeness" on the action figure and in the

6   boxed set of four action figures, only one of which bears his character's likeness.

7   [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 17.]  Mr. Valerio states that the 2%

8   rate in the *License Agreement* is entirely appropriate for some NECA items, but

9   inexplicably disavows it when it comes to the board game.  [*Id.*]

10                                                        **III.**

11     **THE STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY**

12  **A.**    **The Legal Standard Under *Daubert*.**

13      Federal Rule of Evidence 702 governs the admissibility of expert testimony in

14  federal courts.  *In re Live Concert Antitrust Litig.*, 2012 U.S. Dist. LEXIS 47768, at

15  *12 (C.D. Cal. Mar. 23, 2012); *U.S. v. McKenzie*, 2011 U.S. Dist. LEXIS 44078, at

16  *17 (C.D. Cal. Apr. 19, 2011) (Morrow, J.).  In *Daubert v. Merrell Dow Pharms.,*

17  *Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993), the Supreme Court

18  charged district courts with a "gatekeeping" function to ensure that testimony

19  provided by an expert is both reliable and relevant.  *Daubert*, 509 U.S. at 597;

20  *McKenzie*, 2011 U.S. Dist. LEXIS 44078, at **17-18 ("In the seminal case of

21  [*Daubert*], the Supreme Court identified 'a gatekeeping role for the [trial] judge,' who

22  must determine whether to admit or exclude expert evidence in accordance with Rule

23  702.").  The party proffering the expert testimony bears the burden of proving by a

24  preponderance of the evidence that the expert's testimony is admissible.  *Daubert*, 509

25  U.S. at 592 n.10; *Lust v. Merrill Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996);

26  *Keegan v. Am. Honda Motor Co.*, 2012 U.S. Dist. LEXIS 91394, at *16 (C.D. Cal.

27  June 12, 2012) (Morrow, J.).  Plaintiff comes nowhere near meeting that

28  preponderance of the evidence standard.

**MOTION IN LIMINE NO. 1**

Rule 702 requires that the trial court make an initial determination as to whether the proposed expert qualifies as an expert—*i.e.*, whether the expert has the requisite "knowledge, skill, experience, training, or education" to render an opinion. FED. R. EVID. 702; *McKenzie*, 2011 U.S. Dist. LEXIS 44078, at *18.  When making a preliminary finding of an expert's qualifications, a court must examine the qualifications not "in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also* 29 C. Wright & V. Gold, FED. PRACTICE AND PROC.: EVID. § 6265 (1997) (Rule 702 requires that "the area of the witness's competence matches the subject matter of the witness's testimony."); *Prest v. Jermstad*, 2009 U.S. Dist. LEXIS 101550, at *13 (S.D. Cal. Oct. 30, 2009).

If the court determines a witness is qualified, it then must determine whether the *Daubert* "gatekeeping" requirements are satisfied, *i.e.*, "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.[1]  While *Daubert* dealt with scientific testimony, this "gatekeeping" requirement has been held to apply to all expert testimony.  *See, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed 2d 238 (1999); *McKenzie*, 2011 U.S. Dist. LEXIS 44078, at *20 n.51 ("[W]hether an expert's knowledge is scientific, technical, or specialized, the court must determine if 'the factual basis, data, principles, [or] methods' that underlie the testimony 'ha[ve] a reliable basis in the knowledge and experience of the [relevant] discipline.'") (quoting *Kumho*, 526 U.S. at 149); *Tech. Licensing Corp. v. Gennum Corp.*, 2004 WL 1274391, at *1 (N.D. Cal. March 26, 2004).  As with cases involving scientific testimony, the trial court must determine that a non-scientific

---

[1]  The *Daubert* court provided a list of non-exclusive factors district courts should consider in performing their gatekeeping function:  "(1) whether the theory or technique can be, or has been, tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted by the scientific community."  *McKenzie*, 2011 U.S. Dist. LEXIS 44078, at *19 (citing *Daubert*, 509 U.S. at 593-94).

MOTION IN LIMINE NO. 1

expert's testimony is "properly grounded, well-reasoned, and not speculative." Fed. R. Evid. 702 Advisory Comm.'s Note, 2000 Amend.; *Venture Corp. v. Wherify Wireless, Inc.*, 2005 U.S. Dist. LEXIS 45968, at *2 (C.D. Cal. Sept. 23, 2005).[2]

## 1.   An Expert's Experience And Knowledge Must Fit With The Specific Opinions Offered.

An expert must have experience in the particular area on which he intends to opine. General experience does not suffice. *See, e.g., Broadcort Capital Corp. v. Summa Medical Corp.*, 972 F.2d 1183, 1195 (10th Cir. 1992) (excluding an expert in a case involving a securities clearing firm where, notwithstanding the expert's "general experience and education" in securities law, he had no experience representing large brokerage houses or clearing agents); *Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*, 593 F. Supp. 2d 1153, 1163 (S.D. Cal. 2008) (excluding a purported expert on attorney ethics because, despite the fact that he had over 50 years of general experience, he did not have any specific knowledge or training related to attorney ethics). In addition, while expert testimony may be based on personal anecdotal experiences, in such a case the expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 562 U.S. at 152. A witness "'relying solely or primarily on experience' must 'explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *U.S. v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (citation omitted); *3000 E. Imperial, LLC v. Robertshaw Controls Co.*, 2010 U.S. Dist. LEXIS 138661 (C.D. Cal. Dec. 29, 2010) (same); *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 2008 WL 73681, at *1 (N.D. Cal. Jan. 5, 2008) (same). Expert opinions based on nothing more than the expert's statement of experience fail to

---

[2] The *Daubert* factors may be applied in assessing the reliability of non-scientific opinions, but the determination of whether to apply them is made on a case-by-case basis, as their applicability depends on the particular circumstances of the case. *McKenzie*, 2011 U.S. Dist. LEXIS 44078, at *20 n.51.

MOTION IN LIMINE NO. 1

satisfy Rule 702.  *See, e.g., Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (where expert "offers little more than personal assurances based on his [] experience that his conclusions are so," testimony properly excluded); *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311 (9th Cir. 1995) (opinion based solely on experience does not satisfy *Daubert*); *A.H.D.C. v. City of Fresno,* 2000 U.S. Dist. LEXIS 23027, at *10 (E.D. Cal. Aug. 31, 2000) (expert "opinion based only upon his or her experience is not sufficient to meet *Daubert's* requirements.") (citation and quotation omitted); *JMJ Enter., Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, at *10 (E.D. Pa. Apr. 15, 1998) ("An expert must be able to point to the methods that he applied.  An expert cannot simply base his conclusions on his 'thirty-one years of experience.'").

It is not enough that Mr. Valerio may have some generalized experience, as he states, "in the area of product licensing" (he does not). [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 1.]  Rule 702 requires that he show that his "qualifications provide a foundation for [him] to answer *a specific question*," namely, in this case: What is the reasonable royalty for the use of an image of a peripheral, subsidiary film character on merchandise based on that film?  *Berry*, 25 F.3d at 1351 (emphasis added).[3]  He makes no such showing.  Nor is he qualified to make the myriad assumptions and conclusions he uses to reach his ultimate opinions.  Where, as here, an expert's testimony extends far beyond his area of expertise, exclusion is warranted. *See, e.g., U.S. v. Cook*, 261 Fed. Appx. 52, 54 (9th Cir. 2007) ("The trial court may, and perhaps must, exclude . . . testimony that extends beyond the witness's demonstrated expertise."); *Pecover v. Elec. Arts Inc.*, 2010 U.S. Dist. LEXIS 140632,

---

[3]  *See also U.S. v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000) (affirming exclusion of expert testimony on authenticity of a foreign certificate where expertise related to the history of issuance of certificates, not authenticity); *Montgomery v. Noga*, 168 F.3d 1282, 1303 (11th Cir. 1999) (expert in a case involving shareware and utility licensing and marketing properly excluded where his knowledge and experience pertained to commercial banking software development, marketing and licensing); *Morin v. McCulloch Corp.*, 2002 WL 34357202, at *4 (C.D. Cal. July 3, 2002) (purported expert did not qualify; expert's experience with warning labels for smoke detectors and fixed power tools held "dissimilar to the warnings at issue" involving chainsaws).

MOTION IN LIMINE NO. 1

at *17 (N.D. Cal. Dec. 21, 2010) (rejecting testimony regarding game publisher's pricing strategy because the opinion fell outside of the expert's retail sales expertise).

### 2. An Expert's Opinion Must Be Reliable And Not Speculative.

In addition, the proponent of an expert witness has the burden of demonstrating that the expert's testimony is sufficiently reliable to be admitted under Rule 702. *See Lust*, 89 F.3d at 598; *Mesfun v. Hagos*, 2005 WL 5956612, at *11 (C.D. Cal. Feb. 16, 2005) ("Experts are not to testify to their subjective belief or unsupported speculation. The relevance and reliability of their testimony, tested in terms of the principles they apply, must pass muster.").[4]  The expert's mere assurance that his methodology and supporting data is reliable will not suffice to carry this burden. *Daubert*, 43 F.3d at 1319 ("We've been presented with only the expert's qualifications, their conclusions and their assurances of reliability, under *Daubert*, that's not enough."); FED. R. EVID. 702 Advisory Comm.'s Note, 2000 Amend. ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").  Indeed, neither *Daubert* nor the Federal Rules of Evidence "requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).  Expert opinions should be disregarded where, as here, "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

## IV.

## MR. VALERIO'S *REPORT* AND TESTIMONY MUST BE EXCLUDED

Mr. Valerio's opinions are subject to exclusion under *Daubert*, the Federal Rules of Evidence, and the other standards just recited.  First, he is unqualified to render the opinions proffered because the specific subjects on which he opines are far

---

[4]  *See also Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006) ("[T]he trial court also must determine whether the expert opinion is 'based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation.'"); *Sheats v. Bowen*, 318 F. Supp. 640, 644 (D. Del. 1970) ("[W]here expert testimony is based on a stated assumption there must be some evidence that the assumption is valid.").

MOTION IN LIMINE NO. 1

1  beyond his area of only some generalized expertise.  Although Mr. Valerio may have

2  very limited, general experience as a "licensor" and "licensee", he does not have

3  specific knowledge or experience to render expert opinions on: (1) Plaintiff's

4  "economic damages" as a result of Defendants' purported conduct; or (2) a reasonable

5  royalty rate for the use of the image of a peripheral, subsidiary character on

6  merchandise related to that film (an inquiry that Mr. Valerio admits he did not even

7  attempt to undertake).  [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 186:22-187:7.]

8  Second, even assuming that Mr. Valerio were qualified as an expert regarding

9  damages or such license agreements, his purported opinions are unreliable because

10  they are based on conjecture, improper assumptions and unsupported beliefs, and are

11  directly contradicted by his own deposition testimony.

12  **A.**     **Mr. Valerio's Testimony Must Be Excluded Because He Is Not**

13          **A Qualified Economic Damages Expert Under *Daubert*.**

14          Mr. Valerio purports to render an opinion as to Plaintiff's "economic damages"

15  based on his (1) personal interpretation of "the facts of the case", and (2) conjecture

16  that "there was fraud involved", despite the fact that he is not the trier of fact here.

17  [*Id.* at 186:24-187:7.][5]  Mr. Valerio has no experience or base of knowledge from

18

---

19  [5]  That Mr. Valerio is providing an opinion as to Plaintiff's "economic damages", instead of simply an opinion related to royalty rates for film merchandise licensing, is

20  clearly demonstrated by Plaintiff's purported *Fourth Supplemental Response [Defendant's] Interrogatory No. 25*, where Plaintiff states that he is seeking identical,

21  duplicative compensatory damages—$347,574.29—for virtually each of his claims with the exception of breach of contract:  (1) $347,574.29 for Count I (characterized

22  as fraud "Compensatory Damages"); (2) $347,574.29 for Count II (characterized as common law fraud "Compensatory Damages"); (3) $347,574.29 for Count III

23  (characterized as false designation of origin "Compensatory Damages – Reasonable Royalty"); (4) $347,574.29 for Count IV (characterized as statutory right of publicity

24  "Compensatory Damages – Reasonable Royalty"); and (5) $347,574.29 for Count V (characterized as common law right of publicity "Compensatory Damages").  [ECF

25  Docket No. 139 at 12:13-13:1.]  That one very specific figure ($347,574.29) that Plaintiff lists for each of those claims comes from Mr. Valerio's calculation of "a

26  reasonable royalty rate on the Board Game, the Action Figure and the Box Set using a hypothetical negotiation methodology".  [*Id.; see also Raygor Decl.* ¶ 3, **Ex. B**

27  ("*Valerio Report*") at p. 20.]  And that identical figure comes about even though Mr. Valerio used the *License Agreement's* 2% royalty figure for the Action Figure and the

28  Box Set [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 19], but used an entirely

which to determine Plaintiff's "economic damages" based on his personal interpretation of the facts of this case or his bald assertion that some fraud must have occurred, nor did he testify anywhere in his *Report* or his deposition that he has any such experience. *See, e.g.*, FED. R. EVID. 702; *McKenzie*, 2011 U.S. Dist. LEXIS 44078, at *18. Instead, Mr. Valerio solely purports to have "expertise in the area of product licensing". [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 1.] At best, he might be qualified to render an opinion as to what royalty rate should be applied for use of Plaintiff's likeness on some non-film-related consumer product, but he has absolutely no basis for rendering a damages opinion based on his determination of whether or to what extent fraud does or does not exist, a fact he admitted in his deposition. [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 187:8-14.] Despite his admission that he cannot decide whether fraud occurred, Mr. Valerio purports to do exactly that in arriving at his baseless "feelings" about Plaintiff's "economic damages". [*Id.*, at 188:5-189:4 ("Q. Did you on your own at some point discover fraud . . . .? A. I *feel* that I saw fraudulent action going on by NECA and Weinshanker . . . .") (emphasis added).][6] His testimony should be excluded.

**B.   Mr. Valerio's Testimony Must Be Excluded Because He Is Not A Qualified Reasonable Royalty Expert Under *Daubert*.**

In his *Report*, Mr. Valerio only claims to have expertise in the "area of product licensing". [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 1.] But his deposition made it abundantly clear that he has little experience with product licensing, even in

---

different calculus (his invented "penalty royalty rate" of a "40% royalty . . . for non-FOB sales and an additional 50% royalty . . . on FOB sales") for the board game. [*Id.* at p. 18.] Clearly, Mr. Valerio has no expertise whatsoever in "economic damages" as such purported damages cannot possibly be identical for each and every claim Plaintiff asserts, whether based on the action figures and box sets, or the board game.

[6]   The fraud conclusion also improperly relies on statements Defendants provided to Plaintiff in settlement discussions, are subject to FED. R. EVID. 408 protection, and are the subject a separate *motion in limine*, filed concurrently herewith. [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 201:11-202:9.] Mr. Valerio admitted that he was not told that they were subject to the Rule 408 privilege. [*Id.*, at 202:10-25.]

general, or in the licensing of a particular person's likeness or image in particular, not to mention on a board game or in connection with film-related merchandise.

Mr. Valerio's general knowledge of product licensing is minimal or anecdotal, at best. Despite unsupported claims to the contrary, his resumé evidences almost no experience with product licensing. [*Id.* at Ex. A.][7] He could not identify a single writing by him on the subject. [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 183:10-21.][8] When questioned about the extent of his experience with product licensing, he simply stated, without providing specific support, that his "expertise and knowledge . . . in licensing has been going on for more than ten years at a variety of companies." [*Id.* at 112:15-113:2.] His deposition, however, demonstrates that his purported experience is insufficient to qualify him as a general licensing expert. When asked to identify specific experience, Mr. Valerio only provided the following:

- He testified that his current company sells wristbands featuring "text, words from the script" and the "Radio Rebel" trademark—but not any celebrity or actor image or likeness—from the film, yet he repeatedly relied on this single license to validate his expertise. [*Id.*, at 54:5-55:1, 73:21-25; 121:18-122:7.][9]

---

[7] Mr. Valerio's resumé does not include his educational background. [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at Ex. A.] That is likely because at his deposition Mr. Valerio testified that he has only a high school diploma and, while he attended the University of California at San Diego, he did not graduate. [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 60:14-61:4.] Given that admission, he was at a loss to explain why his bio for Otis College of Art and Design, where he currently teaches a course titled "Apparel Manufacturing" fashion, as well as his other resumés, available online, state that he has a Bachelor of Arts degree in Economics from the University of California, and in fact had to admit that statement was false. [*Id.*, at 91:2-92:16, Depo. Ex. 1; 92:22-96:11, Depo. Ex. 2; 98:18-99:16, Depo. Ex. 3.]

[8] Defendants found one piece of writing posted by Mr. Valerio on the subject of licensing—a blog posting on his company's website. [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 117:6-118:1, Depo. Ex. 9.] Mr. Valerio testified, however, that the blog posting was simply created to drive traffic to his company's website, contained language that was not even drafted by him, and was based on a previous article he had read. [*Id.*, at 117:22-120:7.] He did not produce the blog posting to Defendants himself. [*Id.*, at 181:12-182:22.]

[9] The "Radio Rebel" license gave Mr. Valerio the right to use some intellectual property related to the film (*e.g.*, words from the script and the mark RADIO

MOTION IN LIMINE NO. 1

- He claimed that about 10% of his current company's business "is related to licensing". [*Id.*, at 111:21-112:2.] His company's website, however, makes no mention of any licensing. [*Id.*, at 113:3-8, Depo. Ex. 6.]

- He claimed that he is a "senior lecturer" at Otis College of Art and Design,[10] and teaches a course titled "Apparel Manufacturing", which Mr. Valerio claims covers "licensing in depth." [*Id.*, at 77:18-78:4.] Yet, despite his assertion that he prepares materials for this course related to licensing, and the fact that Defendants' subpoena specifically asked for all of his writings on the subject, Mr. Valerio did not produce any documents from this class, let alone any relating to licensing. [*Id.*, at 78:5-79:3, 79:23-80:1, 82:15-20.]

- Mr. Valerio testified that he has "licensed lots of trademark names". Yet he only identified two, in addition to "Radio Rebel". [*Id.*, at 210:15-211:21.]

- Mr. Valerio refused to identify how many licensing contracts he has worked with, instead stating that that he "may have" had more than 10, 15, or 20. [*Id.*, at 228:14-19.][11] Even assuming it went as high as "10, 15, or 20", that is nothing for someone who purports to be a "product licensing" expert.

Furthermore, although provided with ample opportunities to demonstrate his general expertise, Mr. Valerio repeatedly refused to do so:

- In his *Report*, Mr. Valerio claimed that, in general, licensing agreements feature something he coined a "penalty royalty rate". [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 17.] When asked to provide any real world experience supporting that claim, he stated, not before trying to evade the question, that he had seen it in more than two but less than five licensing agreements, but could

---

REBEL). However, Mr. Valerio did not know if it gave him the right to use the likeness of any particular character. [*Id.* at 54:5-55:1.]

[10] As a "senior lecturer", Mr. Valerio is not a full-time faculty member or adjunct faculty member. [*Id.*, at 97:22-25.]

[11] "Q. How many licensing contracts have you had? A. I may have had more than 10. Q. More than 15? A. I may have had more than 15. Q. How about more than 20? A. I may have, or I may not have." [*Id.* at 228:14-19.]

**MOTION IN LIMINE NO. 1**

not identify a single specific such agreement or provision therein.  [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 83:4-84:25.]  He also stated that a "penalty royalty rate" is "normally five times the royalty rate" [*id.* at 83:12-13], but refused to identify any support for that assertion, instead stating that the license agreements he has allegedly encountered that purportedly include such rates are confidential so he refused to discuss them.  [*Id.*, at 83:4-85:25.]  In a last-ditch attempt to support his claim of the existence of some "penalty royalty rate" allegedly standard in some industry, Mr. Valerio referred to a book he identified in his deposition as "Royalty Rates 2011".  [*Id.*, at 86:17-21; 88:17-89:6.]  However, when presented with the actual book at his deposition, Mr. Valerio admitted that he could not find any support for his claim that a standard "penalty royalty rate" exists in license agreements.  [*Id.*, at 86:17-87:23.]

- When asked to support his statement that "most licensees that produce consumer merchandise pay a royalty in the 8 percent to 12 percent range" [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 16], Mr. Valerio again referred to the "Royalty Rate 2011" book, but again admitted he was unable to identify any basis for his claim therein.  [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 214:15-216:17.]

- When asked to support his statement in his *Report* that "the ***vast majority*** of modern contracts in the entertainment industry between a producer and a performer contain merchandising provisions wherein the performer grants the producer merchandising rights for a pre-determined royalty rate" [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 16 (emphasis added)], Mr. Valerio stated that his only support was the handful of contracts between "the actors and Christmas Tree Films (the producer of the Film)" that were provided to him by Plaintiff in connection with this case.  [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 216:18-217:21.]  He also suggested that through his "knowledge and experience", he "know[s] a lot of actors" and has never heard from them that

**MOTION IN LIMINE NO. 1**

they had "retained their merchandise rights". [*Id.*, at 217:22-218:6.] He admitted, however, that putting aside the agreements provided to him by Plaintiff, he has seen "less than ten" contracts between a producer and a performer—certainly nowhere near the realm of "the vast majority of modern contracts in the entertainment industry between a producer and a performer" that he states supports his opinions. [*Id.* at 221:2-11.][12]

This is not the testimony of a person with expertise in the area of product licensing.[13]

Whatever limited experience Mr. Valerio might have had in his business with a few product licenses, he clearly lacks any experience in the particular area on which he purports to opine here—the use of an actor's likeness or image on a board game or other film-related piece of merchandise—and his testimony therefore must be excluded. *See, e.g.*, *Broadcort*, 972 F.2d at 1195. As Mr. Valerio readily admits, "royalty rates are totally different depending on what the product is . . . ." [*Id.* at 120:2-3.] He also admitted that, prior to his involvement in this case, he had no experience with licensing board games, had not seen a license for a board game, and could not recall any licenses that included a board game. [*Id.*, at 49:1-9; 56:7-22; 59:16-60:5.][14] Despite the fact that he claimed he had "looked into the manufacturing

_____

[12] Defendants note that the highest royalty rate Mr. Valerio recalls seeing in those *A Christmas Story* actor agreements was 15% of the producer's royalty fee for licensing the particular film. [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 223:25-225:13.] Mr. Valerio states that the person that received that royalty rate was the "lead in a movie", not a peripheral, subsidiary character like Plaintiff. [*Id.* at 225:14-15.]

[13] Defendants' rebuttal expert agreed, finding that the *Valerio Report* "demonstrates unfamiliarity with the licensing business . . . ." [*Raygor Decl.* ¶ 5, **Ex. D** (Defendants' Expert Witness Rebuttal Report) at p. 7.]

[14] Mr. Valerio was even not provided with a physical copy of the board game for use when drafting his *Report*, so he had no idea of how minimal the appearance of Plaintiff on the back of the box is, or that Plaintiff's image is only one of at least eleven character images appearing on the packaging. [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 169:21-170:4.] In fact, Mr. Valerio did not even attempt to take into account the fact that Plaintiff's appearance is minimal, at best, even though CAL. CIV. CODE § 3344 requires such that any determination of liability for a right of publicity violation must take into account only the damages suffered or profits gained that are directly "attributed" to just that unauthorized use, an no other element. *See* CAL. CIV. CODE § 3344 ("[I]n any action brought under this section, the person who

-14-   MOTION IN LIMINE NO. 1

1   of board games" before his involvement in this case, he admitted that he had never

2   "look[ed] into the cost of potential licenses for board games". [*Id.*, at 58:18-59:15.]

3        Mr. Valerio admits that the entirety of his "knowledge and experience" about

4   licensing a likeness or image for use with a board game comes from a single

5   conversation with an unidentified individual from a single company, where that

6   individual allegedly claimed that the company was seeking an 8%-12% royalty rate

7   for use of intellectual property from the film "Radio Rebel" on board games. [*Id.*, at

8   49:10-53:19.][15] Mr. Valerio did not know if that rate was intended to cover

9   "everything in the movie; for all of the property in the movie, for all of the talent, for

10  all the trademarks, for all the copyrights, [or] for all elements in the film". [*Id.*, at

11  49:10-53:19; 54:5-55:1.][16] Mr. Valerio did not attempt to explain how this single

12  conversation qualified him as an expert.

13       Nor does Mr. Valerio have any experience with licensing an actor's image.  All

14  he could offer was anecdotal evidence based on things his actor friends allegedly told

15  him. [*Id.*, at 217:22-218:6.] Perhaps most telling, when asked about the "right of

16  publicity"—two of the key claims being asserted by Plaintiff in this action—Mr.

17  Valerio admitted that he does not even know what that is. [*Id.*, at 185:8-20.] Any

18  credible expert in the field of licensing an actor's likeness would at least have passing

19

---

20  violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by

21  him or her as a result of the unauthorized use, and ***any profits from the unauthorized use that are attributable to the use*** and are not taken into account in computing the

22  actual damages.") (emphasis added).

23  [15] Mr. Valerio claimed that he confirmed his "knowledge and experience" using a book entitled "Licensing Royalty Rates, 2011 Edition". [*Raygor Decl.* ¶ 4, **Ex. C**

24  (Valerio Depo.) at 48:13-49:6.] He admitted, however, that he did not rely on it when drafting his *Report*. [*Id.*, at 48:13-25.] Nor did mention it in his *Report*. Mr. Valerio

25  also claimed that the only other license agreement for board games of which he has direct knowledge is the license between NECA and WB. [*Id.*, at 58:6-12.]

26  [16] Mr. Valerio admitted that a license that includes trademarks, copyrights, or other "parts" of a movie is clearly broader than one limited to the use of a single likeness,

27  but failed to explain why a royalty rate for multiple "parts" of a film would be applicable to a license for the use of a single character's likeness and/or image. [*Id.*, at

28  208:5-18.]

MOTION IN LIMINE NO. 1

1  familiarity with the concept.  Because Mr. Valerio's purported qualifications do not

2  "provide a foundation for [him] to answer *a specific question*," namely a reasonable

3  royalty for the use of an image of a subsidiary character from a film on film-based

4  merchandise (a board game) that includes many such characters, his testimony must

5  be excluded.  *See Berry*, 25 F.3d at 1351 (emphasis added).[17]

6  **C.    Mr. Valerio's Testimony Must Be Excluded Because It Is**

7  **Unreliable And Completely Speculative.**

8         Mr. Valerio purports to render two opinions, each without foundation and

9  based entirely on his speculation.  Experts "are not to testify to their subjective belief

10  or unsupported speculation.  The relevance and reliability of their testimony, tested in

11  terms of the principles they apply, must pass muster."  *Mesfun*, 2005 WL 5956612, at

12  *11.  Furthermore, reliance of an untested methodology is insufficient to satisfy

13  *Daubert*'s reliability requirement.  *See, e.g., U.S. v. Orr*, 692 F.3d 1079 (10th Cir.

14  2012) (upholding district court exclusion of expert based on district court's

15  determination that expert opinion "was subjective, and concededly subjective.  So his

16  methodology is not only untested, but it is untestable.");  *In re Bextra & Celebrex*

17  *Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1180 (N.D. Cal.

18  2007) (holding that "untested methodology cannot support the proffered opinion").

19         **1.    Mr. Valerio Has No Foundation For His Opinion Regarding A**

20         **"Hypothetical" Penalty Royalty Rate For The Board Game.**

21         Mr. Valerio concocts the following theory himself concerning a purported

22  "hypothetical negotiation" royalty rate:

23         "[A] hypothetical negotiation between Plaintiff and Defendants regarding the

24         unauthorized use of the Plaintiff's image on the Board Game would have

25

_____

26  [17]  As Defendants' rebuttal expert stated, Mr. Valerio's "professional experience does not indicate much activity working with personalities in a licensing context; certainly

27  not a diverse range of personalities in many different scenarios and applications, which tends to be where the perspective and experience of a qualified expert derives."

28  [*Raygor Decl.* ¶ 5, **Ex. D** (Defendants' Expert Witness Rebuttal Report) at p. 7.]

resulted in Defendants paying the Plaintiff a royalty in the amount of $345,970.49 which is the amount that the Defendants would have had to pay WB [Warner Bros.] if WB was made aware of the unauthorized use of the Plaintiff's image on the Board Game and WB enforced all provisions of the 2006 Agreement, including terminating the 2006 Agreement because of the unauthorized Board Game."

[*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at pp. 18-19.]  In order to reach his conclusion that NECA would pay Plaintiff an effective royalty rate of what amounts to more than **76%** before NECA paid royalties due WB,[18] and a **92%** rate after WB's royalty was paid by NECA,[19] Mr. Valerio uses a methodology that he admits (1) he has never seen used, (2) is not supported by the relevant case law and literature, and (3) is based on a series of conjectures and assertions by him based on his unsupported assumptions and legal conclusions.  In short, Mr. Valerio proposes to utilize a ***completely new*** methodology—never before seen by anyone—without providing any foundation for its use or applicability.

Without any support, Mr. Valerio purports to turn the methodology typically used in cases involving the unauthorized use of a likeness or image on its head by "moving the date [of the hypothetical negotiation] to the point where the fraud is exposed."  [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 242:12-13.]  In cases where a

---

[18]  Mr. Valerio opines that Plaintiff should be paid a royalty of $345,970.49 for the board game.  [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 20.]  Based on Mr. Valerio's findings, this amounts to 76% of NECA's pre-Warner Bros. royalty sales numbers:

- $755,403.72 (NECA's "Gross Sales") - $303,013.64 (the "Cost of Goods") = $452,390.08.  According to Mr. Valerio, $452,390.08 is NECA's net profit before the payment of royalties to Warner Bros.

- Mr. Valerio's proposed royalty is more than 76% of NECA's net profit before paying royalties to Warner Bros. ($345,970.49/$452,390.08=.0764 or 76%), and absurd figure an nothing that any true licensing expert would acknowledge as based in fact.

[19]  Mr. Valerio calculates NECA's profits before his proposed royalty to be $376,849.71.  [*Id.* at p. 20.]  His proposed royalty to Plaintiff is more than 91% of that number ($345,970.49/$376,849.71=.918 or 92%).

**MOTION IN LIMINE NO. 1**

plaintiff alleges that some part of his or her personality or identity was improperly used and then tries to apply a hypothetical arm's length negotiation to determine what a reasonable royalty would have been had the accused infringer sought and obtained a license for such use, the hypothetical license is determined *as of the date of the first infringement*. *See, e.g.*, *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1103 (9th Cir. 1992) (affirming an award of damages to the plaintiff "for the fair market value of his services"); *Wang Lab., Inc. v. Mitsubishi Elec. Am., Inc.*, 860 F. Supp. 1448, 1450 (C.D. Cal. 1993) (determining a hypothetical rate premised upon an arm's length transaction between willing parties); *Elrick Rim Co. v. Cheek, et al.*, 195 F. Supp. 496, 502 (S.D. Cal. 1961) (in establishing a reasonable royalty, the primary inquiry is what the parties would have agreed upon, if both were reasonably trying to reach an agreement) (citing *Faulkner v. Gibbs*, 199 F.2d 635, 639 (9th Cir. 1952)).[20]

Mr. Valerio even admitted that it is "normally appropriate to consider the hypothetical negotiation at the time the infringing party began producing unauthorized merchandise." [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 17; *Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 232:9-22.] Yet, when asked about his new version of the hypothetical negotiation test, which, instead of looking at the date of the first purported infringement by NECA, instead looks at when "WB was made aware of the unauthorized use of the Plaintiff's image on the Board Game" and then, if Warner Bros. enforced its agreement with NECA, when "WB enforced all provisions of the 2006 Agreement, including terminating the 2006 Agreement because of the

---

[20] *See also Frazier v. South Florida Cruises, Inc.*, 1991 U.S. Dist. LEXIS 2121, at *5-6 (E.D. Pa. Feb. 21, 1991) ("Plaintiff was unable to show any actual loss of money as a result of defendant's activities, in the form of lost bookings from other sources; and plaintiff was also unable to show any actual diminution in the promotional value associated with plaintiff's name and public persona. Accordingly, plaintiff's damages were measured by the value of what the defendant appropriated: what the 'going rate' would have been if plaintiff had been willing to participate in the proposed cruise venture."); *Cabaniss v. Hipsley*, 114 Ga. App. 367, 380 (Ga. Ct. App. 1966) (plaintiff entitled to recover "advertising value of the use of her photograph in the manner and for the time it was appropriated.").

1  unauthorized Board Game", he *admitted that he has never seen that methodology*

2  *used*. [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 242:12-13.]

3        Notably, Mr. Valerio offered no response to the testimony from Defendants'

4  designated rebuttal expert, a recognized expert in the field of licensing the images of

5  film celebrities, who testified that he has never seen any such methodology used.

6  [*Raygor Decl.* ¶ 5, **Ex. D** (Rebuttal Report) at p. 7.]  The case law is clear—a

7  hypothetical royalty rate is not determined after the plaintiff *discovers* the

8  infringement, or after the film studio who owns the rights might try to *enforce* those

9  rights, but instead when the infringement *occurs*.  *See, e.g., U.S. Philips Corp. v. KXD*

10  *Tech., Inc.*, 2007 U.S. Dist. LEXIS 98908, at *5 (C.D. Cal. Sept. 17, 2007) (relying

11  on expert's opinion as to reasonable royalty rate at the time of infringement); *Smith*

12  *Eng'g Co. v. Eisenmann Corp.*, 2000 U.S. Dist. LEXIS 21803, at *12 (C.D. Cal. Oct.

13  25, 2000) (to establish a reasonable royalty, courts rely upon a methodology that

14  seeks to construct the hypothetical, arms-length result of a negotiation between a

15  willing licensor and willing licensee at the time of infringement).  There is nothing

16  supporting Mr. Valerio's proposed methodology other than his unsupported assertion

17  that it should apply.  An expert's assurance that his methodology is reliable, without

18  more, does not satisfy *Daubert*'s reliability standard.  *Daubert*, 43 F.3d at 1319.

19        The defects in Mr. Valerio's proposed methodology become clear upon review

20  of the chain of speculative reasoning he had to engage in to reach his opinion.  First,

21  on an incomplete review of the record, Mr. Valerio "*assum[es]* that Weinshanker

22  concealed the existence of the Board Game from Plaintiff", which he then *assumes*

23  constitutes "fraudulent conduct".[21]  [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p.

24  _____

25  [21]  Mr. Valerio has no basis for his conclusion that the limited evidence he reviewed supports an assumption that Defendants' purported conduct was "fraudulent".  Experts

26  may not render opinions as to legal issues in a case.  *See, e.g., Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("[A]n expert witness

27  cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law."); *Williams v. Lockheed Martin Corp.*, 2011 U.S. Dist. LEXIS 58716, at *45-

28  46 (S.D. Cal. June 1, 2011) (excluding expert report that offered "opinions on legal

          **MOTION IN LIMINE NO. 1**

17 (emphasis added).]  Next, he then "*assum[es]*" that, at the time of the hypothetical negotiation, (1) "Plaintiff [was] fully aware of the Defendants' unauthorized use of the Plaintiff's image on the Board Game"; (2) "Plaintiff [was] fully aware of his legal rights with respect to licensing his likeness and/or image for use on consumer merchandise"; and (3) "WB was not aware of the Defendants' unauthorized use of the Plaintiff's image of the Board Game but fully intended to enforce all provisions of the 2006 Agreement if WB was made aware of NECA's unauthorized use of the Plaintiff's image on the Board Game."  [*Id.*, at p. 18.]  In his deposition, Mr. Valerio provided a useful summary of the extent of the unsupported speculation-heaped-upon-speculation that he had to engage in to reach his final conclusion:

> "A.    I'm saying that the hypothetical negotiation, the timing of the hypothetical negotiation would be in 2010, which is when Mr. Ward knew all the facts; that there was a board game made with his likeness that he did not approve.  And so then he could have negotiated from a position of knowing that.  And he had legal counsel at the time, so his counsel could have told him, like, you know, 'they tried to get you to sign something, not what you thought you were signing for, but for some other reason, to cover up the fact that they made all these board games without first [*sic*] Warner Bros. approval,' and then secondly without Ward's approval, and then tell Warner Bros. that they got his approval when didn't even know there was a board game."

[*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 234:12-25.]  Based on these myriad "assumptions", Mr. Valerio assumes, again, that in a hypothetical negotiation Defendants would agree to pay an exorbitant license fee—92% of its net profits—to Plaintiff for such an exceedingly minimal use of his likeness.

---

conclusions").  Furthermore, nothing in Mr. Valerio's background qualifies him to render such an opinion.  He has no training as a lawyer or in any other potentially relevant field, and has not demonstrated an understanding of what constitutes "fraudulent conduct", in the legal sense or otherwise.

Finally, Mr. Valerio bases his conclusion that NECA would pay such an extremely large license fee to Plaintiff on his contention that:

> "NECA would have been contractually obligated to pay an additional 40% royalty of $126,925.49 on non-FOB sales and an additional 50% royalty of $219,045 on the FOB sales of the Board Game pursuant to the 2006 Agreement. Therefore, if WB became aware of the unauthorized use of the Plaintiff's image on the Board Game, NECA would have been contractually obligated to pay WB an additional royalty in the amount of $345,970.49 due to the unauthorized sale of the Board Game."

[*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 18; *see also Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 235:15-20; 245:2-18.] Mr. Valerio assumes that, because NECA might purportedly be on the hook for a penalty to WB, that it would simply pay that penalty amount to Plaintiff. [*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 18-19 (a hypothetical negotiation "would have resulted in Defendants paying the Plaintiff a royalty in the amount of $345,970.49 which is the amount Defendants would have had to pay WB if WB was made aware of the unauthorized use of the Plaintiff's image on the Board Game"); *see also Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 277:5-287:20.] Mr. Valerio, however, bases this startling conclusion on a fundamental misinterpretation of the 2006 agreement between NECA and WB. The "penalty" provision upon which Mr. Valerio relies ***has nothing to do with NECA's use of property that does not belong to WB***. The 2006 agreement provides, in relevant part:

> "***Licensee [NECA] will not, in any manner, use any property or properties <u>owned or controlled by Licensor</u> [Warner Bros.] not included as Licensed Property under this Agreement*** . . . . In addition to all other remedies to which Licensor may be entitled, pursuant to this Agreement, at law, in equity or otherwise (including, without limitation, termination of this Agreement and injunctive relief), ***if Licensee engages in any unauthorized use of any <u>such property or properties</u>, Licensee will pay to Licensor an amount equal to five***

**MOTION IN LIMINE NO. 1**

*(5) times the royalties that would have been payable to Licensor at Licensor's prevailing royalty rate for such property or properties had Licensee's unauthorized use been licensed by Licensor.*"

[*Raygor Decl.* ¶ 3, **Ex. B** ("*Valerio Report*") at p. 24 n.13 (emphasis added).]  This clearly and unequivocally relates only to the possible unauthorized use by NECA of property that is **_owned by WB_**—not property that might be owned **_by Plaintiff_**.  And Plaintiff's entire suit is based on an assertion that WB never owned Plaintiff's likeness rights, and that only Plaintiff owned such rights, which then were infringed by NECA.  In fact Mr. Valerio admitted that the entire basis of Plaintiff's lawsuit is his claim that WB holds no rights in his name, likeness and/or image.  [*Raygor Decl.* ¶ 4, **Ex. C** (Valerio Depo.) at 285:9-14.]  As a result, Mr. Valerio's reliance on this provision in the NECA/WB agreement as the basis for his concocted "penalty royalty" theory lacks any foundation and is entirely misplaced as the purported penalty rate he is applying relates only to possible misuse by NECA of **_property owned by WB_**, while the only claims made in this suit are that NECA misused property owned **_by Plaintiff_**.  Mr. Valerio's assumption that NECA would have had to pay a penalty to WB in the amount of $345,970.49—and, therefore, would have paid this amount to Plaintiff—is completely without basis and invalid.[22]  *See, e.g., Sheats*, 318 F. Supp. at 644 ("[W]here expert testimony is based on a stated assumption there must be some evidence that the assumption is valid.").

---

[22]  Mr. Valerio's proposed reasonable royalty to Plaintiff is based **_entirely_** on his calculation of the purported "penalty royalty" he claims NECA would have to pay to Warner Bros.  According to Mr. Valerio, the "penalty" rate is for non-FOB sales is four times the normal royalty rate (4 x 10% = 40%) and five times the normal rate for FOB sales (5 x 10% = 50%).  In the *Report*, Mr. Valerio identifies profits from non-FOB sales of the board game as $317,313.72 and profits from FOB sales as $438,090.  Mr. Valerio then multiplies the purported penalty rates for possible misuse of property owned **_by WB_** by the alleged profits earned by NECA from purported misuse of property owned **_by Plaintiff_** to reach his opinion as to the royalty that NECA would then hypothetically "would pay" Plaintiff:

- ▪ (0.4 x $317,313.72) + (0.5 x $438,090) = **_$345,970.49_**

MOTION IN LIMINE NO. 1

Mr. Valerio also assumes that WB would have "terminat[ed] the 2006 Agreement because of the unauthorized Board Game." Mr. Valerio did not cite the termination provision from the 2006 agreement, which provides that "[i]f any unapproved Licensed Products are being sold, *Licensor may, together with other remedies available to it* including, but not limited to, immediate termination of this Agreement . . . ." [*Declaration of Alexis Mueller* ("*Mueller Decl.*") ¶ 2, **Ex. A** (emphasis added).] Mr. Valerio fails to attempt to explain why he has jumped to the conclusion that WB would immediately terminate the agreement, when the agreement provides that it has discretion to seek any remedy it desires.

Mr. Valerio has taken a relatively straightforward methodology—the negotiation of a reasonable royalty rate between a willing licensor and licensee at the time of alleged infringement—and invented an new methodology never before seen by anyone, that requires extensive conjecture, assumption, and invention to reach a determination of a royalty rate that is more than *91%* of NECA's total net profits. He does not cite a single fact to support any of his assumptions and instead relies on pure speculation to reach his final calculation.[23] There is no basis at all for the use of such a methodology.[24] As such, his testimony must be excluded because "there is simply

---

[23] In fact, Mr. Valerio's opinion completely fails take into account that, in reality, WB took no adverse action against NECA as a result of the claims in this lawsuit. [*Mueller Decl.* ¶ 3.] For this reason alone. Mr. Valerio's testimony should be excluded. *See, e.g., A.H.D.C.*, 2000 U.S. Dist. LEXIS 23027, at *11 (excluding expert opinion because it was "purely speculative" and "a legal conclusion controverted by . . . fact").

[24] Defendants' rebuttal expert found: "Many of Mr. Valerio's opinions are based on legal conclusions and bald statements without evidentiary support. Mr. Valerio appears to have determined that NECA has committed fraud, that NECA would have been obligated to pay royalty rates of forty and even fifty percent, that destruction of the materials were part of the equation, and that Warner Bros. would have cancelled its contract with NECA. I believe these assumptions exceed the scope of Mr. Valerio's expertise, are irrelevant to the determination of a reasonable royalty rate, and do not comport with the typical practices in the licensing industry for resolving issues that can and do occasionally arise between a Licensee and Licensor. [C]ontrary to Mr. Valerio's opinion, in my experience a Licensor (like Warner Bros.) never imposes a 'penalty' royalty rate on a Licensee for uses of intellectual property or identity rights that are not owned by the Licensor, such as Mr. Ward's likeness which

-23-                                    MOTION IN LIMINE NO. 1

too great an analytical gap between [the expert's] unreliable methodology and untested theories and the conclusions he reaches in his report." *Karnauskas v. Columbia Sussex Corp.*, 2012 U.S. Dist. LEXIS 8988 (S.D.N.Y. Jan. 24, 2012).

## 2. Mr. Valerio Has No Foundation For His Opinion Regarding A "Hypothetical" Royalty For The Action Figure And Box Set.

As stated above, Mr. Valerio does not have the required expertise to render an opinion as to the reasonable royalty rate for the use of an actor's likeness or image on film-related merchandise. This, alone, renders his testimony inadmissible. Furthermore, although Mr. Valerio finally provides a factual (not completely hypothetical) basis for his opinion as it relates to the action figure and boxed set only (and not the board game)—the rate actually negotiated by Plaintiff and NECA in the *License Agreement*—his opinion is still deficient. He fails to even attempt to reconcile his assertion that a 2% royalty for an action figure that features ***only*** Plaintiff's likeness and could somehow be consistent with a royalty of more than 91% for a board game that features a tiny image of Plaintiff portraying the character "Scut Farkus" along with a host of other, much more prominent images, along with the much more prominent name of the film itself emblazoned across the front of the board game. As Defendants' rebuttal expert stated:

> "The disparity between Mr. Valerio's valuation of the different products reveals inherent problems in his opinion. Even if NECA's sales of the board game greatly exceeded that of the action figure or box set, these numbers, ranging from $400 to $345,000, reveal a person unfamiliar with the business or the appropriate value of Mr. Ward in relation to the Use."

---

I understand Warner Bros. did not hold. Mr. Valerio's assumptions and analysis lead him to opine that 'in a hypothetical negotiation between the Parties, Defendant would have agreed to pay [$345,970.49] to Plaintiff in order to avoid WB cancelling the 2006 Agreement.' The notion that a negotiation for the inclusion of the Farkus character would lead to a negotiated payment of over a quarter of a million dollars by NECA is inconsistent with the market value of Mr. Ward from his other offers and agreements, and my professional experience in relation to the value of a minimal use of a supporting character in this product category." [*Raygor Decl.* ¶ 5, **Ex. D** at p. 7.]

1    [*Raygor Decl.* ¶ 5, **Ex. D** (Rebuttal Report) at p. 7.]

2    **D.**    <u>**Mr. Valerio's Opinion Regarding A "Hypothetical" Royalty Rate For**</u>

3        <u>**The Action Figure And Boxed Set Should Be Excluded Because It**</u>

4        <u>**Is Unhelpful To The Trier Of Fact**</u>.

5        An expert opinion should be excluded where it is not helpful to the trier of fact.

6 *See, e.g., Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 U.S. Dist. LEXIS 123822,

7 at *57 (N.D. Cal. Jan. 5, 2008) (excluding expert opinions because they were

8 "unhelpful" for the trier of fact).  Despite the fact that both of Defendants' experts

9 believe that 2% royalty is too high for an actor of Plaintiff's stature,[25] Defendants have

10 never contested the assertion that Plaintiff is owed a 2% percent royalty for the Action

11 Figure and Boxed Set.  [*See* ECF Docket No. 6 (NECA's *Answer*) at ¶ 30.]

12                                          **V.**

13                              <u>**CONCLUSION**</u>

14        For the foregoing reasons, Defendants respectfully request the Court exclude

15 the testimony and *Report* of Plaintiff's designated expert Robert F. Valerio.

16 November 9. 2012        SHEPPARD MULLIN RICHTER & HAMPTON LLP

17

18

19                   By     _____

                                     *s/ Kent R. Raygor*

20                                 KENT R. RAYGOR

21                       Attorneys for Defendants

                    NATIONAL ENTERTAINMENT

22              COLLECTIBLES ASSOCIATION, INC. and

                     JOEL WEINSHANKER

407217595.3

23

24 [25] Defendants' expert, who has more than a decade of experience licensing film

25 properties and their constituent elements for merchandise, stated that "the value of the likeness for the supporting character 'Scut Farkus', as portrayed by Plaintiff Zack Ward, for licensed merchandise is, at most, 0.5% of wholesale revenues generated by products containing the character's likeness."  [*Raygor Decl.* ¶ 6, **Ex. E** (Defendants'

26 Expert Report) at p. 2.]  Defendants' rebuttal expert stated that "[c]onsidering the relatively minimal use by NECA of the Farkus character compared to the other

27 characters, in a revenue-sharing context Mr. Ward should expect to get a lower percentage than those featured more prominently and the two percent is actually quite

28 high in that context."  [*Raygor Decl.* ¶ 5, **Ex. D** (Rebuttal Report) at p. 6.]

                          **MOTION IN LIMINE NO. 1**