# Exhibit A

1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF NEW JERSEY
2    CIVIL ACTION NO. 10-cv-3403 (FSH)(PS)

3

4                              ORIGINAL

5

6

7    ZACK WARD,

8              Plaintiff,

9         vs.

10   NATIONAL ENTERTAINMENT
     COLLECTIBLES ASSOCIATION,
11   INC. and JOEL WEINSHANKER,

12             Defendants.

13

14        DEPOSITION OF JOEL WEINSHANKER

15   taken by and before TABITHA R. DENTE, a

16   Certified Shorthand Reporter and Notary Public

17   of the State of New Jersey, held at the Federal

18   Courthouse, 50 Walnut Street, Newark, New

19   Jersey, on Friday, May 6, 2011, commencing at

20   ten o'clock in the morning.

21

22

23        J&M REPORTING SERVICE
          16 Eisenhower Parkway
24        Roseland, NJ 07068
          (973) 618-9087

25

EXHIBIT A  PAGE 3

2

1    A P P E A R A N C E S :

2

3        RANDALL S. NEWMAN, P.C.
         BY:  RANDAL S. NEWMAN, ESQ.
4        37 Wall Street, Penthouse D
         New York, New York 10005
5        Attorney for the Plaintiff

6

7        McCARTER & ENGLISH
         BY:  MATTHEW G. WAPNER, ESQ.
                   -and-
8            WILSON DAVID ANTOINE, ESQ.
         Four Gateway Center
9        100 Mulberry Street
         Newark, New Jersey 07102
10       Attorneys for the Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A  PAGE 4

64

Joel Weinshanker

1          MR. WAPNER:  Object to the form.

2     A.     I think she's just looking for the

3  backup.

4     Q.     The backup for?

5     A.     Um...for the approval.

6     Q.     From the actor who plays Scut

7  Farcus?

8     A.     That's what this says.

9     Q.     Do you know why they needed

10  approval from Scut Farcus --

11          MR. WAPNER:  Objection.

12     Q.     -- or Zack Ward?

13     A.     I don't know for a fact why, no.

14     Q.     When is the first name you met

15  Zack Ward?

16     A.     I don't know that I've ever met

17  him.

18     Q.     When is the first time you talked

19  to Zack Ward?

20     A.     My recollection is late 2005 or

21  early 2006.

22     Q.     And you spoke by telephone?

23     A.     I believe so.

24     Q.     And who called who?

25     A.     I don't recall.

EXHIBIT A  PAGE 5

65

Joel Weinshanker

1    Q.    Do you recall what you discussed?

2    A.    We had numerous conversations so

3    we...we discussed different things.

4    Q.    Such as?

5    A.    Merchandise with his likeness...I

6    think some things that were just not non

7    sequiturs, had nothing to do with anything.

8    Q.    What merchandise did you discuss

9    with his likeness?

10   A.    I think we just discussed

11   merchandise in general and then a board game and

12   possibly some other merchandise.

13   Q.    When was this?  Conversation?

14   A.    My recollection is late 2005 or

15   early 2006.

16   Q.    Did you speak to any other actors

17   that were in the movie?

18   A.    I've spoken to other actors in the

19   movie.

20   Q.    Did you speak to any other actors

21   in the movie about the board game?

22   A.    I don't know.  I don't know.

23   Q.    Do you recall getting Scott

24   Schwartz's approval for board game?

25   A.    No.

EXHIBIT _A_ PAGE _6_

78

Joel Weinshanker

1          (Whereupon, Exhibit P-11 is marked
2      for identification.)

3

4          Q.      Turn to page two.
5                  MR. WAPNER:  You can -- you can look
6      as the entire package.
7                  MR. NEWMAN:  Yeah, whatever.
8                  (Brief pause.)
9          A.      Okay.
10         Q.      Can you tell me what this is?
11         A.      An agreement between Zack Ward and
12     NECA.
13         Q.      And who drafted this agreement?
14         A.      I did.
15         Q.      Did you draft this from scratch or
16     did you cut and paste it from a different
17     agreement?
18         A.      I probably took things from other
19     agreements.
20         Q.      Which other agreements?
21         A.      I don't know.
22         Q.      You drafted this yourself?
23         A.      Yes.
24         Q.      Do you recall when you drafted
25     this?

EXHIBIT A  PAGE 7

79

Joel Weinshanker

1    A.    I don't recall.

2    Q.    What's the date on this agreement?

3    A.    The date in the upper right-hand

4  corner is October 1st, 2006.

5    Q.    Is that the date you drafted the

6  agreement?

7    A.    It would have been the date,

8  um...most likely that I would have sent it to

9  him.

10    Q.    Did you send a copy of this

11  agreement to him on October 1st?

12    A.    I don't recall.

13    Q.    How would you have sent a copy of

14  the agreement to him?

15    A.    I don't know.

16    Q.    Would it have been mail?

17    A.    I don't recall.

18    Q.    E-mail?

19    A.    I don't recall.

20    Q.    How long of a period was it

21  between the time that you claim he gave you

22  approval to use his image and the time you

23  drafted this agreement?

24    A.    It would have been a number of

25  months.

87

Joel Weinshanker

1      Q.      Recall receiving the fax?

2      A.      I don't recall.

3      Q.      You don't recall scanning the fax?

4      A.      I don't recall scanning the fax.

5      Q.      And you don't recall sending this

6   e-mail to Lee Speidel.

7      A.      No.

8      Q.      Did you ever discuss with Lee

9   Speidel Zack's approval for the board game?

10     A.      Don't recall.

11     Q.      How often did you speak to Lee

12   Speidel during the 2006 period?

13     A.      I don't recall.

14     Q.      Do you ever recall discussing the

15   board game with Lee Speidel at all?

16     A.      I don't recall.

17     Q.      Let's go back to...

18             MR. WAPNER:  Can we go off the

19             record for a minute?

20

21             (Whereupon, a brief recess is

22             taken.)

23

24     Q.      Let's talk about your conversation

25   with Zack Ward again.

EXHIBIT A PAGE 9

88

Joel Weinshanker

1      You claim that you spoke with him
2  in late '05.  Did you guys agree to a royalty
3  rate at that time?
4      A.      I didn't say -- I said it was
5  either in late  '05 or in '06.
6      Q.      Do you know when in '06 it would
7  have been?
8      A.      It would have been late '05 or
9  there -- I would think the early part of '06.
10      Q.      And during that conversation did
11  you talk about the royalty rate?
12      A.      I believe so.
13      Q.      And what rate did you mention?
14      A.      Two percent.
15      Q.      And did he...did he ask for a
16  higher rate?
17      A.      I don't believe so.
18      Q.      He just agreed to the two percent?
19      A.      I believe so.
20      Q.      And when Warner Brothers was
21  asking for Zack's approval, why didn't you tell
22  them that Zack had verbally approved?
23      A.      I missed that word.
24      Q.      The e-mails that we reviewed show
25  that Warner Brothers was asking for Zack Ward's

EXHIBIT A  PAGE 10

195

# INSTRUCTIONS TO WITNESS

Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any change in the form or substance, and which have been noted on the following errata sheet, along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a Notary Public.

Return the original errata sheet to the court reporter promptly! Court rules require filing within 30 days after you receive the deposition.

196

1                        ERRATA SHEET

2

3    PAGE      LINE#      CHANGE              REASON

4

5    ------------------------------------------------------------

6    ------------------------------------------------------------

7    ------------------------------------------------------------

8    ------------------------------------------------------------

9    ------------------------------------------------------------

10   ------------------------------------------------------------

11   ------------------------------------------------------------

12   ------------------------------------------------------------

13   ------------------------------------------------------------

14   ------------------------------------------------------------

15   ------------------------------------------------------------

16   ------------------------------------------------------------

17   ------------------------------------------------------------

18   ------------------------------------------------------------

19   ------------------------------------------------------------

20   ------------------------------------------------------------

21   ------------------------------------------------------------

22   ------------------------------------------------------------

23

24

25

EXHIBIT A PAGE 12

197

1                              SIGNATURE PAGE

2                                   OF

3                            JOEL WEINSHANKER

4

5

6          I hereby acknowledge that I have read

7     the aforegoing deposition, dated May 6, 2011,

8     and that the same is a true and correct

9     transcription of the answers given by me to the

10    questions propounded, except for the changes, if

11    any, noted on the attached errata sheet.

12

13

14    SIGNATURE:         ---------------------------

15

16

17

18    Sworn and subscribed to before me on

19    this_____day of_____,

20    2011.

21

22

23    ---------------------------------------

24    Notary Public

25

EXHIBIT A  PAGE 13

# Exhibit B

1  RANDALL S. NEWMAN, P.C.
   Randall S. Newman (Cal. Bar No. 190547)
2  37 Wall Street, Penthouse D
3  New York, NY  10005
   Telephone: (212) 797-3737
4  Facsimile: (212) 797-3172
5  rsn@randallnewman.net

6
   *Attorney for Plaintiff,*
7  *Zack Ward*

8

9           UNITED STATES DISTRICT COURT

10          CENTRAL DISTRICT OF CALIFORNIA

11          CENTRAL DIVISION

12

13  ┌─────────────────────────────────────

14  ZACK WARD,

15                    Plaintiff,

16          – against –                  Case #: 11-cv-6358
                                         (MMM)(CWx)
17

18  NATIONAL ENTERTAINMENT              **EXPERT REPORT OF**
    COLLECTIBLES ASSOCIATION, INC. AND  **ROBERT F. VALERIO**
19  JOEL WEINSHANKER,

20                    Defendants.

21  └─────────────────────────────────────

22

23

24

25

26

27

28

EXHIBIT B  PAGE 14

# EXPERT REPORT OF ROBERT F. VALERIO

## I.    INTRODUCTION

### A.    *Qualifications and Experience*

My name is Robert F. Valerio. I am a Senior Instructor on the faculty of OTIS College of Art and Design, teaching business and marketing courses, including a class on how to license products. I am the President of Central Planning Organization LLC, a business consulting company located in Los Angeles, California. I have expertise in the area of product licensing both as a licensee and as a licensor for a variety of brands. My first experience as a licensor was in 1999 when I licensed skateboard brand names and professional skateboarders' names for the use in toy skateboards. My most recent experience as a licensee was licensing the name *Radio Rebel,* a Disney Channel Original movie starring Debby Ryan for use in the production of apparel accessories. My full qualifications and experience are attached as Exhibit "A" in the form of my curriculum vitae. I write and contribute to a number of blogs on the internet. I have testified at a deposition as an expert witness in one other case in the previous 4 years as indicated on Exhibit "B".

### B.    *Assignment*

I have been asked by counsel for the Plaintiff, Zack Ward (the "Plaintiff"), the actor who portrayed the character "Scut Farkus" in the 1983 movie *A Christmas Story* ("ACS" or the "Movie"), to write an expert report (the "Report") that quantifies the Plaintiff's economic damages in the lawsuit that the Plaintiff commenced on July 3, 2010 against the Defendants, National Entertainment Collectibles Association, Inc. ("NECA") and its owner Joel Weinshanker ("Weinshanker") (the "Defendants"). The Plaintiff's claims against the Defendants are based on NECA's production of an ACS board game using the Plaintiff's image (the "Board Game"); a

Scut Farkus Action figure using the Plaintiff's likeness (the "Action Figure") and a four character box set that included the Action Figure (the "Box Set").

I am being compensated at a rate of $350 per hour, and my compensation is not based on the outcome of this litigation or on any of my opinions expressed in this Report. The same hourly rate will be used for further consulting in this matter.

Section II of this Report contains the background on the movie *A Christmas Story* from its release in 1983 to date. Section III of this Report contains a summary of the documentary evidence regarding NECA's sale of consumer merchandise using the Plaintiff's likeness and/or image. Section IV of this Report details the bases for my opinion that Plaintiff's economic damages should be computed using a methodology that assumes the Plaintiff was unaware of any unauthorized use of his image on the Board Game until after the commencement of this lawsuit. Section V of this Report discusses my methodology for quantifying the Plaintiff's economic damages. Section VI of this Report contains my conclusions as to the amount of the Plaintiff's economic damages.

This Report is based on my review of more than a thousand pages of documentary evidence that the Plaintiff obtained from the Defendants and other third-parties during discovery in this lawsuit. In particular, I have reviewed the documents, objects, images and movie footage identified in Exhibit "C" in preparing this Report. I have also conducted independent research regarding the background of ACS from the time of its release in 1983 to date.

## II.   *A CHRISTMAS STORY* BACKGROUND

*A Christmas Story* was released in November, 1983 and grossed approximately $19 million in theaters. ACS was produced by Christmas Tree Films, Inc. ("CTF") and was released by Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). In 1986, Turner Entertainment Company, Inc. ("Turner") purchased MGM but sold MGM back to Kirk Kerkorian the same year.

- 2 -

However, Turner retained MGM's film and television library, including the rights to ACS. In 1990, Time, Inc. and Warner Communications, Inc. merged to form Time Warner, Inc. ("Time Warner"). In 1996, Time Warner acquired Turner Broadcasting System. In 2000, AOL purchased Time Warner but AOL was subsequently spun-off in 2009. Time Warner's brands include the television networks TNT, TBS, CNN, HBO, and Cinemax. Time Warner's brands also include Warner Bros. ("WB"), New Line Cinema, *People, Sports Illustrated and Time*.

In 1997, TNT began airing 24-hour marathons of ACS on Christmas Eve that ran into Christmas Day. By 2002, it was estimated that 38.4 million viewers had watched part of the 24-hour ACS marathon. By 2008, it was estimated that 54.4 million viewers had tuned into ACS at some point in time during the 24-hour marathon. In 2009 the 8:00 p.m. showing of ACS beat all of the major broadcast networks in viewership (ABC, NBC, CBS, FOX).

The Plaintiff was 13 years old when he played the character Scut Farkus. Scut Farkus is the bully in the Movie and basic internet research shows that the American public considers the Scut Farkus character among the most famous bullies in movie history.

## III.    DOCUMENTARY EVIDENCE REGARDING SALE OF ACS MERCHANDISE USING THE PLAINTIFF'S LIKENESS AND/OR IMAGE

In preparing this Report, I performed a detailed review of many of the agreements that the actors and actresses (the "Performers") entered into with CTF prior to their performances in the Movie. Additionally, I have reviewed licensing agreements that WB and NECA entered into in 2003 and 2006 as well as letter amendments to those agreements. A summary of the those agreements is below.

### A.    *Merchandising Rights with ACS's Performers*

I have examined the agreements between CTF and Darren McGavin ("The Old Man"), Melinda Dillon ("Mother"), Peter Billingsley ("Ralphie"), Ian Petrella ("Randy"), Scott Schwartz ("Flick"), R.D. Robb ("Schwartz"), Yano Anaya ("Grover Dill"), Zack Ward ("Scut Farkus"), Tedde Moore ("Miss Shields") and Jeff Gillen ("Santa Claus") and there is a clear difference between CTF's agreements with Zack Ward, Tedde Moore and Jeff Gillen and all the



other performers.  The clear difference is Zack Ward, Tedde Moore and Jeff Gillen did not grant CTF merchandising rights in their agreements.

### i.    Merchandising Rights for "The Old Man", "Mother", "Ralphie", "Randy", "Flick", "Schwartz" and "Grover Dill" Characters

The agreements between CTF and the performers who portrayed The Old Man, Mother, Ralphie, Randy, Flick, Schwartz and Grover Dill all contain a rider entitled "Artist Standard Terms of Employment" (the "Standard Rider").  The Standard Rider specifically defines the term "Merchandising".[i]  The Standard Rider also describes the "Merchandising Royalty" CTF is required to pay the performer.[ii]

### ii.    Merchandising Rights for the "Scut Farkus", "Miss Shields" and "Santa Claus" characters

The agreements between CTF and the performers who portrayed Scut Farkus, Miss Shields and Santa Claus do not contain the Standard Rider and contain no reference to merchandising rights.  In the documentary evidence described below, WB admits that they do not have the rights to use the likes and/or image of Zack Ward or Tedde Moore for merchandising purposes.

### B.    *WB Agrees to Allow NECA to Produce ACS Merchandise*

In 2003, WB entered into a Product License Agreement with NECA dated April 25, 2003 (the "2003 Agreement") that allowed NECA to develop six products including: 1) Bobbing Head Dolls; 2) Collectible Action Figures; 3) Lunchboxes; 4) Leg Lamps; 5) Ball Ornaments; and 6) Decorative Lights.

The 2003 Agreement specifically excluded the Performers' names, likenesses and visual representations from the definition of "Licensed Property".[iii]  The 2003 Agreement prohibited NECA from manufacturing, selling, distributing or promoting merchandise without WB's prior written approval. [iv]  The 2003 Agreement allowed WB to immediately terminate the 2003

- 4 -

EXHIBIT 2 PAGE 18

Agreement if NECA manufactured or sold merchandise without WB's prior written approval. The 2003 Agreement also allowed WB to force NECA to immediately withdraw from the market and destroy all merchandise that WB had not approved in writing.[v]

### C.  WB Agrees to Allow NECA to Produce an ACS Board Game

By letter agreement dated March 5, 2005, the 2003 Agreement was amended to include "Board Games" as a Licensed Product.  The documents produced to the Plaintiff by WB during discovery show that NECA presented WB with the concept of a board game on or about September 8, 2005.  The documents show that on or about September 21, 2005, WB responded to NECA's concept of a board game and requested that NECA redesign the box, the board and identify the Performers on the Board Game so that WB could verify whether they had merchandising rights to the characters.

### i.  Documentary Evidence regarding the Manufacture and Sale of the Board Game

I reviewed purchase orders from Waldenbooks ("Borders"), Rite Aid Corp. ("Rite Aid"), invoices from the Board Game's manufacturer, Enseng (H.K.) LTD. ("Enseng"), Bills of Lading from China Int'l Freight Co., LTD ("CIF"); Sea Waybills from Schenker, Ltd. and Forwarder's Cargo Receipts from NYK Logistics (Hong Kong) Limited ("NYK Logistics") and NECA's invoices to its customers.  Based upon those documents, 20,000 Board Games were shipped by Enseng to either NECA or Borders from August 12, 2006 to December 11, 2006 and NECA continued to sell the Board Game through 2009 as indicated below:

1.    In Purchase Order No. 14070072-0025 dated July 25, 2006, Borders ordered 1,224 Board Games from NECA for delivery to its distribution center in Lavergne, Tennessee at a cost of $12 per game and required delivery of the Board Games between August 11, 2006 and September 30, 2006;

2.    In Purchase Order No. 14070072-0036 dated July 25, 2006, Borders ordered 3,756 Board Games from NECA for delivery to its distribution center in Mira Loma, CA at a cost of $12 per unit and required delivery of the Board Games between August 11, 2006 and September 30, 2006;

EXHIBIT B PAGE 19

3.  Enseng Invoice No. 2006628 dated August 8, 2006 invoiced NECA for 3,756 Board Games and references Border's Purchase Order No. 14070072-0036;

4.  Enseng Invoice No. 2006629 dated August 8, 2006 invoiced NECA for 1,260 Board Games and references Border's Purchase Order No. 14070072-0025;

5.  NECA's Invoice No. 61072 dated August 9, 2006 invoiced Borders for 3,756 Board Games at a cost of $12 per game, states FOB[vi] Hong Kong and references Border's Purchase Order No. 14070072-025;

6.  NECA's Invoice No. 61075 dated August 9, 2006 invoiced Borders for 1,260 Board Games at a cost of $12 per game, states FOB Hong Kong and references Border's Purchase Order No. 14070072-0025 (NECA shipped and invoiced Borders for an extra 36 Board Games as Border's Purchase Order No. 14070072-0025 was for 1,224 Board Games and NECA shipped and invoiced Borders for 1,260 Board Games);

7.  A CIF Bill of Lading shows that on August 12, 2006, 2,344 Board Games were shipped by Enseng FOB Hong Kong for delivery to NECA in New York, New York;

8.  A CIF Bill of Lading shows that on August 13, 2006, 2,640 Board Games were shipped by Enseng FOB Hong Kong for delivery to NECA in Los Angeles, California;

9.  Enseng Invoice No. 2006649 dated August 12, 2006, invoiced NECA for 2,344 Board Games shipped FOB Hong Kong to New York, New York;

10. Enseng Invoice No. 2006650 dated August 12, 2006, invoiced NECA for 2,640 Board Games shipped FOB Hong Kong to Los Angeles, California;

11. A Schenker Sea Waybill ending in the numbers 5568 shows that on August 22, 2006, 1,260 Board Games were shipped from Enseng FOB Hong Kong for delivery to Borders in Mira Loma, California and references Border's Purchase Order No. 14070072-0025;

12. A Schenker Sea Waybill ending in the numbers 6697 shows that on August 22, 2006, 3,756 Board Games were shipped from Enseng FOB Hong Kong for delivery to Borders in Lavergne, Tennessee and references Border's Purchase Order No. 14070072-0036;

13. A CIF Bill of Lading shows that on November 18, 2006, 5,000 Board Games were shipped by Enseng FOB Hong Kong for delivery to NECA in Los Angeles, California;

EXHIBIT B PAGE 20

14.    Enseng Invoice No. 2006915 dated November 20, 2005, invoiced NECA for 5,000 Board Games shipped FOB Hong Kong to Los Angeles;

15.    A CIF Bill of Lading shows that on December 11, 2006, 5,000 Board Games were shipped by Enseng FOB Hong Kong for delivery to NECA in New York, New York;

16.    Enseng Invoice No. 2006957 (date unknown), invoiced NECA for the 5,000 Board Games shipped FOB Hong Kong to New York, New York;

17.    In Purchase Order No. 4508243 dated April 20, 2009, Rite Aid ordered 2,520 Board Games from NECA for delivery to its distribution center in Perryman, Maryland at a cost of $7.50 per game;

18.    A NYK Logistics Forwarder's Cargo Receipt shows that on July 23, 2009, 2,520 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Perryman, Maryland and references Rite Aid's Purchase Order No. 4508243;

19.    Enseng Invoice No. 2009485 dated July 22, 2009, invoiced NECA for 2,520 Board Games and references Rite Aid's Purchase Order No. 4508243;

20.    On or about August 5, 2009, NECA invoiced Rite Aid for 2,520 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508243;

21.    In Purchase Order No. 4508244 dated April 20, 2009, Rite Aid ordered 996 Board Games from NECA for delivery to its distribution center in Waterford, Michigan at a cost of $7.50 per game;

22.    A NYK Logistics Forwarder's Cargo Receipt shows that on July 23, 2009, 996 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Waterford, Michigan and references Rite Aid's Purchase Order No. 4508244;

23.    Enseng Invoice No. 2009486 dated July 22, 2009, invoiced NECA for 996 Board Games and references Rite Aid's Purchase Order No. 4508244;

24.    On or about August 5, 2009, NECA invoiced Rite Aid for 996 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508244;

25.    In Purchase Order No. 4508245 dated April 20, 2009, Rite Aid ordered 1,080 Board Games from NECA for delivery to its distribution center in Tuscaloosa, Alabama at a cost of $7.50 per game;

26.    A NYK Logistics Forwarder's Cargo Receipt shows that on July 23, 2009, 1,080 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Tuscaloosa, Alabama and references Rite Aid's Purchase Order No. 4508245;

EXHIBIT B PAGE 21

27.    Enseng Invoice No. 2009487 dated July 22, 2009, invoiced NECA for 1,080 Board Games and references Rite Aid's Purchase Order No. 4508245;

28.    On or about August 5, 2009, NECA invoiced Rite Aid for 1,080 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508245;

29.    In Purchase Order No. 4508246 dated April 20, 2009, Rite Aid ordered 1,452 Board Games from NECA for delivery to its distribution center in Poca, West Virginia at a cost of $7.50 per game;

30.    A NYK Logistics Forwarder's Cargo Receipt shows that on July 23, 2009, 1,452 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Poca, West Virginia and references Rite Aid's Purchase Order No. 4508246;

31.    Enseng Invoice No. 2009488 dated July 22, 2009, invoiced NECA for 1,452 Board Games and references Rite Aid's Purchase Order No. 4508246;

32.    On or about August 5, 2009, NECA invoiced Rite Aid for 1,452 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508246;

33.    In Purchase Order No. 4508247 dated April 20, 2009, Rite Aid ordered 1,008 Board Games from NECA for delivery to its distribution center in Charlotte, North Carolina at a cost of $7.50 per game;

34.    A NYK Logistics Forwarder's Cargo Receipt shows that on July 23, 2009, 1,008 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Charlotte, North Carolina and references Rite Aid's Purchase Order No. 4508247;

35.    Enseng Invoice No. 2009489 dated July 22, 2009, invoiced NECA for 1,008 Board Games and references Rite Aid's Purchase Order No. 4508247;

36.    On or about August 5, 2009, NECA invoiced Rite Aid for 1,008 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508247;

37.    In Purchase Order No. 4508248 dated April 20, 2009, Rite Aid ordered 888 Board Games from NECA for delivery to its distribution center in Dayville, Connecticut at a cost of $7.50 per game;

38.    A NYK Logistics Forwarder's Cargo Receipt shows that on July 23, 2009, 888 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Dayville, Connecticut and references Rite Aid's Purchase Order No. 4508248;

39.    Enseng Invoice No. 2009490 dated July 22, 2009, invoiced NECA for 888 Board Games and references Rite Aid's Purchase Order No. 4508248;

EXHIBIT B PAGE 22

40.   On or about August 5, 2009, NECA invoiced Rite Aid for 888 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508248;

41.   In Purchase Order No. 4508249 dated April 20, 2009, Rite Aid ordered 1,560 Board Games from NECA for delivery to its distribution center in Liverpool, New York at a cost of $7.50 per game;

42.   A NYK Logistics Forwarder's Cargo Receipt shows that on July 23, 2009, 1,560 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Liverpool, New York and references Rite Aid's Purchase Order No. 4508249;

43.   Enseng Invoice No. 2009491 dated July 22, 2009, invoiced NECA for 1,560 Board Games and references Rite Aid's Purchase Order No. 4508249;

44.   On or about August 5, 2009, NECA invoiced Rite Aid for 1,560 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508249;

45.   In Purchase Order No. 4508250 dated April 20, 2009, Rite Aid ordered 1,032 Board Games from NECA for delivery to its distribution center in Langhorne, Pennsylvania at a cost of $7.50 per game;

46.   A NYK Logistics Forwarder's Cargo Receipt shows that on July 23, 2009, 1,032 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Langhorne, Pennsylvania and references Rite Aid's Purchase Order No. 4508250;

47.   Enseng Invoice No. 2009492 dated July 22, 2009, invoiced NECA for 1,032 Board Games and references Rite Aid's Purchase Order No. 4508250;

48.   On or about August 5, 2009, NECA invoiced Rite Aid for 1,032 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508250;

49.   In Purchase Order No. 4508251 dated April 20, 2009, Rite Aid ordered 1,476 Board Games from NECA for delivery to its distribution center in Rome, New York at a cost of $7.50 per game;

50.   A NYK Logistics Forwarder's Cargo Receipt shows that on July 23, 2009, 1,476 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Rome, New York and references Rite Aid's Purchase Order No. 4508251;

51.   Enseng Invoice No. 2009493 dated July 22, 2009, invoiced NECA for 1,476 Board Games and references Rite Aid's Purchase Order No. 4508251;

52.   On or about August 5, 2009, NECA invoiced Rite Aid for 1,476 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508251;

EXHIBIT B PAGE 23

53.   In Purchase Order No. 4508252 dated April 20, 2009, Rite Aid ordered 1,164 Board Games from NECA for delivery to its distribution center in Wilsonville, Oregon at a cost of $7.50 per game;

54.   A NYK Logistics Forwarder's Cargo Receipt shows that on August 11, 2009, 1,164 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Wilsonville, Oregon and references Rite Aid's Purchase Order No. 4508252;

55.   Enseng Invoice No. 2009510 dated July 28, 2009, invoiced NECA for 1,164 Board Games and references Rite Aid's Purchase Order No. 4508252;

56.   On or about August 5, 2009, NECA invoiced Rite Aid for 1,164 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508252;

57.   In Purchase Order No. 4508253 dated April 20, 2009, Rite Aid ordered 1,080 Board Games from NECA for delivery to its distribution center in Woodland, California at a cost of $7.50 per game;

58.   A NYK Logistics Forwarder's Cargo Receipt shows that on August 11, 2009, 1,080 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Woodland, California and references Rite Aid's Purchase Order No. 4508253;

59.   Enseng Invoice No. 2009511 dated July 28, 2009, invoiced NECA for 1,080 Board Games and references Rite Aid's Purchase Order No. 4508253;

60.   On or about August 5, 2009, NECA invoiced Rite Aid for 1,080 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508253;

61.   In Purchase Order No. 4508254 dated April 20, 2009, Rite Aid ordered 1,740 Board Games from NECA for delivery to its distribution center in Lancaster, California at a cost of $7.50 per game;

62.   A NYK Logistics Forwarder's Cargo Receipt shows that on August 11, 2009, 1,740 Board Games were shipped by Enseng FOB Hong Kong for delivery to Rite Aid in Lancaster, California and references Rite Aid's Purchase Order No. 4508254;

63.   Enseng Invoice No. 2009512 dated July 28, 2009, invoiced NECA for 1,740 Board Games and references Rite Aid's Purchase Order No. 4508254;

64.   On or about August 5, 2009, NECA invoiced Rite Aid for 1,740 Board Games at a cost of $7.50 per game and references Rite Aid's Purchase Order No. 4508254;

EXHIBIT B   PAGE 24

ii.    **Documentary Evidence regarding NECA's Manufacture and Sale of Unauthorized Board Games**

As discussed above, documentary evidence produced by WB shows that the Defendants first presented the concept of the Board Game to WB in September, 2005. Based upon the documentary evidence I reviewed, it is my opinion that NECA manufactured and sold at least 10,000 Board Games without WB's written approval as email correspondence and other documents produced by WB, as well as images of the physical Board Game show that:

1.    On September 8, 2005, NECA presented images and a concept of the Board Game to WB;

2.    On September 21, 2005, WB responded to NECA's concept and requested that NECA make several revisions to the concept and to the Board Game's box;

3.    On February 17, 2006, WB sent NECA an email requesting a prototype of the Board Game;[vii]

4.    On March 8, 2006, WB sent NECA another email requesting a prototype of the Board Game;[viii]

5.    On March 24, 2006, WB sent NECA an email and specifically advised NECA that NECA did not have WB's authorization to sell the Board Game;[ix]

6.    On September 13, 2006, WB sent NECA the following email:[x]

Joel,

I am concerned that I still haven't heard back from you on the approvals for the game.  You can not [sic] ship this product without approval from the actor who plays Scut Farcus [sic].  Please send me a formal letter that indicates you have secured approval;

7.    On or about October 25, 2006, NECA provided WB with a prototype of the Board Game;

8.    On or about October 27, 2006, WB provided the Defendants with comments related to the Board Game one of which was to remove the Plaintiff's image from the Board Game because WB did not have the Plaintiff's merchandising rights.[xi] WB also required NECA to make certain revisions to the Board Game's box and to the Board Game's playing cards;

- 11 -

9.   On or about November 6, 2006,[xii] WB prepared a new Product Licensing Agreement that ultimately was executed by Weinshanker on behalf of NECA and WB dated November 14, 2006 (the "2006 Agreement");

10.  The 2006 Agreement contained a major revision to the 2003 Agreement because WB added what I will refer to as a "Penalty Royalty Rate" to the 2006 Agreement that required NECA to pay a royalty of five (5) times the normal 10% or 12% royalty rate (or 50% and 60%) if NECA produced unauthorized merchandise;[xiii]

11.  Based upon the timing and revisions WB made in the 2006 Agreement, it appears likely that WB was aware that NECA had produced unauthorized merchandise and the 2006 Agreement was written to solidify WB's rights to penalize NECA for producing unauthorized merchandise;

12.  The version of the Board Game NECA sold that contains the "(s05)" legal notice on the back of the Board Game was unauthorized by WB as the "(s05)" version of the Board Game does not incorporate the revisions that WB required prior to its manufacture and sale such as blurring the Schoolteacher's face;

13.  NECA actually manufactured and sold the "(s05)" version of the Board Game.

## IV.   PLAINTIFF'S ECONOMIC DAMAGES – ASSUMPTION OF UNKNOWN USE

In order for me to quantify the Plaintiff's economic damages in this lawsuit, I made the factual assumption that the Plaintiff was not aware that the Defendants had manufactured and sold the Board Game using his image until after the Plaintiff filed this lawsuit against the Defendants on July 3, 2010. The factual bases for that assumption are discussed below.

### A.   Oral Testimony regarding the Plaintiff's Approval of the Board Game

I have reviewed the deposition transcripts of Scott Schwartz, Joel Weinshanker and Zack Ward and a summary of the relevant portions of those witnesses' testimony is summarized below:

#### i.   Scott Schwartz Testimony

Scott Schwartz testified at his deposition that he used his cellular telephone to call the Plaintiff from NECA's offices on October 27, 2006 and put Weinshanker and the Plaintiff on the phone together.

### ii. Joel Weinshanker Testimony

In his deposition, Weinshanker testified that he could not recall when he first discussed licensing the Scut Farkus character with the Plaintiff but that the Plaintiff had orally agreed to allow NECA to use his image on the Board Game. Weinshanker's version of the events that transpired regarding the Plaintiff's approval of the Board Game are not corroborated by any documentary evidence or oral testimony that I have reviewed (other than his own).

### iii. Zack Ward Testimony

The Plaintiff testified at his deposition that Scott Schwartz used his cellular telephone to call the Plaintiff from NECA's offices on October 27, 2006. The Plaintiff testified that Weinshanker did not mention the Board Game during that conversation and he and Weinshanker only discussed licensing the Plaintiff's likeness for the Scut Farkus Action Figure. The Plaintiff testified that he wanted, and he thought, he was signing a license agreement for a Scut Farkus Action Figure. The Plaintiff testified that he approved a prototype of the Scut Farkus Action Figure and the Scut Farkus action figure was manufactured and sold. The Plaintiff testified that he was completely unaware of the Board Game until after he commenced the lawsuit in New Jersey against the Defendants. The Plaintiff's July 3, 2010 Complaint filed against the Defendants supports the Plaintiff's contentions that he was unaware of the Board Game until after the commencement of this lawsuit because the Plaintiff's Complaint **only** seeks damages from the Defendants based on the Action Figures and the Complaint makes no mention of the Board Game despite the fact that **95.5%** of the royalties that the Defendants have admitted are due the Plaintiff were based on NECA's sales of the Board Game.

- 13 -

**B.**    *Unequal Knowledge and Experience Between the Parties*

Weinshanker has considerable experience in merchandise licensing as Weinshanker testified at his deposition that he had been involved in music and movie merchandising since 1992. Clearly, Weinshanker had considerable experience with complicated licensing agreements and knew industry standards. It is clear to me after reviewing the Plaintiff and Weinshanker's testimony that due to the Plaintiff's lack of experience in merchandising, the Plaintiff relied on and trusted Weinshanker to draft and provide him with a fair and equitable licensing agreement.

The evidence I reviewed indicates that the Plaintiff had little to no understanding of his legal rights to license his likeness and/or image from the Movie for merchandising purposes. This is supported by the following:

1.    The Plaintiff did not have a copy of his 1983 agreement with CTF prior to the initiation of the lawsuit against the Defendants;

2.    The Plaintiff did not have a copy of the other Performers' agreements with CTF prior to the initiation of the lawsuit against the Defendants;

3.    The Plaintiff had never licensed his likeness and/or image for merchandise related to the Movie prior to his interaction with the Defendants;

4.    The Plaintiff did not have an attorney review the NECA/Ward Agreement;

5.    The Plaintiff executed and returned the NECA/Ward Agreement to NECA without any revisions, on the same day that he received the NECA/Ward Agreement from NECA;

In addition to the facts identified above which indicate that the Parties did not possess equal knowledge regarding merchandise licensing, the NECA/Ward Agreement itself (drafted by Weinshanker) contains provisions that demonstrate the Plaintiff's lack of knowledge and experience in consumer merchandising. For example:

1)    Weinshanker prepared the NECA/Ward Agreement with a date of October 1, 2006 even though Weinshanker did not contact the Plaintiff about licensing his likeness until October 25, 2006;

- 14 -

2)   The NECA/Ward Agreement contains no minimum guarantee or royalties in dollar terms, like the WB Agreements;

3)   The NECA/Ward Agreement contains no list of specific products that NECA intended to produce;

4)   The NECA/Ward Agreement contains no provision regarding a "sell-off" or what NECA had to do with products in their inventory after the NECA/Ward Agreement expired on December 31, 2008;

5)   The NECA/Ward Agreement contains no penalty if NECA engaged in any unauthorized use of the Plaintiff's likeness and/or image.

### C.   The Defendants' Lack of Intent to Perform Contractual Obligations

Based upon the documentary evidence provided to me, there is no documentary evidence that the Defendants intended to perform the promises they made in the NECA/Ward Agreement. For example:

1.   There is no documentary evidence to show that the Plaintiff approved of the Board Game prior to its manufacture and sale or at any time subsequent thereto;

2.   There is no documentary evidence to show that NECA sent any quarterly royalty reports to the Plaintiff prior to the initiation of this lawsuit on July 3, 2010;

3.   There is no documentary evidence to show that NECA sent any quarterly royalty checks to the Plaintiff;

4.   There is no documentary evidence to show that NECA has paid the Plaintiff any royalties to date for the use of his likeness and image on the Board Game, Action Figure and Box Set;

5.   After the initiation of this lawsuit, NECA prepared and submitted quarterly royalty statements to the Plaintiff that were materially different than the statements provided to WB as to the timing of merchandise sales;

6.   The documentary evidence shows that NECA sold the Board Game prior to October 1, 2006, the date the NECA/Ward Agreement was dated;

7.   The documentary evidence shows that NECA sold the Board Game prior to December 20, 2006, the date the Plaintiff received, executed and returned the NECA/Ward Agreement to NECA;

8.   The documentary evidence shows that NECA sold merchandise using the Plaintiff's image and likeness after the NECA/Ward Agreement expired on October 31, 2008;

- 15 -

9. The documentary evidence shows that NECA sent quarterly royalty reports to WB based on sales of merchandise from July 1, 2006 to December 31, 2009 and reported sales of merchandise using the Plaintiff's image and likeness;

10. The documentary evidence shows that NECA sold Board Games that were unapproved by WB in 2006;

11. The documentary evidence shows that NECA's profit on the Action Figure and Box Set, after accounting for the cost of the unsold merchandise was approximately $28,000 or less than 1% of NECA's profits made from ACS merchandise from July 1, 2006 to December 31, 2009.

Based upon the foregoing evidence, my calculation of a reasonable royalty amount is based on the assumption that: 1) Weinshanker concealed crucial facts from the Plaintiff (the existence of the Board Game) during their October 27, 2006 telephone conversation; and 2) the Plaintiff was not aware of NECA's unauthorized use of his image on the Board Game at the time the Plaintiff commenced this lawsuit against the Defendants on July 3, 2010.

## V.   THE PLAINTIFF'S ECONOMIC DAMAGES QUANTIFIED

In my opinion and experience, typical licensing agreements for the use of a likeness, image or a trademark typically require the licensee to pay an 8%-12% royalty based upon net sales of a product (gross sales less returns).  My opinion is based upon my experiences both as a licensee and licensor as well as the fact that the WB master license for *A Christmas Story* (the 2003 Agreement and the 2006 Agreement), required NECA to pay WB a royalty of 10% based upon sales of non-FOB licensed merchandise and royalty of 12% based upon sales of FOB licensed merchandise.

The business model behind this royalty rate is that a typical licensee will make a 50%-75% gross profit on sales of a product after direct costs, and a portion of those profits are paid to the licensor.  Obviously, some licensees' profits are greater than others, but most licensees that produce consumer merchandise pay a royalty in the 8%-12% range to the licensor.

In my opinion and experience, the vast majority of modern contracts in the entertainment industry between a producer and a performer contain merchandising provisions wherein the performer grants the producer merchandising rights for a pre-determined royalty rate.  My

EXHIBIT B PAGE 30

opinion is supported by my experiences in the production of consumer merchandise as well as the fact that Weinshanker testified at his deposition that NECA makes "thousands of products" and Arnold Schwarzenegger (Terminator and Terminator 2) and the Plaintiff were the only two actors that NECA dealt with that retained merchandising rights.

### A. Methodology for Computing Plaintiff's Economic Damages

In normal circumstances, if a performer learns that his/her likeness and/or image was used on consumer merchandise without their consent, the infringing party would pay a penalty royalty rate on past sales and either enter into a reasonable go-forward  licensing agreement or destroy and redesign the merchandise without using the unauthorized likeness and/or image. However, the circumstances of this matter are not normal in that the Plaintiff did not discover that his image had been used on the Board Game until after the Plaintiff filed this lawsuit against the Defendants based on the Action Figure at which time NECA had already redesigned the Board Game without using the Plaintiff's image.

Therefore, a proper methodology for use in computing a reasonable royalty due the Plaintiff could be determined by using a hypothetical negotiation methodology involving a willing licensor and licensee.  When using the hypothetical negotiation methodology it is normally appropriate to consider the hypothetical negotiation at the time the infringing party began producing unauthorized merchandise.

However, the circumstances surrounding the manufacture and sale of the Board Game are unusual because the Plaintiff's consent was obtained by Weinshanker's omission of crucial facts. Therefore, based on the assumption that Weinshanker concealed the existence of the Board Game from the Plaintiff, it is my opinion that, the hypothetical royalty should be calculated at the time that the Plaintiff discovered the Defendants' fraudulent conduct in 2010 and not at the time that the Defendants' shipped the unauthorized Board Game in August 2006. My opinion that the hypothetical royalty should be determined at the date of discovery is based upon the fact that calculating the hypothetical royalty at the earlier shipping date would allow the Defendants to benefit from their assumed fraudulent conduct.

**B.**     *Hypothetical Negotiation at Time of Discovery*

In forming my opinion regarding a hypothetical negotiation at the time the Plaintiff discovered the Board Game, I am assuming that a hypothetical royalty negotiation would take place with:

1.     The Plaintiff fully aware of the Defendants' unauthorized use of the Plaintiff's image on the Board Game;

2.     The Plaintiff fully aware of his legal rights with respect to licensing his likeness and/or image for use on consumer merchandise; and

3.     That WB was not aware of the Defendants' unauthorized use of the Plaintiff's image of the Board Game but fully intended to enforce all provisions of the 2006 Agreement if WB was made aware of NECA's unauthorized use of the Plaintiff's image on the Board Game.

With the above assumptions in mind, the quarterly royalty reports that NECA provided to WB indicate that NECA's sales of the board game amounted to $755,403.72 and NECA paid WB royalties in the amount of $75,540.37 on the sales of the Board Game.[xiv]   If, however, Weinshanker had not fraudulently induced the Plaintiff into executing the NECA/Ward Agreement in December, 2006, NECA would have been contractually obligated to pay an additional 40% royalty of $126,925.49 on non-FOB sales and an additional 50% royalty of $219,045 on the FOB sales of the Board Game pursuant to the 2006 Agreement.[xv]   Therefore, if WB became aware of the unauthorized use of the Plaintiff's image on the Board Game, NECA would have been contractually obligated to pay WB an additional royalty in the amount of $345,970.49 due to the unauthorized sale of the Board Game.

More importantly, based on the assumption that WB would have enforced all provisions contained in the 2006 Agreement, WB would have cancelled the 2006 Agreement and NECA would have lost a substantial amount of profits on the sale of ACS merchandise. Based upon the evidence I have reviewed in this matter and the assumptions above, it is my opinion that a hypothetical negotiation between the Plaintiff and the Defendants regarding the unauthorized use of the Plaintiff's image on the Board Game would have resulted in the Defendants paying the

Plaintiff a royalty in the amount of $345,970.49 which is the amount that the Defendants would have had to pay WB if WB was made aware of the unauthorized use of the Plaintiff's image on the Board Game and WB enforced all provisions of the 2006 Agreement, including terminating the 2006 Agreement because of the unauthorized Board Game.

It is my opinion that in a hypothetical negotiation between the Parties, the Defendants would have agreed to pay that amount to Plaintiff in order to avoid WB cancelling the 2006 Agreement because at a typical profit rate of 50%-75%, NECA's profits on non-Scut Farkus merchandise from July 1, 2006 to December 31, 2009 averaged $350,000 to $521,000 per quarter and NECA would have lost several million dollars in future profits from the sale of ACS merchandise if WB cancelled the 2006 Agreement.

### C.   Calculation of Hypothetical Royalty for Action Figure and Box Set

In addition to the royalty for the Board Game, the Plaintiff is entitled to a reasonable royalty for the Action Figure and Box Set. In my opinion, because the Plaintiff approved of the Action Figure and the Box Set and agreed to a 2% royalty for the sale of those products, a 2% royalty rate is a reasonable rate for the use of the Plaintiff's likeness on those products. Based upon the documentary evidence I reviewed, NECA's sales of Action Figures was $20,731.45 and NECA's sales of the Box Set was $59,458.69. Therefore, it is my opinion that a reasonable royalty for the Action Figure is $414.63 and a reasonable royalty for the Box Set is $1,189.17.

## VI.    **CONCLUSION**

Based upon the evidence I reviewed in this matter and the assumptions I have made based upon that evidence, it is my opinion that a reasonable royalty rate on the Board Game, the Action Figure and the Box Set using a hypothetical negotiation methodology is $347,574.29.

|  | Qty. | Gross Sales | Cost of Goods | 10% WB Royalty | Profit Before Ward Royalty | Ward Royalty | NECA Profit after Ward Royalty |
|---|---|---|---|---|---|---|---|
| **Board Game** | 74,236 | $755,403.72 | $303,013.64 | $75,540.37 | $376,849.71 | $345,970.49 | $30,879.22 |
| **Action Figure** | 2,652 | $20,731.45 | $11,258.72 | $2,073.15 | $7,399.58 | $414.63 | $6,984.95 |
| **Box Set** | 2,316 | $59,458.69 | $15,748.80 | $5,945.87 | $37,764.02 | $1,189.17 | $36,574.85 |
|  |  |  |  | Total |  | $347,574.29 | $74,439.02 |

Executed this seventeenth day of August, 2012 in Los Angeles, CA.

*Robert F. Valerio*

_____

Robert F. Valerio

Exhibit B Page 34

i    Paragraph 1 of the Standard Rider defines the term "Merchandising" as:

Any and all rights to use the name and/or likeness of the Artist as he (or she) appears in the Photoplay with respect to toys, novelties, figures and figurines, trinkits, games, fabrics, apparel, food, drink and all other goods and services of a similar or dissimilar nature and premiums and the like.

ii    Paragraph 11 entitled "Merchandising Royalty" states:

In accordance with the foregoing, Producer may enter into merchandising deals or commercial tie-ups relating to the photoplay which may or may not include the use of Artist's name or likeness.  Producer agrees to pay Artist an amount equal to 5% of the profits (as hereinafter defined) derived from those merchandising deals or commercial tie-ups relating to the photoplay from which Producer derives monetary revenue, and which include the use of Artist's name or likeness but do not include the use of any other artist's name or likeness; if Artist's name or likeness is used in conjunction with the names or likenesses of one or more other artists, Producer agrees to pay Artist a pro-rata share (payable among all artists whose names or likeness are used) of the profits (as hereinafter defined).

In determining the amount of profits from merchandising deals or commercial tie-ups, it is understood that Producer may retain for itself or pay to some other person or company (including an affiliate or subsidiary of Producer or of Metro-Goldwyn-Mayer Film Co., a fee (herein called the "merchandising fee") up to (but not exceeding) 50% of the gross revenue derived from each respective merchandising deal or commercial tie-up.  Only the sums actually received by Producer from a merchandising deal or commercial tie-up utilizing Artist's name or likeness, after deduction of the aforesaid merchandising fee shall be deemed to be profits to Producer.

Artist shall not be entitled to any share of the profits from merchandising deals or commercial tie-ups which include only the name of the character portrayed by Artist or a fictional likeness of the character played by Artist (i.e., one in which Artist's name or likeness is not involved).  The marketing or exploitation of sound track phonograph records and/or book publications shall under no circumstances be deemed to be a merchandising deal or commercial tie-up from which Artist receives a share of profits.  It is recognized that Producer may make commercial tie-ups from which no revenue is derived. i.e., where the benefit to Producer is the advertising, publicity and exploitation received from the tie-up, and that such cases are not within the scope of this SECTION.

Within ninety (90) days after the end of each semi-annual period, Producer will render statements to Artist showing the gross revenues, the deductions from gross revenues, and the amount, if any, owing to Artist which amount shall be paid concurrently with the rendition of the statement. Producer shall keep true and accurate books of account with respect to the profits derived from merchandising or commercial tie-ups relating to the photoplay at such place(s) as may from time to time be customary with Producer or in accordance with its ordinary business practices. Artist shall have the right to have the said books of account audited or inspected at the place where the same are kept, at Artist's own cost, by any firm of certified public accountants, at reasonable time during business hours, but not more than once annually and for not more than one (1) consecutive thirty (30) day period during each annual period, and then only to the extent that they relate to the photoplay. Said books of account need not be retained by Producer for more than eighteen (18) months after the date on which Producer renders the first statement covering a particular accounting period.

iii     Paragraph 1(d) of the 2003 WBCP/NECA Licensing Agreement defines the term "Licensed Property" as:

The elements, including, but not limited to, trademarks, copyrights, logos, character names, artwork, environmental settings, costumes and plot elements (the "Movie Elements"), depicted in the version released in the year 1983 of the theatrical motion picture entitled **"A CHRISTMAS STORY"** (the "Motion Picture") but only to the extent merchandising rights have been granted to Licensor in and to such Movie Elements. Excluded herefrom is the right to reproduce the names, likenesses, autographs, signatures, visual representations, audio recordings or voices (the "Name and Likeness") of the actors and actresses in the Motion Picture (the "Performer(s)") except to the extent specifically permitted otherwise in writing by Licensor and then only to the extent the Performer(s) have granted merchandising rights to Licensor. Notwithstanding the foregoing, all uses of any of the Movie Elements and the Name and Likeness of the Performer(s) afforded hereunder must be specifically approved in writing by Licensor, pursuant to Paragraph 9 herein.

iv     Paragraph 9(b) of the 2003 WBCP/NECA Licensing Agreement states, in part, that:

No Licensed Products and no material utilizing the Licensed Property shall be manufactured, sold, distributed or promoted by Licensee without prior written approval.

EXHIBIT 3  PAGE 34

<sup>v</sup> Paragraph 9(c) of the 2003 WBCP/NECA Licensing Agreement states, in part, that:

> Approval or disapproval shall lie in Licensor's sold discretion. Any Licensed Products not so approved in writing shall be deemed unlicensed and shall not be manufactured or sold. If any unapproved Licensed Products are being sold, Licensor may, together with other remedies available to it including, but not limited to, immediate termination of this Agreement, require such Licensed Products to be immediately withdrawn from the market and to be destroyed, such destruction to be attested to in a certificate signed by an officer of Licensee.

Paragraph 14 of the 2003 Agreement allows the Licensor to terminate the agreement upon the occurrence of one or more "defaults" which paragraph 14(a)(viii) includes:

> Licensee shall manufacture, sell or distribute, whichever first occurs, any of the Licensed Products with the prior written approval of Licensor as provided in Paragraph 9 hereof.

<sup>vi</sup> The term FOB is a term used in the commercial shipping industry which usually is understood to mean Freight on Board and refers to which party pays for shipping costs and when responsibility for goods is transferred. FOB shipping results in lower merchandise cost to the licensee in the form of savings on shipping and insurance and a portion of that savings is typically passed on to the licensor. The reason that a licensee pays a higher royalty on FOB merchandise is due to the shipping and insurance cost savings to the licensee a portion of which is passed on to the licensor.

<sup>vii</sup> *See* February 17, 2006, email from Carmella Johns to Weinshanker.

<sup>viii</sup> *See* March 8, 2006 email from Carmella Johns to Weinshanker.

<sup>ix</sup> *See* March 24, 2006 email from Carmella Johns to Weinshanker which states, in part:

> Please be advised that unless we see and approve the Christmas Story board game that we requested two months ago – you are not authorized to ship product to retail. We initially only received a concept and never received the actual play pattern concept. Once received, we may have creative comments/revisions that you understand you will need to incorporate into the product before production.

<sup>x</sup> *See* September 13, 2006 email from Lee Speidel to Weinshanker.

EXHIBIT 3 PAGE 37

xi    WB's comments stated:

> Sample needs revisions: 1. Please omit the Scut Farcus [sic] pieces (or provide proof that you have secured the rights to use his likeness). We are not allowed to licensee [sic] his likenees [sic] (Zack Ward). The following characters are the only ones allowed: - all of the Parker family – Flick (Scott Schwartz) 2. On the board: - "The School Yard" scene, please blurr [sic] the faces of all other characters (except Ralphie, Randy and Flick). We are not allowed to license the characters. – "the School" scene, please blur the schoolteacher's [sic] face. The actresses' likeness is not allowed on merchandise. – Delete the WB SHIELD and legal notice. These are only required on packaging. ORNAMENT SHAPED CARDS: 1. Remove the WB SHIELD and legal notice. RECTANGULAR CARDS: 1. Add standard legal notice. 2. Remove Scut Farcus [sic] (or provide proof that you have secured the right to use his likeness). Resubmit with corrections.

WB also advised the Defendants that they could "Proceed to production after making corrections" that included the legal notice on the back of the board game box to read "WB SHIELD: TM & © Warner Bros. Entertainment Inc. (s06)".

xii    A review of the footer on the 2006 WBCP/NECA Product Licensing Agreement indicates a date of November 6, 2006.

xiii    Paragraph 3 of the 2006 Agreement states that:

> Licensee understands and agrees that the license granted in Paragraph 2(a) with respect to the Licensed Property is limited to the characters and elements depicted in the Style Guide(s) and/or any Artwork that has been approved by Licensor in accordance with this Agreement, and all rights in, to or associated with any and all other elements and properties are excluded from such license. Without limiting the generality of the foregoing, all rights in, to or associated with the following elements and properties are specifically excluded from such license: (i) any television or theatrical motion picture, television series, movie-of-the-week, television special, television pilot, direct-to-video production, online series, stage show (or other live production), novel, comic book or other publication, or any other media representation derived from the Licensed Property, or from which the Licensed Property was derived, that are not specifically identified as Licensed Property hereunder; (ii) any previously or subsequently produced versions of the Licensed Property (including, without limitation, any prequels, sequels or spin-offs of the Licensed Property or any multi-media combination that includes any element(s) of the Licensed Property); (iii) any other version(s) of the Licensed Property that are not specifically identified as Licensed Property (e.g., any infant toddler or other age-differentiated versions of the Licensed Property that are not

specifically identified as Licensed Property); (iv) any guest stars depicted in connection with the Licensed Property that are not principally associated with the Licensed Property; (v) film clips, stills, animation clips, sounds bites, voices, music or other audio clips; (vi) the names, likenesses, autographs, signatures, visual representations, audio recordings or voices (the "Names and Likenesses") of any and all actor(s), author(s), creator(s), director(s) and/or other individuals represented in, or otherwise attached to or connected with, the Licensed Property, except to the extent specifically permitted otherwise in writing by Licensor and then only to the extent merchandising rights to the Names and Likenesses have been granted to Licensor; (vii) elements of or related to the Licensed Property that are not owned or controlled by Licensor, except to the extent specifically permitted otherwise in writing by Licensor and then only to the extent merchandising rights to such elements have been granted to Licensor; and (viii) any other properties, characters or elements specifically excluded from Licensed Property elsewhere in this Agreement. If Licensee wishes to obtain rights to use any such elements or properties, Licensee must separately procure the necessary rights and any rights clearance or related fees arising therefrom will be at Licensee's sole expense. Licensee will not, in any manner, use any property or properties owned or controlled by Licensor not included as Licensed Property under this Agreement (except as may be authorized prior to such use pursuant to any separate, written agreement(s) between the parties hereto). In addition to all other remedies to which Licensor may be entitled, pursuant to this Agreement, at law, in equity or otherwise (including, without limitation, termination of this Agreement and injunctive relief), if Licensee engages in any unauthorized use of any such property or properties, Licensee will pay to Licensor an amount equal to five (5) times the royalties that would have been payable to Licensor at Licensor's prevailing royalty rate for such property or properties had Licensee's unauthorized use been licensed by Licensor. The parties expressly agree that while the precise amount of damage suffered by Licensor from such improper use is difficult to determine with precision, the payment contemplated hereunder constitutes a reasonable estimate of the losses that might be sustained by Licensor thereby, and shall not be argued to be or deemed a penalty.

[xiv]     According to the 2003 and 2006 WBCP/NECA Licensing Agreements, NECA was required to pay a 10% royalty on gross sales and a 12% royalty on gross FOB sales. According to the quarterly royalty reports NECA provided to WBCP, NECA paid a 10% royalty on all sales despite the fact that FOB sales to Rite Aid and Borders totaled $403,090. As a result, NECA should have paid WBCP an extra 2% or $8,761.80 in royalties to WBCP on the FOB sales of the board game.

xv        According to the documentary evidence I reviewed, non-FOB sales of the Board Game amounted to $317,313.72 and FOB sales of the Board Game amounted to $438,090.

EXHIBIT B PAGE 40

# EXHIBIT A

EXHIBIT 3   PAGE 41

## Robert Valerio

*213-784-4040*

*1680 Vine St. Hollywood CA 90028*

robv@cplanorg.com

- **President** Central Planning Organization LLC

  October 2003 — Present

  CPO LLC provides experienced management for explosive growth companies. Currently CPO provides business management and consulting to a variety of companies in the internet, consumer products, and manufacturing industries. Projects include retail, licensing, online publishing, ecommerce, apparel, cleantech, entertainment, and teen markets.

- **Senior Lecturer** Otis College of Art and Design

  August 2005 — Present

  Marketing class focused on the changing competitive landscape brought on by the internet and social media. Teach a business course focused on the globalization of products and services and the unique role creatives hold as key to innovative companies.

- **Managing Partner** EMAX Hosting

  October 2006 — October 2009 (3 years)

  Internet company with full service hosting of 3000 business ecommerce websites. Included 24/7 dedicated technical support, credit card processing, website design and back end infrastructure. Offices in Los Angeles USA, Toronto Canada, and Nasik India. Sold to Jumpline.com in October 2009.

- **CEO** Destructo Industries, Inc.

  April 2005 — July 2008 (3 years 4 months)

  Spun this brand out of Giant Skateboard Distribution in April 2005 with 4 partners. $1.3 million gain in first year. I moved production overseas, leveraged my good standing with vendors and banks to finance the company, and expanded into softgoods to complement the hardgoods categories. Sold company in July 2008.

- **CEO** Giant Skateboard Distribution

  February 2004 — April 2005 (1 year 3 months)

  Replaced existing executive management and completed a turnaround effort for the business. Moved location, right-sized staff and packaged company for a sale in April 2005.

- **President** Dwindle Distribution/World Industries

  1999 — 2003 (4 years)

  Grew company from $15 million to $63 million. Sold to 1000 retailers and 43 countries. Moved production from US to China. Launched 5 new successful brands under corporate umbrella. Sold company for $46 million to public company in 2002.

- **General Manager** Tum Yeto Inc.

  1995 — 1999 (4 years)

  Grew company by 300% while reducing staff by 2/3. Vertically integrated production and significantly increased customer base globally. Moved company to new corporate headquarters.

EXHIBIT B PAGE 42

**Other Experience**

AIGA Los Angeles, Los Angeles, CA
**Board of Directors, Treasurer**

Los Feliz Village Business Improvement District, Los Angeles, CA
**Board of Directors**

International Association of Skateboard Companies, Rancho Santa Margarita, CA
**Board of Directors, Chairman of the Board**

Chop Chop Woodshop Ltd., Guangdong, China
**Board of Directors**

# EXHIBIT B

**EXHIBIT B**
**CASES IN WHICH I HAVE TESTIFIED AS EXPERT WITNESS IN PAST 4 YEARS**

1. Streetsurfing, LLC v. United States, United States Court of International Trade, Case No. 09-00136.

# EXHIBIT C

EXHIBIT B PAGE 44

## EXHIBIT C
## EVIDENCE REVIEWED

1.    The Plaintiff's Complaint filed on July 3, 2010;

2.    The Defendants' Answers filed on August 3, 2010;

3.    The Plaintiff's Amended Complaint filed on May 5, 2011;

4.    The License Agreement between Zack Ward and NECA;

5.    The Deposition Transcript of Joel Weinshanker dated May 6, 2011;

6.    The Deposition Transcript of Zack Ward dated June 7, 2011;

7.    The Deposition Transcript of Scott Schwartz dated July 7 2011;

8.    The Defendants Interrogatories to the Plaintiff and the Plaintiff's Responses to those Interrogatories;

9.    The Plaintiff's Interrogatories to the Defendants and the Defendants' Responses to those Interrogatories;

10.   The Defendants Requests for Admissions to the Plaintiff and the Plaintiff's Responses to those Requests for Admissions;

11.   The Plaintiff's Requests for Admissions to the Defendants and the Defendants' Responses to those Requests for Admissions;

12.   The April 25, 2003 Product License Agreement between Warner Bros. Consumer Products, Inc. and NECA;

13.   The November 24, 2003 Letter Agreement between WBCP and NECA;

14.   The March 8, 2005 Letter Agreement between WBCP and NECA;

15.   The November 14, 2006 Product License Agreement between Warner Bros. Consumer Products, Inc. and NECA;

16.   The March 22, 2007 Letter Agreement between WBCP and NECA;

17.   The June 12, 2008 Letter Agreement between WBCP and NECA;

18.   The June 30, 2009 Letter Agreement between WBCP and NECA;

19.   The Agreement between Christmas Tree Films, Inc. and Zack Ward;

20.   The Agreement between Christmas Tree Films, Inc. and Scott Schwartz;

21.   The Agreement between Christmas Tree Films, Inc. and Yano Anaya;

22.   The Agreement between Christmas Tree Films, Inc. and Peter Billingsley;

23.    The Agreement between Christmas Tree Films, Inc. and Tedde Moore;

24.    The Agreement between Christmas Tree Films, Inc. and R.D. Robb;

25.    The Agreement between Christmas Tree Films, Inc. and Jeff Gillen;

26.    The Agreement between Christmas Tree Films, Inc. and Ian Petrella;

27.    The Agreement between Christmas Tree Films, Inc. and Darren McGavin;

28.    The Agreement between Christmas Tree Films, Inc. and Melinda Dillon;

29.    Quarterly Royalty Reports NECA provided WBCP from January 1, 2006 to December 31, 2009;

30.    Quarterly Royalty Reports NECA provided the Plaintiff show sales from October 1, 2006 to December 31, 2008;

31.    Bills of Lading from China Int'l Freight Co., Ltd.

32.    Sea Waybills from Schenker, Ltd.;

33.    Forwarder's Cargo Receipts from NYK Logistics (Hong Kong) Limited;

34.    Invoices from Enseng (H.K.) Ltd.;

35.    Invoices from Gold Star Tooling Co.;

36.    Invoices from Yuen Toys Manufactory Ltd.;

37.    NECA Invoices to customers;

38.    Purchase Orders from Waldenbooks (Borders);

39.    Purchase Orders from Rite Aid;

40.    Documents provided by WBCP regarding approval of the Board Game and the Scut Farkus Action Figure;

41.    Email from Carmella Johns to Joel Weinshanker dated February 17, 2006;

42.    Email from Joel Weinshanker to Carmella Johns dated February 17, 2006;

43.    Email from Carmella Johns to Joel Weinshanker dated March 8, 2006;

44.    Email from Joel Weinshanker to Carmella Johns dated March 9, 2006;

45.    Email from Carmella Johns to Joel Weinshanker dated March 24, 2006;

46.    Email from Lee Speidel to Joel Weinshanker dated September 13, 2006;

47.    Email from Joel Weinshanker to Lee Speidel dated December 20, 2006;

48.    Email from Lee Speidel to Julie Hanif, Scott Whiteleather, Steven Fogelson and Kathleen Wallis dated December 21, 2006

49.    Images of the 7" Scut Farkus Action Figure;

50.    Images of the Kids Box Set;

51.    Images of the *A Christmas Story* Board Game ("S05");

52.    Images of the *A Christmas Story* Board Game ("S08");

53.    Footage from the movie *A Christmas Story*.