# Exhibit D

1    SHEPPARD MULLIN RICHTER & HAMPTON LLP
      KENT R. RAYGOR, Cal. Bar No. 117224
2    BENJAMIN O. AIGBOBOH, Cal. Bar No. 268531
      1901 Avenue of the Stars, Suite 1600
3    Los Angeles, California 90067-6017
      Telephone: (310) 228-3700
4    Facsimile: (310) 228-3701
      E-mail:     kraygor@sheppardmullin.com
5                baigboboh@sheppardmullin.com

6    Attorneys for Defendants
      NATIONAL ENTERTAINMENT
7    COLLECTIBLES ASSOCIATION, INC. and
      JOEL WEINSHANKER

8

9               UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                 CENTRAL DIVISION

12

13    ZACK WARD,               Case No. 11-CV-6358 MMM (CWx)

14           Plaintiff,         **DEFENDANT NATIONAL**

15                      **ENTERTAINMENT**
         v.                   **COLLECTIBLES ASSOCIATION,**
16                      **INC.'S AND JOEL**
      NATIONAL ENTERTAINMENT   **WEINSHANKER'S REBUTTAL**
17    COLLECTIBLES ASSOCIATION,   **EXPERT DISCLOSURE [FED. R.**
      INC., and JOEL WEINSHANKER,   **CIV. P. 26(a)(2)]**

18

19           Defendants.       FAC Filed:    May 5, 2011

20

21

22

23

24

25

26

27

28

-1-

TO PLAINTIFF ZACK WARD AND HIS ATTORNEY OF RECORD:

Defendants National Entertainment Collectibles Association, Inc. and Joel Weinshanker hereby designate the following rebuttal expert witness pursuant to FED. R. CIV. P. 26(a)(2):

Jonathan Faber

Luminary Group LLC

2150 Intelliplex Drive, Suite 100

Shelbyville, Indiana 46176

Pursuant to FED. R. CIV. P. 26(a)(2)(B), attached hereto, and incorporated by this reference, is the written report of Jonathan Faber, prepared and signed by the rebuttal expert.

Dated:  August 31, 2012              SHEPPARD MULLIN RICHTER & HAMPTON LLP

By        /s/ Kent R. Raygor
              KENT R. RAYGOR

Attorneys for Defendants
NATIONAL ENTERTAINMENT
COLLECTIBLES ASSOCIATION, INC. and
JOEL WEINSHANKER

406642739.1

-2-

EXHIBIT D  PAGE 189

**Expert Witness Rebuttal Report**
**by Jonathan Faber**
**on behalf of**
**National Entertainment Collectibles Association, Inc.**
**and Joel Weinshanker**

In the matter captioned
*Zack Ward v. National Entertainment*
*Collectibles Association, Inc. and Joel Weinshanker,*
(Case No. 11-cv-6358 (MMM)(CWx)

**Submitted August 31, 2012**

CONFIDENTIAL DOCUMENT
Subject to Confidentiality Protective Order

© 2012 Jonathan Faber

**Table of Contents**

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

II.     Qualifications and Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

III.    Overview of Rebuttal to the Valerio Report. . . . . . . . . . . . . . . .   4

IV.     Zack Ward Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

V.      NECA's Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

VI.     Valuation and Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

VII.    Rebuttal to Mr. Valerio's Expert Report . . . . . . . . . . . . . . . . . .   7

Appendix A—Table of Sources. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

Appendix B—CV of Jonathan Faber. . . . . . . . . . . . . . . . . . . . . . . . .   9

Appendix C—Statement of Assumptions and Limiting Conditions. . . . . .  12

Appendix D—Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

2

## I.   Introduction

I have been asked to examine and respond to the expert report of Robert F. Valerio submitted by
Plaintiff Zack Ward ("Ward") in this action concerning the value of the use of the character
portrayed by Mr. Ward in *A Christmas Story* as used by National Entertainment Collectibles
Association ("NECA") on board games, an action figure, and a box set of action figures ("Use").

## II.   Qualifications and Procedure

As the Founder and CEO of Luminary Group LLC, I am responsible for managing, promoting
and protecting the intellectual property of my clients.  This includes seeking out potential
business partners, negotiating contracts for use of my clients' identities, and monitoring potential
unauthorized commercial use of my clients' identities in the marketplace.  These activities are a
daily part of my business.  I therefore regularly perform valuations relating to: 1) negotiated
commercial uses concerning famous personalities; and 2) unauthorized uses of famous
personalities.

Prior to founding Luminary Group, I served as the President of CMG Worldwide, Inc.  Through
Luminary Group and CMG, I have represented or consulted on behalf of personalities such as
Marilyn Monroe LLC, Sophia Loren, James Dean, Inc. The Estate of Babe Ruth and the Babe
Ruth League, the Estate of Jackie Robinson, The Diana, Princess of Wales Memorial Fund, The
Raymond and Rosa Parks Institute, Chuck Berry, Johnny Unitas and Unitas Management Corp.,
the Family of Jesse Owens, Karl Malone, Buddy Holly, I♥NY, the Vatican Library, the Girls
Next Door, Scott Baio, Elle MacPherson, Redd Foxx, Heritage Motorsports, Champ Car, Bill
Elliott, Evernham Motorsports, Mark Spitz, Coach John Wooden, Golden Boy Promotions, Dawn
Wells and Bob Denver (both of *Gilligan's Island*), and many others.

Over my years in the industry, I have handled or been involved in a wide variety of business
applications such as endorsements, sponsorships, licenses, asset transfers, joint ventures,
infringement recoveries and valuations, with countless corporations, agencies, and businesses
throughout the world.  As a result of my work on behalf of my clients, I have been asked to assist
as an expert witness in litigation, typically in relation to performing a valuation concerning an
unauthorized use of a famous person.

In addition to my licensing business, I serve as the adjunct professor of Right of Publicity for
Indiana University School of Law—Indianapolis, and I also have served as the adjunct professor
of Licensing Intellectual Property at Indiana University School of Law (Bloomington).  My
*curriculum vitae* (detailing employment, publications, and expert witness engagements) is
included as an Appendix to this report.

I began by discussing this case with NECA's attorneys, Mr. Kent Raygor and Mr. Ben Aigboboh
of Sheppard Mullin Richter & Hampton LLP.  I received documentary information relating to the
lawsuit, and had several follow-up discussions with Mr. Raygor and Mr. Aigboboh.  I considered
all of the information I was provided in order to understand the dispute and to determine the
appropriate basis for responding to Mr. Valerio's opinions regarding the Use.

To aid in my analysis, I also consulted publicly available sources of information as cited in
Appendix A following this report.  These sources, together with the materials provided to me,
contribute to my analysis concerning the dispute between Mr. Ward and NECA.  I arrived at my
opinion using generally accepted standards for celebrity licensing, valuations, and transactions of

EXHIBIT D PAGE 192

this kind.[1]  I reserve the right to adjust or amend any portion of my analysis in this report in the event that further information which I believe is relevant becomes available or is provided to me.

## III.    Overview of Rebuttal to the Valerio Report

I disagree with the greatly inflated value Mr. Valerio placed on the Use as it relates to the board game, as stated in Mr. Valerio's conclusion on page 20 of his report.  I assess the fair market value for the Use by NECA of Zack Ward's likeness to be in the range of $15,000 to $25,000, for an average of $20,000.

I also believe that Mr. Valerio's report is unsupportable and flawed, being based on various legal conclusions that have not been determined in this case and not within the purview of an expert witness to determine, and factual assumptions that are unsupportable.  Mr. Valerio renders a valuation that is not commensurate with industry standards in the licensing business or in relation to what a personality like Mr. Ward or his likeness as manifested in the Scut Farkus character could expect to earn in a licensing context for the products produced by NECA.

As background for my response to Mr. Valerio's report, I first provide an overview of Zach Ward's identity, NECA's Use, and the commonly accepted approach to the valuation of Rights of Publicity.

## IV.    Zack Ward Overview

I do not regard it as necessary to recount every detail of Zack Ward's career for purposes of this report, other than noting the following.  Zack Ward is a working actor best known for his supporting role as the bully Scut Farkus in the 1983 movie, *A Christmas Story*[2] when he was twelve or thirteen years old. While Mr. Ward has continued to get bit parts in television and movie productions over the decades since *A Christmas Story*, none have been as significant as his role in *A Christmas Story*.[3]

The main character in *A Christmas Story*, Ralphie, is the face of the movie and often is the only person appearing on packaging, promotional elements or products relating to the movie.  In fact, on the board game at issue, Ralphie's face is prominently featured on the cover of the game.  The other characters depicted (when anyone other than Ralphie appears), consist mainly of Ralphie's parents, Santa Claus, or Ralphie's friend.[4]  For example, the DVD packaging, front and back, of *A Christmas Story* does not include an image of Mr. Ward's character.[5]  The image gallery on the official film website includes images of various scenes and characters, but none of Mr. Ward's character.[6]  Mr. Ward's character, while part of the plot of the movie, is subsidiary and does not appear to be a focal point for the branding of the movie.  This is reflected on the board game at issue where, of the many characters from the film appearing on the box, the only appearance of the Scut Farkus character is in a small photograph on the back of the box that only shows part of the character's face in an array of many other character's images.

Mr. Ward was reportedly offered about $200 by Parker Bros. to grant permission for use of the Farkus character in a Monopoly board game they were proposing.[7]  For his professional services

---

[1] See "Statement of Assumptions and Limiting Conditions," Appendix C.
[2] http://www.imdb.com/name/nm0911933/
[3] http://www.imdb.com/name/nm0911933/bio
[4] http://www2.warnerbros.com/achristmasstory/
[5] http://www.amazon.com/A-Christmas-Story-Full-Screen-Edition/dp/B000VBIGCW/ref=sr_1_1?ie=UTF8&qid=1346343982&sr=8-1&keywords=a+christmas+story
[6] http://www2.warnerbros.com/achristmasstory/
[7] Deposition of Zach Ward, June 7, 2011, page 145, lines 3-6.

EXHIBIT D  PAGE 193

as an actor, Mr. Ward secured a role in the *Transformers* movie, for which he was paid about $7500 a week for a period of about five to six weeks.[8]   Mr. Ward testified that he earns about $800 in residuals from *A Christmas Story* every couple of years.[9]   Mr. Ward has not engaged in licensing his own name and image or the Farkus character, which is consistent with my experience and expectation for an actor who is primarily or solely known publicly for a supporting role in a single work from decades past.   In other words, I would not expect that someone in Mr. Ward's position to have much by way of a licensing program based on his name, image or likeness or the characters he has portrayed during his career.

## V.   NECA's Use

NECA is a producer of a wide range of consumer products relating to music, movies, TV and pop culture properties.   NECA is a prominent participant in the licensing industry, producing licensed merchandise in connection with movies like *Harry Potter* and *The Hunger Games*, AC/DC and Iron Maiden, and Charlie Sheen, among others.[10]

It is my understanding that the Use by NECA of the Scut Farkus character which Plaintiff complains of pertains primarily to a board game, action figure and box set that NECA produced. NECA secured a license from Warner Bros., owner of the rights to *A Christmas Story*, to secure permission to develop a line of *A Christmas Story*-related products.   It is my understanding that Warner Bros. may not have had the ability to grant permission in relation to the Farkus character, due to the language of Mr. Ward's contract for his role in *A Christmas Story*.

For the grant of rights that Warner Bros. does control pertaining to *A Christmas Story*, NECA paid an advance guarantee of $60,000 to Warner Bros. in 2003.[11]   Another $60,000 in guarantees was paid in 2004.   These guarantees were applied to the royalty rate in the agreement, which was the standard ten percent of net sales by Licensee, and twelve percent of net sales from Licensed Products sold to customers from an F.O.B. location outside the Territory.

I understand that based on the Defendants' Product Profit Report, gross sales from the Board Game were just over $750,000, but that there was a loss related to the Board Game in the amount of just over $62,000.[12]   Plaintiff in the Amended Complaint alleges that NECA actually earned approximately $470,000 in profits from the sale of the Board Games.[13]

## VI.   Valuation Approach and Analysis

Fair market value has been defined as that value at which an asset changes hands between a willing buyer and a willing seller, with neither of them being under compulsion to act and both having full knowledge of the facts.[14]   Similarly, the market approach, which has been called the "most reliable method of valuation," reflects the price the market will bear for a given transaction.[15]   The market approach involves looking at what comparable transactions have yielded for similar uses.   This can be challenging due to the fact that there often are unique

---

[8] Deposition of Zach Ward, June 7, 2011, page 47, lines 10-15.
[9] Deposition of Zach Ward, June 7, 2011, page 114, lines 2-3.
[10] http://necaonline.com/
[11] Product License, April 25, 2003, Plaintiff's Exhibit 1.
[12] Amended Complaint, filed May 5, 2011, page 12, lines 91-93.
[13] Amended Complaint, filed May 5, 2011, page 12, lines 91-93.
[14] *Fundamentals of Intellectual Property Valuation*, Wes Anson (2005), at 49.
[15] *Licensing Intellectual Property in the Information Age*, Kenneth Port, et. al. (Second Edition, 2005) at 184.

EXHIBIT D PAGE 194

factors or distinguishing characteristics to every deal, and because many transactions are strictly confidential, and the licensing business is by nature secretive.

Nevertheless, in this instance I have the benefit of various transactions pertaining to Mr. Ward by which to measure his market value. I have already noted his offer of $200 from Parker Bros. for use of the Farkus character in a board game and his compensation of $7500 per week for providing his professional services as an actor in *Transformers*. I also have reviewed Mr. Ward's 2006 contract with NECA for "all consumer products incorporating his [Mr. Ward's] likeness," for which Mr. Ward was provided no guaranteed compensation or consideration of any kind other than a two percent royalty on net sales by NECA.[16]

From these transactions, it is evident that the value of Mr. Ward's likeness in a licensing and merchandise context is minimal. This is not intended to demean Mr. Ward in any way; it is simply the reality of the circumstances.

I do not know the circumstances by which Mr. Ward's contracts were negotiated, if at all. Mr. Ward's expert alleges, without citations to any evidence, that the parties were "unequal" in their dealings and that Mr. Ward did not have a lawyer review his NECA contract.[17] Having read the deposition of Mr. Ward, it is evident that he is an astute person with at least a reasonably good knowledge of his business.[18] The NECA contract signed by Mr. Ward is by my assessment a simple two-page agreement with no particular complexity. The grant of rights from Mr. Ward to NECA, whereby Mr. Ward granted NECA the right to produce "All consumer products incorporating his likeness" is highlighted and set off in the opening of the agreement.[19] There is no reason I know of that a person of average intelligence, let alone a person who has worked in the industry for approximately thirty years and has demonstrated an awareness of the business overall, would not be capable of understanding the simple language of this grant of rights.

There is value to the inclusion of the Farkus character in relation to merchandise relating to *A Christmas Story*. Mr. Ward's contract with NECA provides him a two percent royalty, which falls within the range of industry standards for a program involving multiple personalities or rights holders, whereby the available royalty is divided amongst the rights owners. Considering the relatively minimal use by NECA of the Farkus character compared to the other characters, in a revenue-sharing context Mr. Ward should expect to get a lower percentage than those featured more prominently and the two percent is actually quite high in that context.[20]

I believe the fair market value of the Use is in the range of $15,000 to $25,000. Two percent of the $755,403 in sales from the board game reported by NECA[21] produces a royalty of $15,108, two percent of $20,731 in sales from the action figure[22] produces a royalty of $414; and two percent of $59,458 in sales from the box set[23] produces a royalty of $1,189. These amounts include the sales of $75,656 that occurred prior to the license granted by Mr. Ward to NECA as well as $181,313 that occurred after the expiration of the license granted by Mr. Ward to NECA. This range takes into account both the value that I would expect a personality like Mr. Ward might be able to get for the products relevant to the Use, as well as the total reported sales of NECA's product involved in the Use.

---

[16] NECA / Ward License Agreement, October 1, 2006.
[17] Expert Report of Robert F. Valerio, August 17, 2012, page 14.
[18] Deposition of Zach Ward, June 7, 2011.
[19] NECA / Ward License Agreement, October 1, 2006.
[20] Amended Complaint, filed May 5, 2011, page 15, paragraphs 108-110.
[21] Expert Report of Robert F. Valerio, August 17, 2012, page 18.
[22] *Id.*
[23] *Id.*

EXHIBIT D  PAGE 195

## VII.   Rebuttal to Mr. Valerio's Expert Opinion

I have carefully reviewed the expert report by Mr. Robert Valerio. I do not know Mr. Valerio but I assume he is an accomplished individual in his chosen career and business. Mr. Valerio's report is well-written. I find Mr. Valerio's expert opinion to be problematic, however, and I disagree with the conclusions he reaches and the manner by which he arrives at his conclusions.

With all due respect to Mr. Valerio, I believe his opinion demonstrates unfamiliarity with the licensing business and that his opinions are ultimately unsupportable. His professional experience does not indicate much activity working with personalities in a licensing context; certainly not a diverse range of personalities in many different scenarios and applications, which tends to be where the perspective and experience of a qualified expert derives.

Many of Mr. Valerio's opinions are based on legal conclusions and bald statements without evidentiary support. Mr. Valerio appears to have determined that NECA has committed fraud, that NECA would have been obligated to pay royalty rates of forty and even fifty percent, that destruction of the materials were part of the equation, and that Warner Bros. would have cancelled its contract with NECA.[24] I believe these assumptions exceed the scope of Mr. Valerio's expertise, are irrelevant to the determination of a reasonable royalty rate, and do not comport with the typical practices in the licensing industry for resolving issues that can and do occasionally arise between a Licensee and Licensor.[25] For example, contrary to Mr. Valerio's opinion, in my experience a Licensor (like Warner Bros.) never imposes a "penalty" royalty rate on a Licensee for uses of intellectual property or identity rights that are not owned by the Licensor, such as Mr. Ward's likeness which I understand Warner Bros. did not hold.

Mr. Valerio's assumptions and analysis lead him to opine that "in a hypothetical negotiation between the Parties, Defendant would have agreed to pay [$345,970.49] to Plaintiff in order to avoid WB cancelling the 2006 Agreement." The notion that a negotiation for the inclusion of the Farkus character would lead to a negotiated payment of over a quarter of a million dollars by NECA is inconsistent with the market value of Mr. Ward from his other offers and agreements, and my professional experience in relation to the value of a minimal use of a supporting character in this product category.

Mr. Valerio then opines that the value of the "Hypothetical Royalty for Action Figure and Box Set" would be just over $400 for the action figure and just over $1,000 for the box set.[26] The disparity between Mr. Valerio's valuation of the different products reveals inherent problems in his opinion. Even if NECA's sales of the board game greatly exceeded that of the action figure or box set, these numbers, ranging from $400 to $345,000, reveal a person unfamiliar with the business or the appropriate value of Mr. Ward in relation to the Use.

Respectfully submitted,

_[signature]_

---

[24] *Id.*
[25] *Id.*
[26] *Id.*, page 19.

EXHIBIT D PAGE 196

## Appendix A—Table of Sources

1)   Amended Complaint, *Zach Ward v. NECA, et. al.*, (10-cv-3403 (FSH)(PS).

2)   http://www.amazon.com/A-Christmas-Story-Full-Screen-Edition/dp/B000VBIGCW/ref=sr_1_1?ie=UTF8&qid=1346343982&sr=8-1&keywords=a+christmas+story.

3)   http://www.imdb.com/name/nm0911933/.

4)   http://www.imdb.com/name/nm0911933/bio.

5)   http://www2.warnerbros.com/achristmasstory/.

6)   Deposition of Zach Ward, June 7, 2011.

7)   Product License, April 25, 2003, Plaintiff's Exhibit 1.

8)   Expert Report of Robert F. Valerio, August 17, 2012.

EXHIBIT D PAGE 197

### Appendix B—CV of Jonathan Faber

## EXPERIENCE

*Founder & CEO*                                                                                   *August 2006 – present*
Luminary Group LLC                                                                                   Indianapolis, IN
Founder of licensing company representing a diverse range of famous personalities and intellectual property owners. Provide marketing, branding and policing services to clients and collaborate with advertising agencies and market-leading manufacturers to create effective licensing campaigns for clients. Also provide consulting services on request.

*Attorney*                                                                                   *September 2007 – present*
McNeely, Stephenson, Thopy & Harrold                                                                                   Shelbyville, IN
Responsible for establishing Intellectual Property practice within firm. Handle business and intellectual property counseling, strategy and implementation, litigation, and contractual negotiations for diverse array of intellectual property owners.

*Adjunct Professor of Law*                                                                                   *since 2007*
Indiana University Maurer School of Law                                                                                   Bloomington, IN
Creator/professor of course entitled *Licensing Intellectual Property*. Course is offered to JD and LLM candidates.

*Adjunct Professor of Law*                                                                                   *since 2004*
Indiana University Robert H. McKinney School of Law                                                                                   Indianapolis, IN
Creator/professor of course entitled *The Right of Publicity*. Course is part of the *Center for IP Law and Innovation* initiative.

*Attorney, Chair of Licensing Group*                                                                                   *July 2006 – August 2007*
Sommer Barnard PC (now Taft)                                                                                   Indianapolis, IN
Partner/Shareholder of 130-lawyer firm. Member of Intellectual Property and Business Law groups, founder of Licensing group. Responsible for intellectual property counseling, litigation support, and strategies for various clients. Delivered key clients to firm including complex litigation involving Rosa Parks and Marilyn Monroe, and other trademark and patent work.

*President*                                                                                   *January 2003 – July 2006*
CMG Worldwide, Inc.                                                                                   Indianapolis, IN
Managed client relations, directed operations between departments, and built branding campaigns around over 200 clientele (Marilyn Monroe, James Dean, the Vatican Library, Sophia Loren, Babe Ruth, Chuck Berry, I♥NY, etc). Identified and secured key new clients (including Princess Diana, Kurt Cobain, Ella Fitzgerald, Rosa Parks). Spearheaded corporate acquisitions, consulting, and other areas of expansion and revenue. Served as legal spokesperson for media purposes.

*Director/Vice President, Business & Legal Affairs*                                                                                   *1997 - 2002*
CMG Worldwide, Inc.                                                                                   Indianapolis, IN
Directed lawsuits as lead attorney or with outside counsel. Handled U.S. and Canadian trademark applications and oppositions. Recovered over 100 client domain names, several resulting in landmark NAF arbitration decisions. Negotiated settlements with advertising agencies and Fortune 500 companies infringing on clients' right of publicity and trademarks. Began as a law clerk in 1997; Director from 1999 to 2000; Vice President from 2001 to 2002.

Prior to 1997, employed by Office of the Mayor, City of Indianapolis; and Time Warner AudioBooks, LA (joint venture between Time Warner and Atlantic Records).

## EDUCATION
Indiana University Robert H. McKinney School of Law
*Indiana International & Comparative Law Review* board member; *Order of Barristers* and *Dean's Tutorial Society*

Wittenberg University, Springfield, OH
Bachelor of Arts, *Magna cum Laude*, with departmental honors (English Major, Music Minor)
Highest Distinction on written and oral components of English Comprehensive Exam
Junior and Senior Ostrom Awards for Expository Writing
Allen J. Kopenhaver Award ("Most Outstanding English Major")
Crowell Creativity Award (music and literary composition)
Phi Eta Sigma Honorary

## HONORS & AWARDS
Leadership in Law Award, *Indiana Lawyer*
Forty Under 40, *Indianapolis Business Journal*
First Place Winner of 5th Annual *Harrison Legal Writing Competition*, Indiana State Bar Association
Outstanding Young Alumnus Award, Wittenberg University
*National Jurist's* "Most Fascinating Law Students"

EXHIBIT D PAGE 198

Jonathan L. Faber                                                                    Page 2 of 3

## EXPERT WITNESS ENGAGEMENTS
*Rembe v. The Revocable Trust of Marshall & Alexis Girard, et. al*, (D-202 CV-2011-07173, NM), 2012
*Zooey Deschanel v. Steven Madden Ltd., Kohl's, et al.*, (BC451472, Sup. Ct., Los Angeles County), 2011
*Scott v. Stringfellow's of New York, LTD*, (09 CV 3801, NY), 2009
*The Frank Lloyd Wright Foundation v. Archetype Associates*, (CV 08-1112-PHX-DGC, CA), 2009
*Uma Thurman v. Lancôme Parfums et Beauté & Cie*, 08 Civ. 4392 (SAS)(DF) (NY), 2009
*- v. Checkers Drive-In Restaurants*, (Civil Action No. 1:07-cv-2851, NC), 2008
*Gary Stevens v. Southern States Cooperative*, (Civil Action No. 3:07CV648, VA), 2008
*Team Gordon, Inc. v. Fruit of the Loom, Inc.*, (Civil Action No. 3:06-CV-201, NC), 2008
*Madeline Bemelmans v. DIC Enterprises, Inc. et. al.*, (9th Circuit, Los Angeles County), 2006
*E.S.S. Entertainment 2000 Inc. v. Rockstar Games, et. al.*, (9th Circuit, Los Angeles County), 2006
*Tara Reid v. Sky Las Vegas Condominiums*, (9th Circuit, Los Angeles County), 2005
*Nikki Sixx v. Vans, Inc., High Speed Productions, & Thrasher Magazine*, (9th Circuit, Los Angeles County), 2005
*Digable Planets v. Target, et. al.*, (9th Circuit, Los Angeles County), 2005
*Tardy v. Dicksons*, (7th Circuit, Indianapolis, Indiana), 2005
*Hachette Filipacchi Presse v. E.F. Licensing, LLC*, (U.S.P.T.O Trademark Trial and Appeal Board), 2004
*Franklin Mint Co. v. Lord Simon Cairns, Manatt Phelps, et. al.*, (9th Circuit, Los Angeles County), 2004
*Estate of Duke Ellington v. Baldwin Piano, Gibson Corp.*, (6th Circuit, Indianapolis, Indiana), 2004
*Palm v. Thane*, (9th Circuit, Los Angeles County), 2003
*Medicus v. Thane*, (9th Circuit, Los Angeles County), 2003
*Cuccioli v. Jekyll and Hyde Bremen Theater GmbH & Co.*, (Southern District of New York), 2000

## CONSULTING ENGAGEMENTS
Coach John Wooden estate valuation, 2012
Golden Boy Enterprises, asset inventory valuation, 2008
The Estate of Ron Goldman and Harper Collins, News Corp, Fox and O.J. Simpson, 2006
Jessica Simpson and Nick Lachey divorce, 2006
Dr. I. King Jordan and Gallaudet University, 2005
*O'Grady v. 20th Century Fox*, Dis. Ct. ED TX, Texarkana Division, Civ. No. 502CV173, 2003
Jeff Gordon and Brooke Sealey divorce, 2003
Raymond Loewy Foundation and British-American Tobacco, 2003.
*Pisano v. House of Blues*, 2002
Hugh Hefner, personal Intellectual Property valuation, 2001
*Sugar Ray Leonard v. Tae-Bo*, 2000
*Soloflex v. Bowflex*, 1999

## MEMBERSHIPS & ASSOCIATIONS
Licensing Industry Merchandisers Association (LIMA)
American Society of Composers, Authors, and Publishers (ASCAP)
National Academy of Recording Arts and Sciences (NARAS), Voting Member
Past Chair, Sports & Entertainment Law Executive Committee, Indianapolis Bar Association
ABA, IP Section, Special Committee on Sales of Products Embodying Intellectual Property
Indianapolis Bar Association Sports & Entertainment Law Executive Committee
Board Member of *Indiana State Bar Internet and Digital Commerce Division*
Indianapolis Bar Association, Indiana State Bar Association
American Bar Association, Intellectual Property section
Midwest Association for Canadian Studies

EXHIBIT D PAGE 199

Jonathan L. Faber                                                    Page 3 of 3

## PUBLICATIONS

*Licensing, Infringements and Acquisition,* AIPLA Annual Conference Materials, January 2010

*Intellectual Property, Fraud, and Social Networking,* in *Claims Advisor,* July 2009

*A Licensing Parable,* in *Global License! Magazine,* July 2007

*The NFL in a Tough Spot,* in *Indianapolis Business Journal,* March 12, 2007

*The Right of Publicity:  Is It Right For Your Business?,* in *The Counselor,* February 2007

*Savvy Brand Management,* in *Smart Business Magazine,* October 2006

*Stars for Sale,* in *License! Magazine,* June 2006

*Legal Notes,* in *License! Magazine,* June 2005

*Courtside* in *License! Magazine,* August 2004

*Trade-Wrongs:  Misadventures in Un-Intellectual Property,* in *Res Gestae,* October 2004

*Protecting, Valuing and Licensing the Famous,* in *Indiana Lawyer,* March 24, 2004

*Star Struck,* in *License! Magazine,* June 2003

*Coming of Age:  The Right of Publicity Is Ready to Move to the Federal Level,* in *Res Gestae,* November 2001

*Celebrity Licensing* chapter in *Licensing Deskbook: Legal & Business Guide* (Aspen Law & Business) 2001

*Indiana:  A Celebrity-Friendly Jurisdiction,* cover story in *Res Gestae,* March 2000

*Canadian Culture in the Balance,* in *Indiana International & Comparative Law Review,* Vol. 8, No. 2, 1998

11

**Appendix C—Statement of Assumptions and Limiting Conditions**

1.  Information contained in this report was obtained from sources considered to be reliable. However, I assume no liability for the accuracy of those sources.

2.  Information supplied through discovery has been accepted as correct without further verification.

3.  This report reflects facts and conditions existing at the date of its submission. Subsequent events have not been considered.

EXHIBIT D PAGE 201

**Appendix D—Compensation**

I was hired by NECA, the Defendant in the matter captioned *Zack Ward v. NECA and Joel Weinshanker* (Case No. 11-cv-6358 (MMM)(CWx). I am being compensated at the rate of six hundred dollars ($600) per hour.

13

1

### PROOF OF SERVICE

2

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

4

     I am employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within entitled action; my business address is 1901 Avenue of the Stars, Suite 1600, Los Angeles, California 90067-6055.

5

     On **August 31, 2012**, I served the following document(s) described as:

6

7

8

     **DEFENDANT NATIONAL ENTERTAINMENT COLLECTIBLES ASSOCIATION, INC.'S AND JOEL WEINSHANKER'S REBUTTAL EXPERT DISCLOSURE [Fed. R. Civ. P. 26(a)(2)]** on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

9

10

11

12

13

Randall S. Newman, Esq.
RANDALL S. NEWMAN, P.C.
37 Wall Street, Penthouse D
New York, New York 10005
Telephone:   (212) 797-3737
Facsimile:    (212) 797-3172
E-mail:       rsn@randallnewman.net

14

15

16

17

**BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

18

19

20

     I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

21

     Executed on **August 31, 2012**, at Los Angeles, California.

22

23

                                   Natalie Aronstein

24

25

26

27

28

-1-

EXHIBIT D PAGE 203

# Exhibit E

1 | SHEPPARD MULLIN RICHTER & HAMPTON LLP
KENT R. RAYGOR, Cal. Bar No. 117224
2 | BENJAMIN O. AIGBOBOH, Cal. Bar No. 268531
1901 Avenue of the Stars, Suite 1600
3 | Los Angeles, California 90067-6017
Telephone:  (310) 228-3700
4 | Facsimile:   (310) 228-3701
E-mail:      kraygor@sheppardmullin.com
5 |             baigboboh@sheppardmullin.com

6 | Attorneys for Defendants
NATIONAL ENTERTAINMENT
7 | COLLECTIBLES ASSOCIATION, INC. and
JOEL WEINSHANKER

8

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | CENTRAL DIVISION

12

| ZACK WARD, | Case No. 11-CV-6358 MMM (CWx) |
| Plaintiff, | **DEFENDANT NATIONAL ENTERTAINMENT COLLECTIBLES ASSOCIATION, INC.'S AND JOEL WEINSHANKER'S EXPERT DISCLOSURE [FED. R. CIV. P. 26(a)(2)]** |
| v. | |
| NATIONAL ENTERTAINMENT COLLECTIBLES ASSOCIATION, INC., and JOEL WEINSHANKER, | |
| Defendants. | FAC Filed:    May 5, 2011 |

EXHIBIT E PAGE 204

1   TO PLAINTIFF ZACK WARD AND HIS ATTORNEY OF RECORD:

2

3        Defendants National Entertainment Collectibles Association, Inc. and

4   Joel Weinshanker ("**Defendants**") hereby designate the following expert witness

5   pursuant to FED. R. CIV. P. 26(a)(2):

6

7        Marc Mostman

8        MOST MANAGEMENT LLC

9        5000 North Parkway Calabasas, Suite 210

10       Calabasas, California 91302

11

12        Pursuant to FED. R. CIV. P. 26(a)(2)(B), attached hereto, and

13   incorporated by this reference, is the written report of Marc Mostman, prepared and

14   signed by the expert.

15

16   Dated:  August 17, 2012      SHEPPARD MULLIN RICHTER & HAMPTON LLP

17

18               By       */s/ Kent R. Raygor*

19                         KENT R. RAYGOR

20                  Attorneys for Defendants
                      NATIONAL ENTERTAINMENT

21              COLLECTIBLES ASSOCIATION, INC. and
                      JOEL WEINSHANKER

22   406307623.1

23

24

25

26

27

28

# EXPERT REPORT

## of

# MARC MOSTMAN

EXHIBIT E PAGE 206

### ZACK WARD
### v.
### NATIONAL ENTERTAINMENT COLLECTIBLES ASSOCIATION, INC. and JOEL WEINSHANKER

### Case No. 2:11-CV-6358 MMM (CWx)
### United States District Court for the Central District of California

### MARC MOSTMAN, ESQ., EXPERT REPORT

1.       I, Marc Mostman, Esq., am the president and founder of MOST MANAGEMENT, a licensing agency based in Calabasas, CA, that creates and implements merchandise licensing programs for clients who include film and television studios, video game companies, and other brand owners.  Prior to establishing MOST MANAGEMENT, I served as Executive Director of Domestic Licensing at Viacom Consumer Products, the licensing division for Paramount Studios.  I have a B.A. in History from the University of California, Berkeley and a J.D. from Loyola Law School.  I am an active member of the California Bar.

### OPINION

2.       I have been asked to render an opinion regarding the value of Plaintiff Zack Ward's likeness for use on commercial merchandise.  In particular, I have been asked to render an opinion as to the value of the use of still images from the 1983 MGM film *A Christmas Story* featuring Plaintiff Zack Ward as a twelve (12) or thirteen (13) year old boy portraying the supporting character "Scut Farkus".

3.       In my opinion:

(a) The royalty rate of 2% of Defendant National Entertainment Collectibles Association, Inc.'s net sales apparently provided for by the License Agreement dated October 1, 2006, by and between Defendant National Entertainment Collectibles and

Plaintiff Zack Ward (the "License Agreement") is highly unusual in the entertainment industry.

(b) Royalties paid to actors (also known as "talent"), if granted, are generally only granted to top tier, A-list actors.

(c) It is highly unusual for an actor of Plaintiff Zack Ward's stature in the entertainment industry to be granted a royalty rate similar to or exceeding the royalty in the License Agreement, even taking into account the purported "cult" status of the film, *A Christmas Story,* and the purported popularity of the supporting character "Scut Farkus".

(d) In my experience, I have never seen an actor receive a royalty rate as high as the one granted in the License Agreement.

(e) Based on my experience, as described below, the value of the likeness of the supporting character "Scut Farkus", as portrayed by Plaintiff Zack Ward, for licensed merchandise is, at most, 0.5% of wholesale revenues generated by products containing the character's likeness.

4.     In my experience in the licensing industry and working for and with feature film studio and television production clients, I have seen numerous actor agreements that detail merchandising percentages payable to actors for the right to license their names and likenesses, or that of the characters they play, for merchandise.  Generally, only top-of-the-line (also known as "A-list) talent are able to retain merchandising rights (i.e., the right to receive a share of the income derived by the licensor (the "studio") from any royalties derived from the sale of products utilizing a character's likeness), and thereby receive a percentage of licensing revenues generated from sales of licensed products.  This would not be true for incidental, minor or

EXHIBIT E PAGE 208

supporting characters, such as the "Scut Farkus" character here. Generally, incidental characters receive nothing from the merchandising revenues.

In the event an actor is able to retain his or her merchandising rights, the amount of royalty participation is generally in the range of 5% of the licensing revenues received by the studio. If there are multiple actors included in a licensed product, and each retained his or her merchandising rights, the share of royalty participation for each actor would be reduced. Generally, the 5% participation is reduced to about 2.5% per participating actor. However, it is important to note that the actor's 5% (or 2.5%) participation typically comes out of the licensor's (i.e., the studio's) share of the licensing revenues ("royalties"), not from the total amount of the licensee's (i.e., National Entertainment Collectibles Association) wholesale revenues.

For a typical board game deal, the royalty rate paid by a licensee (National Entertainment Collectibles Association) to a licensor (i.e., Warner Bros.) would likely be 10% of the licensee's net wholesale sales. That 10% is the royalty revenue ("royalties") paid by the licensee to the licensor (Warner Bros.). From that royalty revenue, talent would then be paid their 5% or 2.5% participation and the studio retains the balance of the royalty revenue.

If Plaintiff Zack Ward did in fact retain his merchandising rights, he would likely be entitled to receive at most between 2.5% to 5% of the 10% that the studio received as royalty revenue ("royalties") from the licensee (National Entertainment Collectibles Association). That would translate to 0.25% to 0.5% if that amount was paid directly by the licensee (National Entertainment Collectibles Association) to Plaintiff Zack Ward.

## **FACTS OR DATA**

5.      In order to form my opinion, I have reviewed the materials compiled in **Exhibit A** attached to this Expert Report. These materials were provided to me by the counsel for Defendants National Entertainment Collectibles Association, Inc. and Joel Weinshanker. I also

considered my background and experience in the licensing industry and experience over the years with various talent participation agreements and merchandising rights agreements. The opinions in this report are based upon my over 15 years of experience in the entertainment licensing industry.

## EXHIBITS TO BE USED TO SUMMARIZE OR SUPPORT OPINION

6.      None at present.

## QUALIFICATIONS, INCLUDING LIST OF ALL PUBLICATIONS AUTHORED IN PREVIOUS 10 YEARS

7.      I have been involved in business and legal affairs for over 15 years. I had an internship during law school in the business affairs department at Universal Television. I worked as Executive director of Licensing at Paramount Pictures. I worked at Disney Interactive in the licensing and business development department. Past and current clients include Summit Entertainment, Lionsgate, Media Rights Capital, Legendary Pictures, Dreamworks Studios, AMC Television, and more. I have been a featured speaker at the Licensing Industry Merchandiser's Association events including Licensing University at Licensing Expo 2012. I am on the Licensing Industry Board as West Coast Regional Representative. I have received awards for Outstanding Licensing Program for 2009 and 2011. I have been a mentor in the Licensing Industry Mentor Program. Attached hereto is as **Exhibit B** is a true and correct copy of my bio.

8.      I have authored no publications in the last ten years.

## LIST OF ALL OTHER CASES IN WHICH, DURING THE PREVIOUS 4 YEARS, I HAVE TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION

9.      None.

-4-

## <u>STATEMENT OF COMPENSATION TO BE PAID FOR THE STUDY AND TESTIMONY IN THE CASE</u>

10.     I am being compensated for my work on this case at the rate of $350.00 per hour for expert consulting.  My compensation is not dependent on the outcome of this case.


Executed this 17th day of August 2012.


By: _____
    MARC MOSTMAN

-5-

EXHIBIT E PAGE 211

# EXHIBIT A

EXHIBIT E PAGE 212

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ZACK WARD, | ECF Case |
| Plaintiff, | Jury Trial Demanded |
| – against – | AMENDED COMPLAINT |
| NATIONAL ENTERTAINMENT COLLECTIBLES ASSOCIATION, INC. AND JOEL WEINSHANKER, | Case #: 10-cv-3403 (FSH)(PS) |
| Defendants. | |

The Plaintiff, by and through his undersigned attorneys, alleges upon knowledge as to himself and his own acts, and as to all other matters upon information and belief, and brings this Amended Complaint against the above-named Defendants, and in support thereof alleges the following:

## PRELIMINARY STATEMENT

1.      This action is brought by the Plaintiff, Zack Ward (the "Plaintiff"), the actor who portrayed the character "Scut Farkus" in A CHRISTMAS STORY (Metro-Goldwyn-Mayer ("MGM") 1983) (the "Movie").  The Plaintiff seeks monetary damages and injunctive relief against the Defendants for Fraud (Cal. Civ. Code §§ 1709-1710); Common Law Fraud, violation of the Lanham Act (15 U.S.C. § 1125(a)), Misappropriation of Likeness (Cal. Civ. Code § 3344), Common Law Right to Privacy and Breach of Contract related to the Defendants' manufacture and sale of consumer products using the Plaintiff's likeness and image.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1332 and 1338(a) and (b), and Section 43(a) of the Lanham Act.

EXHIBIT E  PAGE 213

3.     This Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Defendant is a New Jersey corporation and its principal place of business is located within this District.

## PARTIES

5.     The Plaintiff, Zack Ward, is an individual residing at 12312 Collins Street, Valley Village, California 91607.

6.     The Defendant, National Entertainment Collectibles Association, Inc. ("NECA"), is a New Jersey corporation with a principal place of business located at 603 Sweetland Ave, Hillside, New Jersey 07205.

7.     The Defendant, Joel Weinshanker ("Weinshanker"), is an individual who resides at 4 Bushkill Dr., Livingston, New Jersey 07039.  ("NECA" and "Weinshanker" are collectively referred to as the "Defendants").

8.     Weinshanker is NECA's sole shareholder.

## FACTUAL ALLEGATIONS

9.     In 1983, when the Plaintiff was thirteen (13) years old, he entered into an agreement with Christmas Tree Films, Inc. ("Christmas Tree Films") to play the character Scut Farkus in the Movie.

10.     The Plaintiff, a resident of Canada at the time, was a member of the Alliance of Canadian Cinema, Television and Radio Artists ("ACTRA").

11.     ACTRA is a Canadian labor union representing performers in English-language media.

2

EXHIBIT E PAGE 214

12.   The contract with Christmas Tree Films used ACTRA's standard "Performer Contract for Independent Production – Documentary, Industrial, Non-Documentary Productions" contract and was signed by the Plaintiff's mother, Pam Hyatt.

13.   The Plaintiff's mother also signed a Parental Agreement with Christmas Tree Films because of the Plaintiff's status as a minor.

14.   The ACTRA contract did not give Christmas Tree Films merchandising rights, namely, the right to use the Plaintiff's likeness or image for the purpose of producing consumer products related to the Movie ("Merchandising Rights").

15.   The Plaintiff was the only major character from the Movie who was a resident of Canada and a member of ACTRA.

16.   The Plaintiff was paid approximately $5,000 to play the Scut Farkus character.

17.   The American version of ACTRA is known as the Screen Actors Guild ("SAG").

18.   Based upon information and belief, the SAG contracts signed by the other major cast members granted Christmas Tree Films Merchandising Rights.

19.   As a result of the difference between the SAG and ACTRA contracts, the Plaintiff is the only major character from the Movie who retained Merchandising Rights.

### *"A Christmas Story" – the Background*.

20.   The Movie was initially released by MGM in movie theatres a week before Thanksgiving in 1983.

21.   The Movie had gross earnings of just over $19.2 million during its theatrical run.

22.   In 1986, Ted Turner's Turner Entertainment Company, Inc. ("Turner Entertainment") bought MGM's film and television library, including the rights to the Movie.

EXHIBIT E PAGE 215

23.   In the late 1980s and early 1990s, the Movie began airing on Turner's SuperStation WTBS and Superstation WGN

24.   In 1996, Time Warner, Inc. ("Time Warner") purchased Turner Entertainment and currently owns the rights to the Movie.

25.   Due to the increasing popularity of the Movie, in 1997 Turner's TNT network began airing a 24-hour marathon of the Movie twelve consecutive times beginning at 7 or 8 p.m. on Christmas Eve and ending Christmas Day.

26.   By 2005, TBS reported that 45.4 million viewers had tuned into the Movie's 24-hour marathon.

27.   In 2007, new all-time ratings records were set, with the highest single showing (8 p.m. Christmas Eve) drawing 4.4 million viewers.

28.   Viewership increased again in 2008, with 8 p.m. Christmas Eve drawing 4.5 million viewers, and 10 p.m. drawing 4.3 million, and 54.4 million total.

29.   In 2009, the Movie aired on TBS during a 24 hour marathon on Christmas Eve. The first viewing at 8 p.m. EST on Christmas Eve beat the major broadcast networks (NBC, ABC, CBS, and FOX).

### *NECA and WBCP Enter into Agreement to Make Consumer Products.*

30.   On April 25, 2003, Warner Bros. Consumer Products ("WBCP"), a division of Time Warner and NECA entered into a product license agreement (the "2003 Agreement") whereby NECA was permitted to manufacture and sell six (6) products related to the Movie: 1) Bobbling Head Dolls; 2) Collectible Action Figures; 3) Lunchboxes; 4) Leg Lamps; 5) Ball Ornaments (Boxed set of four); and 6) Decorative Lights.

4



EXHIBIT E PAGE 216

31.    The 2003 Agreement allowed NECA to manufacture and sell the six (6) products related to the Movie from February 1, 2003 through December 31, 2005.

32.    The 2003 Agreement required NECA to "strictly comply and maintain compliance with ... the rights of approval" prior to any goods being "**manufactured, sold, distributed or promoted by [NECA] without prior written approval**." (emphasis added).

33.    The 2003 Agreement stated that any Licensed Products not "approved in writing shall be deemed unlicensed and shall _**not be manufactured or sold**_." (emphasis added).

34.    By letter dated November 24, 2003, the 2003 Agreement was amended to allow NECA to produce twelve (12) additional products (for a total of eighteen (18)) related to the Movie: 7) Figural Ornaments (non-human only); 8) Mini Christmas Trees with Ornaments (non-human only); 9) Snow Globes; 10) Statues; 11) Night Lights; 12) Playing Cards; 13) Votives; 14) Mugs; 15) Steins; 16) Clocks; 17) Watches; and 18) Posters.

35.    The November 24, 2003 letter also extended the term of the 2003 Agreement until December 31, 2006.

36.    By letter dated March 8, 2005, the 2003 Agreement was amended to allow NECA to produce two (2) additional products (for a total of twenty (20)) related to the Movie; 19) Board Games; and 20) Outdoor Airblown Inflatables.

37.    The nineteenth (19th) product, the Board Games, is the gravamen of the Plaintiff's complaint against the Defendants.

EXHIBIT 6 PAGE 217

### *The Defendants Manufactured and Sold Unauthorized Board Games.*

38.     On September 8, 2005, the Defendants submitted a prototype of the Board Game

to WBCP.

39.     On October 6, 2005, WBCP responded to the Defendants with the following

comments:

> Concept is not approved.  ...Per Legal Affairs: Please identify these actors
> preferably both by name of the actor and the name of the character they portrayed
> so that WBCP can confirm whether or not we have merchandising rights.

40.     On February 17, 2006, Carmella Jones, a Director of Studio Licensing for WBCP

("Ms. Jones") sent the following email to Weinshanker:

> When we were in your showroom I saw the board game.  In Cyber we've only
> seen the packaging, can you please send a prototype so we can review gameplay
> and board?

41.     Weinshanker replied to Ms. Jones the same day stating, "I will make sure we get

you a game prototype next week."

42.     On March 8, 2006, Ms. Jones emailed Weinshanker asking "where is the board

game?"

43.     On March 9, 2006, Weinshanker replied to Ms. Jones and said he would send her

the prototype of the board game that day.

44.     On March 24, 2006, Ms. Jones sent the following email to Weinshanker:

> Hi Joel,
>
> Please be advised that unless we see and approve the Christmas Story board game
> that we requested two months ago – you are not authorized to ship product to
> retail.  We initially only received a concept and never received the actual play
> pattern concept.  Once received, we may have creative comments/revisions that
> you understand you will need to incorporate into the product before production.
>
> Thank you for your immediate attention to send this to me to arrive by 3/29.

6

45.     Despite Ms. Jones explicit instructions not to manufacture the Board Game because it was not approved by WBCP, the Defendants had Enseng (Hong Kong) Limited ("Enseng") manufacture the Board Game in China.

46.     On August 12, 2006 and August 13, 2006, Enseng shipped a total of 4,984 Board Games directly to NECA

47.     On August 22, 2006, Enseng shipped 5,016 Board Games to the retailer Borders Group, Inc. ("Borders") FOB Hong Kong.

48.     NECA invoiced Borders for the 5,016 Board Games on August 24, 2006.

49.     Beginning on August 30, 2006, the Defendants began to sell and ship the 4,984 Board Games that Enseng shipped directly to NECA to their customers.

50.     On September 13, 2006, Lee Speidel, a Senior Account Executive with WBCP ("Ms. Speidel"), sent Weinshanker the following email:

> Joel,
>
> I am concerned that I still haven't heard back from you on the approvals for the game. You can not ship this product without approval from the actor who plays Scott Farcus [sic]. Please send me a formal letter that indicates you have secured approval. I will be out of the office stating [sic] tomorrow through 10/2. However, it's imperative that you send this letter. In my absence, please send to Kathleen Wallis - so she can give to our legal dept.

### *The ACTRA v. SAG Contract Causes the Defendants a Big Problem.*

51.     Based upon information and belief, at the time the first 10,000 unauthorized of "grey market" Board Games were manufactured and shipped to NECA and Borders, Weinshanker was not aware of the nuances between the ACTRA and SAG contracts and did not know that WBCP did not have merchandising rights for the Scut Farkus character.

52.     As a result, the Defendants were caught in a dilemma because the Defendants had already manufactured and shipped 10,000 "grey market" Board Games and had not even spoken



EXHIBIT E  PAGE 219

to the Plaintiff about his approval.

53.    The Defendants decided to provide WBCP with one of the "grey market" Board Games as its final prototype on October 25, 2006.

54.    On October 27, 2006, WBCP responded to the Defendants as follows:

Sample needs revisions. 1. Please omit the Scut Farcus [sic] pieces (or provide proof that you have secured the rights to use his likeness). We are not allowed to licensee [sic] his likeness (Zack Ward).

55.    WBCP also requested the following revision to the Board Game's box:

Please update the WB SHIELD's legal notice. It should read: WB SHIELD: TM & © Warner Bros. Entertainment Inc. (s06).

56.    Because WBCP required a revision to the WB logo on the back of the box, the 10,000 "grey market" Board Games manufactured and sold by the Defendants can be identified by the (s05) v. (s06) legal notice and by the placement of the legal notice on the back of the box.

57.    In fact, the Plaintiff is in possession of one of the "grey market" Board Games.

### *The Defendants' Contact the Plaintiff to Fraudulently Obtain His Approval for the Board Game.*

58.    After receiving WBCP's comments to the Defendants' final prototype of the Board Game, the Defendants were in a quandary -- 5,016 Board Games had been manufactured and shipped to Borders in August, and the other 4,984 Board Games were manufactured and shipped to NECA to be sold by the Defendants to their customers.

59.    Coincidentally, Scott Schwartz ("Mr. Schwartz"), the actor who played the character "Flick" in the Movie, was at the Defendants' offices on October 27, 2006, the day that WBCP provided Weinshanker with its final comments to the Board Game.

60.    During that visit, Weinshanker asked Mr. Schwartz if he knew how he could get in touch with the Plaintiff.

8



Case 2:11-cv-06358-MMM-CW   Document 148-4   Filed 11/09/12   Page 36 of 63   Page ID
#:3575
Case 2:10-cv-03403-FSH -PS   Document 37   Filed 05/05/11   Page 9 of 25 PageID: 153

61.     Because Mr. Schwartz and the Plaintiff had remained in touch since they worked

together on the Movie, Mr. Schwartz provided Weinshanker with the Plaintiff's phone number

and Weinshanker called the Plaintiff from the Defendants' offices on October 27, 2006.

62.     This was the first time that Weinshanker and the Plaintiff discussed licensing the

Plaintiff's likeness for any consumer products.

63.     During their conversation, Weinshanker told the Plaintiff that NECA wanted to

manufacture and sell a 7" Scut Farkus action figure (the "Scut Farkus Action Figure").

64.     During their conversation, Weinshanker made no mention of the Board Game.

65.     The Plaintiff agreed that he would enter into a written licensing agreement to

allow NECA to use his likeness to manufacture and sell the Scut Farkus Action Figure.

66.     Weinshanker advised the Plaintiff that he would send him a written licensing

agreement for his review and signature.

67.     A few weeks later, on November 14, 2006, NECA and WBCP entered into a

Product License agreement that superseded and replaced the 2003 Agreement (the "2006

Agreement").

68.     The term of the 2006 Agreement allowed NECA to manufacture and sell

consumer products related to the Movie from January 1, 2007 through December 31, 2008.

69.     On November 18, 2006, Enseng shipped 5,000 Board Games to the Defendants.

70.     On December 11, 2006, Enseng shipped 5,000 Board Games to the Defendants.

71.     On December 20, 2006, almost two months after their initial and only discussion,

the Plaintiff received a written license agreement from Weinshanker (the "NECA Ward

Agreement").

72.     The Plaintiff signed and faxed the NECA Ward Agreement to the Defendants on

EXHIBIT E PAGE 221

Case 2:11-cv-06358-MMM-CW   Document 148-4   Filed 11/09/12   Page 37 of 63   Page ID
#:3576
Case 2:10-cv-03403-FSH -PS   Document 37   Filed 05/05/11   Page 10 of 25 PageID: 154

December 20, 2006 at 1:14 p.m. EST not knowing that 20,000 Board Games had been manufactured and shipped from China.

73.     Twelve minutes later, at 1:26 p.m., Weinshanker sent an email to Ms. Speidel saying only "Here is a copy…" and attached a copy of the NECA Ward Agreement.

74.     On December 21, 2006 at 10:38 a.m., Ms. Speidel sent an email to several of WBCP's employees stating:

> Attached please find for your files a copy of the agreement between NECA and Zack Ward (Scut Farcus [sic], A Christmas Story) for Zack's participation (likeness approval) in the Christmas Story board game.

> NECA has also secured the rights to develop additional product, including but not limited to figures and bobblehead, using the character played by Zack for an agreed upon fee.  NECA will be the only licensee utilizing this character on product.

75.     Despite what the Defendants led Ms. Speidel to believe, the Plaintiff did not provide his likeness approval for the Board Game because he was unaware of the Board Game's existence.

### *The Terms of the NECA Ward Agreement*.

76.     Paragraph 4 of the NECA Ward Agreement states that:

> Royalties (and related itemized statements) shall be due and payable within thirty (30) days following the end of the preceding quarter during the term of the Agreement.   NECA will send Licensor itemized statements every quarter, regardless of whether royalties have accrued during that period.  Payments shall be made in the form of a business check, made payable to: Zack Ward.

77.     Paragraph 12 of the NECA Ward Agreement states that:

> Licensor will have the right of approval, in advance, of all items to be produced by NECA hereunder.  We will supply you with color comps, and a pre-production sample of each Authorized Product prior to manufacture for your approval.  You will reply within 8 business days with your approval, disapproval, or changes.  If a reply is not given within 8 business days, we will send a reminder and if you have not responded within 2 business days following the receipt of such notice,

10



Case 2:11-cv-06358-MMM-CW   Document 148-4   Filed 11/09/12   Page 38 of 63   Page ID
#:3577
Case 2:10-cv-03403-FSH -PS   Document 37   Filed 05/05/11   Page 11 of 25 PageID: 155

the sample will be deemed approved, and we will move on to the next level of sample (if pre-production sample is approved, then we will move to production).

78.    Paragraph 1 of the NECA Ward Agreement provided that the term of the agreement was "to December 31, 2008".

79.    Paragraph 15 of the NECA Ward Agreement provides that the agreement "is entered into in California and California law is controlling."

**_The Defendants' Performance (or Lack Thereof) After Execution of the NECA Ward Agreement._**

80.    The Defendants did not provide one quarterly royalty report to the Plaintiff as required by the NECA Ward Agreement.

81.    The Defendants did not send one quarterly royalty check to the Plaintiff as required by the NECA Ward Agreement.

82.    The Defendants did not send the Board Game to the Plaintiff for his approval prior to its manufacture and sale as required by the NECA Ward Agreement.

83.    In fact, Weinshanker acted as if the NECA Ward Agreement did not exist.

84.    On or about March 8, 2010, the Plaintiff, through counsel, contacted Weinshanker and NECA via United States Certified Mail and via facsimile and requested a full accounting of all Scut Products sold.

85.    NECA failed to respond to the March 8, 2010 letter.

86.    Thereafter, on July 3, 2010, the Plaintiff commenced the instant action seeking damages related to sales of the Scut Farkus Action Figures.

87.    However, at the time the Plaintiff commenced this action, he had no idea that sales of the Scut Farkus Action Figures only accounted for 9.6% of the total sales the Defendants generated using the Plaintiff's image and likeness.

EXHIBIT E   PAGE 223

### *The Defendants' Fraudulent Conduct After the Initiation of Litigation.*

88.     On August 3, 2010, the Defendants filed an Answer to the Plaintiff's Complaint.

89.     Attached to their Answer is Exhibit "A" which purports to be a "Product Profit Report" for three products: 1) the Board Game; 2) the Scut Farkus Action Figure; and 3) the Box Set of Action Figures (containing the characters Flick, Randy, Ralphie and Scut Farkus).

90.     The Product Profit Report was the first time the Defendants provided any information to the Plaintiff about the use of his likeness or image on the Board Game.  In fact, prior to receiving the Defendants' Answer, the Plaintiff had no idea that the Defendants had even manufactured and sold a Board Game based on the Movie.

91.     According to the Defendants' Product Profit Report, the gross sales related to the Board Game amounted to $755,553.67 and the Product Profit Report shows a loss related to the Board Game in the amount of $62,336.33.

92.     However, according to the invoices from Enseng to NECA, the Defendants' cost of the Board Game was $2.85 per game, therefore, based upon information and belief, the Defendants actually made approximately $470,000 in profits from the sale of the Board Games.

93.     Based upon information and belief, the Defendants prepared and submitted an inaccurate Product Profit Report as Exhibit "A" to their Answer in order to attempt to cover up their wrongdoing related to the manufacture and sale of the Board Games.

### *The Fraudulent Quarterly Royalty Reports.*

94.     On September 27, 2010, the Defendants provided the Plaintiff's counsel with quarterly royalty statements from October 1, 2006 to December 31, 2008 (the "Ward Royalty Reports").

12


EXHIBIT E PAGE 224

95.     On October 20, 2010, the Parties appeared at a conference in the instant matter during which Weinshanker made several misleading statements regarding the manufacture and sale of the Board Games, including that fact that only a "few" of the Board Games were sold after 2008.

96.     In reality, NECA shipped almost 16,000 Board Games to Rite Aid in August, 2009 pursuant to purchase orders Rite Aid issued to the Defendants in April, 2009.

97.     On or about November 24, 2010, the Defendants produced copies of the royalty reports that they provided to WBCP (the "WBCP Royalty Reports").

98.     The table below compares the Ward Royalty Reports to the WBCP Royalty Reports.

| Period | Sales Reported to WB | Sales Reported to Ward | Difference |
|---|---|---|---|
| 7/1/06 TO 9/30/06 | $75,656.32 | $0.00 | $75,656.32 |
| 10/1/06 TO 12/31/06 | $86,272.80 | $161,929.32 | ($75,656.52) |
| 1/1/07 TO 3/31/07 | $6,362.70 | $6,362.70 | $0.00 |
| 4/1/07 TO 6/30/07 | $12,224.10 | $12,224.10 | $0.00 |
| 7/1/07 TO 9/30/07 | $80,677.30 | $80,677.30 | $0.00 |
| 10/1/07 TO 12/31/07 | $76,566.00 | $76,566.00 | $0.00 |
| 1/1/08 TO 3/31/08 | $66.00 | $66.00 | $0.00 |
| 4/1/08 TO 6/30/08 | $151.60 | $151.60 | $0.00 |
| 7/1/08 TO 9/30/08 | $234,274.44 | $234,274.44 | $0.00 |
| 10/1/08 TO 12/31/08 | $1,989.00 | $183,302.21 | ($181,313.21) |
| 1/1/09 TO 3/31/09 | $2,156.76 | $0.00 | $2,156.76 |
| 4/1/09 TO 6/30/09 | $202.90 | $0.00 | $202.90 |
| 7/1/09 TO 9/30/09 | $152,190.60 | $0.00 | $152,190.60 |
| 10/1/09 TO 12/31/09 | $2,575.16 | $0.00 | $2,575.16 |

13

Case 2:11-cv-06358-MMM-CW   Document 148-4   Filed 11/09/12   Page 41 of 63   Page ID
#:3580
Case 2:10-cv-03403-FSH -PS   Document 37   Filed 05/05/11   Page 14 of 25 PageID: 158

99.     As the table above shows, the Defendants prepared the Ward Royalty Reports to mislead the Plaintiff into believing that all sales of Scut Farkus products occurred during the term of the NECA Ward Agreement which ran from December 20, 2006 until December 31, 2008.

100.     The Defendants further attempted to cover up their wrongdoing related to the manufacture and sale of the Board Games by only producing one page of each quarterly WB Royalty Report to the Plaintiff.

101.     In response to a third-party subpoena to WBCP in this matter, on or about March 24, 2011 WBCP produced a copy of the quarterly royalty reports the Defendants provided to WBCP.

102.     Attached as page 3 to the quarterly royalty reports the Defendants provided to WBCP is a character likeness schedule showing which characters from the Movie appeared on consumer products sold during that quarter.

103.     The following characters are listed on the character likeness schedule from July 1, 2006 to September 30, 2008: Ralphie, Mom, Old Man, Flick, Randy.

104.     The character Scut Farkus appears for the first time on the October 1, 2008 to December 31, 2008 character likeness schedule.

105.     On September 2, 2008, Kam Yuen Toys Manufactory Ltd. shipped the Defendants 1,800 Scut Farkus Action Figures and 2,400 Boxed Sets and on September 9, 2009, Kam Yuen shipped the Defendants 3,000 Scut Farkus Action Figures and 2,400 Boxed Sets.

106.     Based upon information and belief, the Defendants purposefully omitted the Licensee Character Likeness Summary from the documents produced to the Plaintiff during discovery in an attempt to conceal their wrongdoing related to the manufacture and sale of the

14

Case 2:11-cv-06358-MMM-CW   Document 148-4   Filed 11/09/12   Page 42 of 63   Page ID
#:3581
Case 2:10-cv-03403-FSH -PS   Document 37   Filed 05/05/11   Page 15 of 25 PageID: 159

Board Games.

### *The Defendants' Use of the Plaintiff's Image on the Board Game.*

107.    It was not until early December, 2010 that the Plaintiff actually obtained one of the Board Games.

108.    The Plaintiff's image from the Movie appears on 21 of the 36 card "Question Deck"

109.    The Plaintiff's image from the Movie appears on 12 of the 75 card "Game Deck".

110.    The Plaintiff's image from the Movie appears on the back of the Board Game's box.

### *The Board Game was so Bad the Defendants Ceased Production.*

111.    Based upon information and belief, WBCP received so many complaints regarding the quality of the Board Game that the Defendants were told by WBCP to stop manufacturing and selling the Board Game.

112.    For example, of the 36 reviews of the Board Game on Amazon.com's website, 25 people rated the Board Game 1 out of 5 stars and 8 more rated the Board Game 2 out of 5 stars.

113.    The reviews of the Board Game contain the following comments:

a.    "Like others have said, this has got to be the worst board game ever produced, and if I could give it 0 stars, I would."

b.    "I don't recommend anyone buy this game. Very disappointing."

c.    "I just wanted to add my voice to the chorus of bad reviews to hopefully help hammer home the point to other consumers that they SHOULD NOT buy this game. The instructions are absolutely impossible to decipher, the layout of the board is bizarre ... it's just a train wreck. The designer must have been a mental patient. All of the other reviewers who said the manufacturers must never have play-tested the game are definitely right. Whomever controls the rights to "A Christmas Story" should be genuinely peeved at this blight on their brand name, and should never have allowed this unplayable mess to hit the stores. Five

15

minutes with this game and there's no question that it's nothing more than garbage churned out without even the merest effort at quality, mass-produced and relying wholly on the "Christmas Story" name to sell it."

d.      "THIS is the biggest POS game in history."

e.      "The worst game ever, I can't even give this game one stinking star."

f.      "World's worst rip-off.  This is the worst rip-off of a game made off a such a wonderful movie. If you could get through being able to understands the horrific instructions, you would then identify how terrible the game is. It was just slapped together sponging off the movie. This game is going in the trash as it's not worth the space in my house. Many other reviews go into more detail how bad this game really is."

g.      "Wow this game was bad. I mean REALLY bad..."A Christmas Story" game is the Hindenburg of board games. "Oh the humanity" ... Like others who have commented about this lousy excuse for home entertainment, we thought the misunderstanding was on our end. It was not.  After slogging through the first two pages of incomprehensible directions, I actually thought the game was a joke, like an April Fools Day prank. It was not. Luckily, we purchased the game for $1 at a garage sale. We overpaid. Next time, I hope "A Christmas Story" board game manufacturers think twice before nearly ruining our favorite holiday movie."

h.      "As true fans of the movie...we were all very disappointed in the game. I would not recommend anyone buy it. The manufacturers should rethink it."

## CAUSES OF ACTION

## COUNT I
## FRAUD
### (California Civil Code §§ 1709-1710)

114.    The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

115.    Cal. Civ. Code § 1709 states, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

16

EXHIBIT E PAGE 228

Case 2:11-cv-06358-MMM-CW   Document 148-4   Filed 11/09/12   Page 44 of 63   Page ID
#:3583
Case 2:10-cv-03403-FSH -PS   Document 37   Filed 05/05/11   Page 17 of 25 PageID: 161

116.    A willful deception includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." Cal Civ. Code § 1710(3).

117.    A willful deception also includes "[a] promise, made without any intention of performing it." Cal Civ. Code § 1710(4).

118.    During the October 27, 2006 telephone conversation with the Plaintiff, Weinshanker willfully deceived the Plaintiff into agreeing in principle to license his likeness for use in producing a Scut Farkus Action Figure when, in reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without WBCP and Plaintiff's knowledge or approval.

119.    During the October 27, 2006 telephone conversation, Weinshanker suppressed the facts about the manufacture and sale of the Board Games in order to mislead the Plaintiff into executing the NECA Ward Agreement.

120.    Weinshanker also made a promise to pay the Plaintiff royalties pursuant to the NECA Ward Agreement when, in reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without WBCP and Plaintiff's knowledge or approval.

121.    At the time Weinshanker executed the NECA Ward Agreement and promised to pay royalties to the Plaintiff, Weinshanker had no intention of *actually* paying the royalties to the Plaintiff as Weinshanker had to conceal from the Plaintiff the fact that the Defendants unlawfully used Plaintiff's image on the Board Game.

EXHIBIT E PAGE 229

122.    Weinshanker intended to deceive the Plaintiff to act in reliance on the promise to
pay royalties in order to induce the Plaintiff to execute the Agreement on December 20, 2006.

123.    In reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP
because the Defendants had unlawfully manufactured and shipped the Board Games without the
WBCP and Plaintiff's knowledge or approval.

124.    As a result of Weinshanker's deception, the Plaintiff is entitled to actual damages,
punitive damage and costs in an amount to be determined at trial; is entitled to void the NECA
Ward Agreement and is entitled to an order enjoining the Defendants from manufacturing and/or
selling any products using the Plaintiff's image or likeness without the Plaintiff's consent.  The
Plaintiff also seeks to have the Defendants destroy all Scut Farkus products in its possession.

### COUNT II
### COMMON LAW FRAUD

125.    The Plaintiff repeats and realleges each of the allegations set forth above as
though they were fully set forth herein.

126.    During the October 27, 2006 telephone conversation with the Plaintiff,
Weinshanker willfully deceived the Plaintiff into agreeing in principle to license his likeness for
use in producing a Scut Farkus Action Figure when, in reality, Weinshanker needed the
Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully
manufactured and shipped the Board Games without WBCP and Plaintiff's knowledge or
approval.

127.    During the October 27, 2006 telephone conversation, Weinshanker suppressed the
facts about the manufacture and sale of the Board Game in order to mislead the Plaintiff into
executing the NECA Ward Agreement.

18

EXHIBIT E PAGE 230

128.   Weinshanker also made a promise to pay the Plaintiff royalties pursuant to the NECA Ward Agreement when, in reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without WBCP and the Plaintiff's knowledge or approval.

129.   At the time Weinshanker executed the NECA Ward Agreement and promised to pay royalties to the Plaintiff, Weinshanker had no intention of *actually* paying the royalties to the Plaintiff as Weinshanker had to conceal from the Plaintiff the fact that the Defendants unlawfully used Plaintiff's image on the Board Game.

130.   Weinshanker intended to deceive the Plaintiff to act in reliance on the promise to pay royalties in order to induce the Plaintiff to execute the Agreement on December 20, 2006.

131.   In reality, Weinshanker needed the Plaintiff's authorization to provide to WBCP because the Defendants had unlawfully manufactured and shipped the Board Games without WBCP and the Plaintiff's knowledge or approval.

132.   As a result of Weinshanker's deception, the Plaintiff is entitled to actual damages, punitive damage and costs in an amount to be determined at trial; is entitled to void the NECA Ward Agreement and is entitled to an order enjoining the Defendants from manufacturing and/or selling any products using the Plaintiff's image or likeness without the Plaintiff's consent. The Plaintiff also seeks to have the Defendants destroy all Scut Farkus products in its possession.

19

## COUNT III
## FALSE DESIGNATION OF ORIGIN
### (The Lanham Act, 15 U.S.C. § 1125(a))

133.   The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

134.   15 U.S.C. § 1125(a) provides, in pertinent part, "[a]ny person who, on or in connection with any goods or services...uses in commerce any word, term, name, symbol, or device, or any combination thereof...which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person...or approval of his or her goods, services, or commercial activities by another person...shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

135.   Because the NECA Ward Agreement was induced by fraud, the NECA Ward Agreement is void and the Defendants used, and continue to use, the Plaintiff's image and likeness in a false or misleading way that is likely to cause confusion, mistake and/or deceive as to the Plaintiff's affiliation with the Scut Farkus Products.

136.   Weinshanker and NECA knowingly used the Plaintiff's likeness and image without the Plaintiff's consent, even after being advised by WBCP that such use was unlawful.

137.   The Defendants' actions constitute a false designation of origin in violation of 15 U.S.C. § 1125(a).

138.   As a result of the Defendants' conduct, the Plaintiff is entitled to actual damages, punitive damage, attorney's fees and costs in an amount to be determined at trial; is entitled to void the NECA Ward Agreement and is entitled to an order enjoining the Defendants from manufacturing and/or selling any products using the Plaintiff's image or likeness without the

EXHIBIT E PAGE 232

Plaintiff's consent.  The Plaintiff also seeks to have the Defendants destroy all Scut Farkus products in its possession.

**COUNT IV**
**MISAPPROPRIATION OF LIKENESS**
**(Cal. Civ. Code § 3344)**

139.   The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

140.   Cal. Civ. Code § 3344 states in pertinent part: "[a]ny person who knowingly uses another's...likeness, in any manner on or in products, merchandise, or goods... without such person's prior consent...shall be liable for any damages sustained by the person or persons injured as a result thereof..."

141.   Cal. Civ. Code § 3344 also states that

...in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages.

142.   § 3344 states that:

[i]n establishing such profits, the injured party or parties are required to present proof only of the gross revenue attributable to such use, and the person who violated this section is required to prove his or her deductible expenses. Punitive damages may also be awarded to the injured party or parties. The prevailing party in any action under this section shall also be entitled to attorney's fees and costs.

143.   The Defendants fraudulently induced the Plaintiff to enter into the NECA Ward Agreement rendering the NECA Ward Agreement void.

21

EXHIBIT E  PAGE 233

144.   The Defendants used the Plaintiff's image for the purpose of selling the Board Game without the Plaintiff knowledge or consent.

145.   The Defendants used the Plaintiff's likeness for the purpose of selling the Scut Farkus Action Figure without the Plaintiff's consent because the NECA Ward Agreement is void.

146.   Even if the NECA Ward Agreement is not void, the Defendants used the Plaintiff's image for the purpose of selling the Board Games prior to the term of the NECA Ward Agreement and after the expiration of the term of the NECA Ward Agreement.

147.   Even if the NECA Ward Agreement is not void, the Defendants used the Plaintiff's likeness for the purpose of selling the Scut Farkus Action Figures after the expiration of the term of the NECA Ward Agreement.

148.   As a result of the Defendants' conduct, the Plaintiff is entitled to monetary damages equal to the Defendants' profits from the sale of the Board Games and Scut Farkus Action Figures as well as punitive damages, attorney's fees and costs.

## COUNT V
## COMMON LAW RIGHT TO PUBLICITY

149.   The Plaintiff repeats and realleges each of the allegations set forth above as though they were fully set forth herein.

150.   The Defendants used, and continue to use, the Plaintiff's image and likeness for their commercial advantage.

151.   The Defendants used, and continue to use, the Plaintiff's image and likeness without the Plaintiff's consent.

152.   As a result of the Defendants' conduct, the Plaintiff is entitled to monetary

EXHIBIT E PAGE 234

damages in an amount to be determined at trial as well as an order enjoining the Defendants from
manufacturing and/or selling any products using the Plaintiff's image and likeness without the
Plaintiff's consent.

## COUNT VI
## BREACH OF CONTRACT

153.   The Plaintiff repeats and realleges each of the allegations set forth above as
though they were fully set forth herein.

154.   The Defendants were obligated to comply with the terms of the NECA Ward
Agreement by paying royalties to the Plaintiff and accounting to the Plaintiff for sales of Scut
Farkus Products.

155.   The Defendants were obligated to comply with the terms of the NECA Ward
Agreement by submitting all proposed products to the Plaintiff for approval prior to
manufacturing said product.

156.   NECA failed to pay royalties or provide an accounting of its sales of Scut Farkus
Products to the Plaintiff.

157.   NECA failed to submit the Board Game to the Plaintiff for his approval prior to
manufacturing and selling the Board Game.

158.   The Defendants' conduct is a breach of the NECA Ward Agreement and the
Plaintiff is entitled to monetary damages in an amount to be determined at trial as well as an
order enjoining the Defendants from manufacturing and/or selling any products using the
Plaintiff's image or likeness without the Plaintiff's consent.

EXHIBIT E PAGE 235

**WHEREFORE**, the Plaintiff respectfully requests that this Court enter judgment against the Defendants as follows:

    a.   Declare that the NECA Ward Agreement is void;

    b.   Award the Plaintiff the Defendants' profits which are attributable to the sale of Scut Farkus Products;

    c.   Award the Plaintiff actual damages in an amount to be determined at trial;

    d.   Award the Plaintiff punitive damages pursuant to Cal. Civ. Code §§ 1709, 1710, and 3344 by reason of Defendants' deceptive acts and unauthorized use of the Plaintiff's image and likeness;

    e.   Order the Defendants to destroy all Scut Farkus Products in the Defendants' possession and/or control;

    f.   Enjoin, restrain and prohibit the Defendants, their agents, servants, employees, officers, directors, successor and assigns, and all persons, firms and corporations acting in concert or participation with the Defendants or on the Defendants' behalf, from using the Plaintiff's image and/or likeness to produce, manufacture, license, sell, promote and/or ship any Scut Farkus Products;

    g.   Award the Plaintiff costs and reasonable attorney's fees; and

    h.   Award the Plaintiff such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a trial by jury.

EXHIBIT E PAGE 236

Dated: New York, New York
      May 5, 2011

                Respectfully submitted,

                RANDALL S. NEWMAN, P.C.

By: _____
                Randall S. Newman, Esq. (RN7862)
                37 Wall Street, PH D
                New York, New York 10005
                Tel: (212) 797-3737

                *Attorney for Plaintiff,*
                *Zack Ward*

EXHIBIT E PAGE 237



**NECA**
NATIONAL ENTERTAINMENT
COLLECTIBLES' ASSOCIATION
LICENSE AGREEMENT

October 1, 2006

Upon your signing below under the words "Consented and Agreed to", the following will constitute our agreement:

1.      Conditioned on our full and faithful compliance with all the terms, covenants and conditions herein contained, you hereby authorize us to manufacture, distribute, vend and sell products listed below(the "Authorized Products") bearing the names, photographs, likenesses, symbols, emblems and designs of artist, in the territory, during the term, through galleries, specialty retailers, catalogs, exhibitions and websites.

Licensor:                              Zack Ward's likeness in the feature film "A Christmas Story"

AUTHORIZED PRODUCTS:      All Consumer Products incorporating his likeness

TERRITORY:                        Worldwide

TERM:                             TO 12/31/08

2.      Zack Ward hereby grants to NECA the exclusive license to manufacture, and cause others to Manufacture the Authorized products as set forth herein:

3.      We shall make the following payments to you:

(a)     A royalty of Two Percent (2%) of our net receipts from the sale of the Authorized products.  As used herein, "Net Receipts" shall be defined as the wholesale price of all Authorized Products sold and not returned.

4.      Royalties (and related itemized statements) shall be due and payable within thirty (30) days following the end of the preceding quarter during the term of the Agreement.  NECA will send Licensor itemized statements every quarter, regardless of whether royalties have accrued during that period.  Payments shall be made in the form of a business check, made payable to : Zack Ward

5.      You shall have the right to inspect our books up to four (4) times during the term at our offices.  If an audit is performed, and a discrepancy of more than 5% is found in Zack Ward's favor, then NECA will pay reasonable 3rd party audit costs.

6.      Upon entering into this agreement, we shall include Zack Ward individually as additionally insured, in our Comprehensive General Liability Insurance, which includes, among other things "Product Liability" insurance for a minimum amount of TWO MILLION DOLLARS ($2,000,000).  The said Comprehensive General Liability Insurance shall be carried throughout the "Term".  We will supply a copy, including Licensor as additionally covered, to Licensor, within 30 days from Licensors execution of this agreement.  The insurer will notify you, with thirty days notice, of policy cancellation.

A NEW JERSEY CORPORATION
603 SWEETLAND AVE • HILLSIDE N.J 07205
TEL (908) 686-3300 FAX (908) 686-0301



EXHIBIT E  PAGE 238



7.      We shall indemnify and hold Zack Ward, his employees, attorney, auditors and agents harmless from and against all claims, demands, obligations, causes of action, liabilities and expenses (including attorney's fees) and damages arising out of or relating to (i) any alleged defects in the Authorized Product or (ii) any breach by us of any agreement made hereunder.  You shall give us prompt written notice of any such claim, demand or cause of action and we shall have the right to participate in the defense thereof, at our expense.  The relationship of the parties is as Licensee/Licensor only.  No partnership or joint venture is created hereunder.

8.      The terms of this agreement are confidential, and we shall not disclose such terms to any third party, excluding necessary employees and professionals.

9.      (a) You represent that you have the full right, power and authority to enter into this agreement, and to license all the rights herein granted.

        (b) You shall indemnify and hold us harmless from any loss or damage we may suffer by reason of any breach by you of the warranty and representation contained in paragraph 9(a), supra.

10.     This agreement shall be governed, construed and enforced in accordance with the laws of the State of California, applicable to agreements made and to be wholly performed.

11.     Upon our request, and subject to availability, you will supply us with any movie reference available.

12.     Licensor will have the right of approval, in advance, of all items to be produced by NECA hereunder.  We will supply you with color comps, and a pre-production sample of each Authorized Product prior to manufacture for your approval.  You will reply within 8 business days with your approval, disapproval, or changes.  If a reply is not given within 8 business days, we will send a reminder and if you have not responded within 2 business days following the receipt of such notice, the sample will be deemed approved, and we will move on to the next level of sample (if pre-production sample is approved, then we will move to production).

13.     All notices, deliveries, payments, and other such communication shall be in writing and shall be deemed given when the delivered in person or sent via fax, prepaid first class registered or certified mail, return receipt requested, or federal express or UPS, to the following addresses, or other addresses as may be designated by notice:

If to you:

        Zack Ward
        12312 Collins St
        Valley Village, CA 91607
        Scriptforzack @
          yahoo.com

If to us:

        National Entertainment Collectibles Association
        603 Sweetland Ave  Hillside NJ 07205
        Attn: Joel Weinshanker
        Fax 908-686-0301

15.     The parties heretofore acknowledge that this agreement sets forth the entire agreement between you and us with respect to the subject matter hereof and shall not be modified



EXHIBIT E PAGE 239



# NECA
## NATIONAL ENTERTAINMENT
## COLLECTIBLES ASSOCIATION

except by the execution of a written instrument signed by all parties. This agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto

Should any covenant, provision or section of this Agreement be held in any court of competent jurisdiction to be illegal or unenforceable, such covenant, provision or section shall be severed from this Agreement, and the remainder of this Agreement shall continue in full force and effect. Either Party's waiver of any other or subsequent breach, unless in writing and signed by both Parties. This agreement is entered into in California and California law is controlling.

Consented and Agreed to:
For the NBCA                                        For    Zack Ward

By: _____                               By: _Zack Ward_
    Joel Weinshanker
                                                   By: _____

                                                   DATE: _12/20/06_

DATE: _____                             By: _____

                                                   Date: _____

A NEW JERSEY CORPORATION
603 SWEETLAND AVE • HILLSIDE NJ 07205
TEL (908) 686-3300 FAX (908) 686-0701

EXHIBIT E  PAGE 240



# IMDbPro

Search [ _____ ] Go    Morgan Sloane's account | Logout | Help

Careers    Industry Directory    In Production    STARmeter    Box Office    News

## Zack Ward

Main Details  Filmography  Personal Details  Media  Contact  Clients/Coworkers

**Main Details**
STARmeter
Filmography
Summary
Year
Profession
Title Type
TV Series
Credited Name
Genre
Keyword
Budget
Box Office
Ratings
Votes
**Personal Details**
Biography
Quotes
Trivia
Other Works
Awards
Message Board
**Media**
Photo Gallery
Official Photos
Publicity
News Articles

Web Sites
Titles for Sale
**Contact**
Clients/Coworkers

| | | |
|---|---|---|
| **Manager:** | Harrison Stokes   more » | |
| | West Hollywood, CA: | |
| | 8730 W Sunset Blvd | |
| | Suite #270 | |
| | West Hollywood, CA 92069 | |
| | USA | |
| **Profession:** | Actor / Producer / Miscellaneous Crew | |
| **Known for:** | Transformers / A Christmas Story / Postal | |
| **Also Known As:** | Zack Ward / Zach Ward / Zacharias Ward   more » | |
| **Awards:** | 1 win   more » | |
| **Born:** | 31 August 1970, Canada (age 41)   more » | |
| **Height:** | 5' 10" (1.78 m) | |

**STARmeter™**

Current rank: **5,882**
Click graph for more detail

Photo Gallery
Official Photos

**Industry News:** 'Christmas Story' Actor Drops Lawsuit Against Warner Bros. (From The Hollywood Reporter. 14 January 2012, 10:38 AM, PST)

**News:** 'Christmas Story' Actor Drops Lawsuit Against Warner Bros. (From The Hollywood Reporter. 14 January 2012, 10:38 AM, PST)
(47 articles) 'A Christmas Story' 11 things you may not know about the holiday classic (From Zap21 - From Inside the Box. 25 December 2011, 10:52 AM, PST)

### Industry Connections
To view your connections with Zack Ward, you must first claim your page on IMDb so we know who you are          (Hide

### Filmography sorted by:  Production Status  ▾  Go

Jump to: Past Films & Videos   Past Television   Self   Other   Archive Footage   Add IMDb Resume

| Projects in Development (1 title) | Year | MOVIE Meter | Status |
|---|---|---|---|
| Last Stop - Alex, Producer, Stunt Coordinator | ???? | 24,617 | Unknown |

| Past Films & Videos (44 titles) | Year | MOVIE Meter | Budget | Opening Weekend | US Box Office |
|---|---|---|---|---|---|
| Haunted - Chris McCulloch | 2012 | 19,411 | | | |
| Spectacle (short) - Rob | 2012 | 192,995 | | | |
| Screamplay - Special Thanks | 2011 | 103,985 | | | |
| In My Pocket - Rob | 2011 | 25,524 | | | |
| Monster Mutt - Sirus Caldwell, Associate Producer | 2011 | 25,170 | $8M | | |
| End of the Road - Falco / Zack, Associate Producer | 2011 | 71,145 | | | |
| In the Void - Mark | 2010 | 150,178 | $1.25M | | |
| Repo - Rad | 2010 | 22,461 | $4M | | |
| The Devil's Tomb - Nickels | 2009 | 8,262 | $10M | | |
| Battle Planet - Jordan Strider | 2008 | 24,104 | | | |
| Along in the Dark II (video) - Xavier | 2008 | 13,823 | $4.6M | | |
| Dead and Gone - The Weatherman | 2008 | 35,805 | $500K | | |
| Kissing Cousins - Charlie | 2008 | 18,609 | | | |
| The Untold Christmas Story (video documentary) - Himself, Producer, Photographs Courtesy Of | 2008 | 264,221 | | | |
| Everyday Joe (short) - Writer | 2007 | 233,372 | $800 | | |
| BloodRayne: Deliverance (video) - Billy the Kid | 2007 | 9,760 | $10M | | |
| Postal - Dude | 2007 | 6,060 | | | |
| Transformers - First Sergeant Donnelly | 2007 | 385 | $150M | $70.5M | $319M |
| Moving McAllister - Earl | 2007 | 9,532 | | $28.7K | $42.2 |
| Trade - Alex Green | 2007 | 4,699 | $12M | $118K | $214 |
| Pennies (short) - Stoner Todd | 2006 | 47,813 | $5K | | |

EXHIBIT E PAGE 241

| Title | Year | Movie Meter | User Rating | User Votes |
|---|---|---|---|---|
| Hollywood Kills - Nate Folds | 2006 | 78,888 | $200K | |
| Brotherly Love: An Interview with Zack Ward (video documentary short) - Himself, *Special Thanks* | 2006 | 153,471 | | |
| Aurora Borealis - Lindstrom | 2005 | 21,773 | $4.32K | $60.6 |
| Resident Evil: Apocalypse - Nicholai Ginovaeff | 2004 | 1,749 | $45M | $23M | $50.7 |
| L.A. Twister - Lenny | 2004 | 84,097 | $450K | $5.07K | $54 |
| A Night at Sophie's - Tony | 2004 | 385,777 | | |
| April's Shower - August | 2003 | 22,679 | $1M | $13.2K | $16.3 |
| Another Christmas Story (video documentary short) - Himself - 'Scut Farcus', *Special Thanks* | 2003 | 283,081 | | |
| Freddy vs. Jason - Bobby Davis (Mark's Brother) | 2003 | 2,190 | $25M | $36.4M | $82.2 |
| The Pink House - Murray | 2003 | 134,807 | | |
| Completely Totally Utterly - Chad | 2001 | 389,792 | | |
| The Sign of Watermelons - Skinhead | 2000 | 46,880 | | |
| Almost Famous - The Legendary Red Dog | 2000 | 537 | $60M | $2.31M | $32.5 |
| Civility - Billy | 2000 | 76,145 | | |
| The Fair - Jimmy | 1999 | 192,196 | | |
| How to Make the Cruelest Month - Manhattan's Neighbor | 1998 | 90,410 | | |
| Wild America - D.C. | 1997 | 10,667 | $2.88M | $7.32 |
| Lancelot: Guardian of Time - A.J. | 1997 | 92,353 | | |
| Ed - Dusty Richards (as Zacharias Ward) | 1996 | 10,458 | | $6.29 |
| Star Hunter (video) - Cooper (as Zach Ward) | 1996 | 66,666 | | |
| The Club - Kyle | 1994 | 75,890 | | |
| Just for Fun (short) - Tom | 1993 | 240,697 | | |
| A Christmas Story - Scut Farkus | 1983 | 3,649 | | |

**Past Television (56 titles)**

| Title | Year | Movie Meter | User Rating | User Votes |
|---|---|---|---|---|
| CSI: Miami (TV series) - Clyde Novak (1 episode, 2012) | | 621 | 6.3 | 23,39 |
| Law & Disorder - Clyde Novak | 2012 | | 8.2 | 4 |
| A Night at the Movies: Merry Christmas (TV documentary) - Himself - Interviewee, *Special Thanks* | 2011 | 142,284 | 6.9 | 1 |
| Hawaii Five-0 (TV series) - Billy Murphy (1 episode, 2011) | | 481 | 7.5 | 15,29 |
| Ike Maka - Billy Murphy | 2011 | | 7.9 | 13 |
| The Mentalist (TV series) - Whit Naylor (1 episode, 2011) | | 103 | 8.0 | 33,22 |
| Blood and Sand - Whit Naylor | 2011 | | 7.9 | 17 |
| Drop Dead Diva (TV series) - Keith Geary (1 episode, 2011) | | 682 | 7.5 | 5,13 |
| The Wedding - Keith Geary | 2011 | | 7.0 | 3 |
| Breakout Kings (TV series) - Christian Beaumont (1 episode, 2011) | | 2,064 | 7.3 | 5,11 |
| Like Father, Like Son - Christian Beaumont | 2011 | | 7.3 | 7 |
| Accidentally in Love (TV movie) - Scott Dunbar | 2011 | 19,103 | 5.3 | 14 |
| Warehouse 13 (TV series) - Leo (1 episode, 2010) | | 136 | 7.5 | 10,53 |
| 13.1 - Leo | 2010 | | 7.8 | 13 |
| I'm in the Band (TV series) - Xander (1 episode, 2010) | | 12,656 | 6.3 | 52 |
| Got No Class - Xander | 2010 | | | |
| Dollhouse (TV series) - Zone (2 episodes, 2009-2010) | | 1,622 | 7.5 | 10,43 |
| Epitaph Two: Return - Zone | 2010 | | 8.6 | 35 |
| Epitaph One - Zone | 2009 | | 6.8 | 60 |
| Cold Case (TV series) - Ed Dubinski (1 episode, 2009) | | 1,714 | 7.4 | 10,72 |
| Lotto Fever - Ed Dubinski | 2009 | | 7.9 | 4 |
| Terminator: The Sarah Connor Chronicles (TV series) - Wells (1 episode, 2008) | | 1,986 | 7.5 | 17,47 |
| Automatic for the People - Wells | 2008 | | 7.6 | 46 |
| CSI: Crime Scene Investigation (TV series) - Steve Card (1 episode, 2007) | | 554 | 8.0 | 36,42 |
| Lying Down with Dogs - Steve Card | 2007 | | 8.1 | 36 |
| Girlfriends (TV series) - Mike (1 episode, 2006) | | 8,059 | 6.1 | 91 |
| Hustle & Oough - Mike | 2006 | | | |
| All of Us (TV series) - Jeff Sizemore (4 episodes, 2005) | | 12,413 | 5.4 | 55 |
| Legal Affairs: Part 2 - Jeff Sizemore (as Zack Ward) | 2005 | | | |
| Legal Affairs: Part 1 - Jeff Sizemore (as Zack Ward) | 2005 | | | |
| If You Can't Stand the Heat - Jeff Sizemore (as Zack Ward) | 2005 | | | |
| Starting Over - Jeff Sizemore (as Zack Ward) | 2005 | | | |


EXHIBIT E PAGE 242

| | | | | |
|---|---|---|---|---|
| NCIS (TV series) - Police Officer Billy Krieg (1 episode, 2005) | | 292 | 7.8 | 21,24 |
| Hometown Hero - Police Officer Billy Krieg | 2005 | | 7.9 | 14 |
| Deadwood (TV series) - Actor (2 episodes, 2004-2005) | | 779 | 9.0 | 27,52 |
| Childish Things - Actor | 2005 | | 8.1 | 20 |
| No Other Sons or Daughters - Actor | 2004 | | 8.3 | 24 |
| Lost (TV series) - Marc Silverman (1 episode, 2005) | | 114 | 8.4 | 102,94 |
| Do No Harm - Marc Silverman | 2005 | | 8.8 | 1,42 |
| Crossing Jordan (TV series) - FBI Agent Blair (1 episode, 2005) | | 3,975 | 6.8 | 3,58 |
| A Stranger Among Us - FBI Agent Blair | 2005 | | 7.7 | 2 |
| Significant Others (TV series) - Zack (1 episode, 2004) | | 80,182 | 6.6 | 6 |
| Episode #2.6 - Zack | 2004 | | | |
| Charmed (TV series) - Kevin Casey / Sirk (1 episode, 2004) | | 648 | 6.8 | 24,76 |
| Styx Feet Under - Sirk/Kevin Casey | 2004 | | 7.6 | 12 |
| Monte Walsh (TV movie) - Powder Kent | 2003 | 20,881 | 7.2 | 83 |
| Ghost Dog: A Detective Tail (TV movie) - Howie Tibbadoe | 2003 | 119,871 | 4.3 | 9 |
| Chasing Alice (TV movie) - Actor | 2003 | 125,032 | 4.1 | |
| MDs (TV series) - Dr. Lewis (1 episode, 2002) | | 55,297 | 5.8 | 7 |
| A La Casa - Dr. Lewis | 2002 | | | |
| Titus (TV series) - Dave Scouvel (54 episodes, 2000-2002) | | 11,655 | 7.6 | 3,15 |
| The Protector - Dave Scouvel | 2002 | | 8.2 | 1 |
| Insanity Genetic: Part 1 - Dave Scouvel | 2002 | | 8.9 | 1 |
| Insanity Genetic: Part 2 - Dave Scouvel | 2002 | | 8.3 | 1 |
| After Mrs. Shafter - Dave Scouvel | 2002 | | 7.5 | 1 |
| The Visit - Dave Scouvel | 2002 | | 8.7 | 1 |
| (49 more) | | | | |
| She Spies (TV series) - The Thin Man in Black (1 episode, 2002) | | 14,686 | 5.9 | 71 |
| Poster Girl - The Thin Man in Black | 2002 | | 7.1 | 1 |
| The Outer Limits (TV series) - Link (1 episode, 2002) | | 4,661 | 7.8 | 4,28 |
| The Human Factor - Link | 2002 | | 7.0 | 2 |
| Chasing Destiny (TV movie) - Eric | 2001 | 58,584 | 5.1 | 20 |
| Anne of Green Gables: The Continuing Story (TV movie) - Moody Spurgeon | 2000 | 12,773 | 6.5 | 1,85 |
| Brotherhood of Murder (TV movie) - Charles Higgins | 1999 | 45,113 | 5.3 | 28 |
| Y2K (TV movie) - Rick Rothman | 1999 | 58,976 | 3.5 | 30 |
| Atomic Train (TV movie) - Stan Adkins | 1999 | 28,321 | 4.5 | 1,49 |
| Profiler (TV series) - Little Joshua / Reed (1 episode, 1999) | | 9,389 | 7.1 | 1,31 |
| Grand Master - Reed/Little Joshua | 1999 | | 7.1 | 1 |
| The Pretender (TV series) - Little Joshua / Theodore Read (1 episode, 1999) | | 4,872 | 7.5 | 6,53 |
| End Game - Theodore Read/Little Joshua | 1999 | | 6.5 | 1 |
| Viper (TV series) - Crup (1 episode, 1999) | | 19,765 | 5.1 | 34 |
| My Fair Hoodlums - Crup | 1999 | | | |
| JAG (TV series) - Curtis Dastuge (1 episode, 1998) | | 2,402 | 6.3 | 6,50 |
| The Martin Baker Fan Club - Curtis Dastuge | 1998 | | 6.2 | 2 |
| NYPD Blue (TV series) - Dan Evers / Jerry (2 episodes, 1995-1998) | | 3,953 | 7.5 | 3,95 |
| Top Gum - Dan Evers | 1998 | | 5.9 | 1 |
| Dirty Laundry - Jerry | 1995 | | 6.2 | 1 |
| Nash Bridges (TV series) - Paul Pangborn (1 episode, 1998) | | 7,467 | 6.6 | 2,56 |
| Overdrive - Paul Pangborn | 1998 | | 7.9 | 2 |
| Blade Squad (TV movie) - Billy Mustard | 1998 | 94,123 | 3.5 | 10 |
| Fast Track (TV series) - Actor (1 episode, 1998) | | 71,959 | 6.2 | 3 |
| Guys with Guns - Actor | 1998 | | | |
| The Sentinel (TV series) - Orange Glasses Man (1 episode, 1997) | | 13,970 | 6.6 | 70 |
| Breaking Ground - Orange Glasses Man | 1997 | | 6.0 | |
| Walker, Texas Ranger (TV series) - Jerry 'Mad Dog' Sullivan (1 episode, 1997) | | 3,507 | 5.1 | 6,09 |
| Mr. Justice - Jerry 'Mad Dog' Sullivan | 1997 | | 5.0 | 1 |
| Party of Five (TV series) - Tad (1 episode, 1997) | | 4,050 | 6.7 | 3,63 |
| Significant Others - Tad (as Zach Ward) | 1997 | | 6.6 | |
| Sliders (TV series) - Gerald Thomas / Security Guard (2 episodes, 1995-1996) | | 3,883 | 7.4 | 6,53 |
| The Dream Masters - Gerald Thomas | 1996 | | 6.8 | 8 |
| The King is Back - Security Guard (uncredited) | 1995 | | 7.4 | 7 |
| Harvest for the Heart (TV movie) - Ross Hansen | 1994 | 146,233 | 5.3 | 3 |
| Boogies Diner (TV series) - Kirby (unknown episodes) | 1994 | 157,035 | 6.6 | 2 |
| Spenser: Ceremony (TV movie) - Hummer | 1993 | 99,316 | 6.0 | 9 |
| Forever Knight (TV series) - Topper (1 episode, 1992) | | 12,488 | 7.6 | 98 |
| Dark Knight - Topper | 1992 | | 8.1 | 1 |
| Manor Manson (TV series) - Tim (1 episode, 1991) | | 33,729 | 6.6 | 7 |
| Ugly Like Me - Tim | 1991 | | | |
| My Secret Identity (TV series) - Actor (1 episode, 1990) | | 21,484 | 7.1 | 37 |
| White Lies - Actor | 1990 | | | |

| | Year | MOVIE Meter | User Rating | User Votes |
|---|---|---|---|---|
| Neon Rider (TV series) - Digger (1 episode, 1990) | | 35,160 | 5.7 | 11 |
| Vengeance - Digger | 1990 | | | |
| Friday the 13th (TV series) - Greg Mazzey (1 episode, 1988) | | 13,680 | 7.6 | 1,45 |
| Vanity's Mirror - Greg Mazzey | 1988 | | 7.9 | 4 |
| Anne of Avonlea (TV movie) - Moody Spurgeon | 1987 | 10,578 | 7.9 | 3,85 |
| Taking Care of Terrific (TV movie) - Seth Sandruff | 1987 | 347,764 | 7.0 | 1 |
| Anne of Green Gables (TV movie) - Moody Spurgeon | 1985 | 5,641 | 8.1 | 8,60 |

| Self (9 titles) | Year | MOVIE Meter | User Rating | User Votes |
|---|---|---|---|---|
| Never Sleep Again: The Elm Street Legacy (video documentary) - Himself | 2010 | 15,565 | 8.7 | 1,09 |
| Clarkworld (documentary) - Himself | 2009 | 95,222 | 7.2 | 3 |
| From Script to Sand: The Skorponok Desert Attack (video documentary short) - Himself | 2007 | 133,432 | 5.5 | 4 |
| Our World (video documentary) - Himself | 2007 | 82,652 | 6.5 | 5 |
| The John Kerwin Show (TV series) - Himself (1 episode, 2007) | | 59,399 | 5.4 | 4 |
| Episode dated 26 September 2007 - Himself | 2007 | | | |
| Up Close with Carrie Keagan (TV series) - Himself (1 episode, 2007) | | 9,521 | 5.7 | 5 |
| Episode dated 14 September 2007 - Himself | 2007 | | | |
| Resident Evil: Diary of an Apocalypse (video documentary short) - Himself | 2007 | 81,990 | 6.2 | 1 |
| Game Babes (video documentary short) - Himself | 2004 | 230,149 | 4.9 | 2 |
| Game Over: 'Resident Evil' Reanimated (video documentary) - Himself | 2004 | 106,384 | 5.3 | 4 |

| Other (1 title) | Year | MOVIE Meter | User Rating | User Votes |
|---|---|---|---|---|
| Army of Two: The Devil's Cartel (video game) - Actor | 2013 | | | |

| Archive Footage (1 title) | | | | Year |
|---|---|---|---|---|
| Friday the 13th (TV series) - Greg Mazzey (1 episode, 1989) | | | | |
| Face of Evil (1989) - Greg Mazzey | | | | 1989 |

**Biography**
Zack Ward was born in 1970. He wanted to act, but his mom, an actress herself, wanted her son to be normal, and would not let him. Finally, his brother intervened, allowing Zack the chance to act. After a year of the small stuff, he got his first big audition for the '80s classic A Christmas Story. About 300 kids showed up for the part (originally he was the sidekick...more »

update    You may report errors and omissions on this page to the IMDb database managers. They will be examined and if approved will be included in a future update. Clicking the 'Edit page' button will take you through a step-by-step process.

Subscriber Agreement | Contact IMDb | Press Room | Privacy Policy | Copyright | Cancel

EXHIBIT E PAGE 244                                                 8/10/2012

# IMDbPro

Search [                    ]  Go                    Morgan Sloane's account | Logout | Help

Careers     Industry Directory     In Production     STARmeter     Box Office     News

## Zack Ward

Main Details  Filmography  Personal Details  Media  Contact  Clients/Coworkers

**Main Details**
STARmeter
**Filmography**
Summary
Year
Profession
Title Type
TV Series
Credited Name
Genre
Keyword
Budget
**Box Office**
Ratings
Votes
**Personal Details**
Biography
Quotes
Trivia
Other Works
Awards
Message Board
**Media**

Official Photos
Publicity
News Articles

Web Sites
Titles for Sale
**Contact**
Clients/Coworkers

### Contact Information

to Jump to: Representation

### Representation

| Company | Agent | Type | Address | Contact |
|---|---|---|---|---|
| Harrison Stokes | | Manager | 8730 W. Sunset Blvd Suite #270 West Hollywood, CA 90069 USA | Phone: 424-288-4363 Fax: 424-249-3362 |
| Independant Artists (I) | Ferenc Laszlo | Talent Agent-Voice | 9601 Wilshire Blvd. Ste. 750 Beverly Hills, CA 90210 USA | Phone: +1 310 550 5000 Fax: +1 310 550 5005 |
| Anderson Group Public Relations | Liza Anderson | Publicist | 8060 Melrose Ave 4th Fl Los Angeles, CA 90046 USA | Phone: +1 323 655 1008 Fax: +1 323 655 1048 http://andersongrouppr.com lagpr@andersongrouppr.com |

update    You may report errors and omissions on this page to the IMDb database managers. They will be examined and if approved will be included in a future update. Clicking the 'Edit page' button will take you through a step-by-step process.

Subscriber Agreement | Contact IMDb | Press Room | Privacy Policy | Copyright | Cancel

EXHIBIT E PAGE 245

# EXHIBIT B

EXHIBIT E PAGE 244

Marc Mostman
President, MOST MANAGEMENT LLC

_____

Biography

Marc Mostman, the president and founder of MOST MANAGEMENT, is an accomplished licensing and marketing executive with over fifteen years of experience in the entertainment licensing industry. MOST MANAGEMENT was launched in 2002 and is dedicated to maximizing licensing opportunities and building brand equity for clients that include movie studios, television production companies, videogame companies, corporate brand owners, comic book publishers, artists and more.

Over the years, Marc has created full-scale merchandising programs for properties ranging from classic children's brands such as Disney, to movies (The Twilight Saga, The Hunger Games), television shows (The Walking Dead, Star Trek, Doctor Who), animation (Astro Boy, Mega Man), video games (Angry Birds, Pac-Man, Street Fighter, Tomb Raider) and comic books (The Crow). Marc brings his expertise, strong industry relationships and unique passion to MOST MANAGEMENT's clients. Marc has worked in all facets of merchandising including sales, marketing, product development, business development, and business affairs.

In 2005, MOST MANAGEMENT partnered with STRIKER ENTERTAINMENT to begin representing Lionsgate and launched the SAW merchandise program. Since that time, the team has worked together on The Twilight Saga franchise from Summit Entertainment, Angry Birds, the mobile game from Rovio Entertainment, The Hunger Games book and feature film franchise from Lionsgate, Real Steel from DreamWorks Studios, and The Walking Dead from AMC. Marc has received 11 Licensing Industry Excellence Awards, including the Overall Best Licensing Program of the Year for The Twilight Saga: New Moon in 2009 and Angry Birds in 2011.

Prior to establishing MOST MANAGEMENT, Marc served at Viacom Consumer Products, the licensing division for Paramount Studios, as the Executive Director of Domestic Licensing and was responsible for several key worldwide interactive and toy initiatives. Marc also served at the Walt Disney Company, overseeing business development in the online/interactive marketplace for Disney Interactive. Marc began his licensing career at Entertainment Licensing Associates, where he served as the Director of Licensing and Business Affairs. He was responsible for re-launching several classic franchises and was instrumental in selling feature film deals and various animated series. He also managed a worldwide network of foreign agents. Marc is currently the West Coast Regional Representative for L.I.M.A. (Licensing Industry Merchandisers' Association). Marc holds a B.A. in History from the University of California, Berkeley, a J.D. from Loyola Law School, and is an active member of the California Bar.



EXHIBIT E PAGE 247

<u>PROOF OF SERVICE</u>

<u>STATE OF CALIFORNIA, COUNTY OF LOS ANGELES</u>

I am employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within entitled action; my business address is 1901 Avenue of the Stars, Suite 1600, Los Angeles, California 90067-6055.

On **August 17, 2012**, I served the following document(s) described as **DEFENDANT NATIONAL ENTERTAINMENT COLLECTIBLES ASSOCIATION, INC.'S AND JOEL WEINSHANKER'S EXPERT DISCLOSURE [FED. R. CIV. P. 26(a)(2)]** on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

Randall S. Newman, Esq.
RANDALL S. NEWMAN, P.C.
37 Wall Street, Penthouse D
New York, New York 1005
Telephone: (212) 797-3737
Facsimile: (212) 797-3172
E-mail: rsn@randallnewman.net

**BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **August 17, 2012**, at Los Angeles, California.

Brenda J. Smith